FILED & ENTERED

SEP 08 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell   DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SWING HOUSE REHEARSAL AND RECORDING, INC.,<br><br>               Debtor. | Lead Case No. 2:16-bk-24758-RK<br><br>Chapter 11<br><br>Jointly administered with:<br><br>Case No. 2:16-bk-24760-RK<br><br>Converted to Chapter 7 |
| In re:<br><br>PHILIP JOSEPH JAURIGUI,<br><br>               Debtor. | |
| JONATHAN MOVER,<br><br>               Plaintiff,<br><br>v.<br><br>PHILIP JOSEPH JAURIGUI,<br><br>               Defendant. | Adv. No. 2:18-ap-01351-RK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL ON COMPLAINT FOR NON-DISCHARGEABILITY UNDER 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) AND (a)(6) AND OBJECTION TO DISCHARGE UNDER 11 U.S.C. §§ 727(a)(2) AND (a)(4)** |
| x Affects Philip Joseph Jaurigui Only. | |

1

I.    INTRODUCTION

2        The undersigned United States Bankruptcy Judge conducted the trial in this adversary

3  proceeding on August 19, 2021, August 20, 2021, September 2, 2021, September 3, 2021,

4  September 17, 2021, September 27, 2021 and April 20, 2022 on Plaintiff Jonathan Mover's

5  Complaint, Adversary Proceeding No. 2:18-ap-01351-RK, for Nondischargeability under 11

6  U.S.C. §§ 523(a)(2)(A), (a)(2)(B), (a)(6) and Objection to Discharge under §§ 727(a)(2) and

7  (a)(4), against Defendant Philip Joseph Jaurigui along with Plaintiff Swing House Rehearsal

8  and Recording, Inc.'s Complaint, Adversary Proceeding No. 2:18-ap-01352-RK for

9  Nondischargeability under 11  U.S.C. §§ 523(a)(4) and 523(a)(6) and Objection to Discharge

10  under 11 U.S.C. § 727(a)(4).  Steven R. Fox and Janis G. Abrams, of the Fox Law Corporation,

11  Inc., appeared for Plaintiffs Jonathan Mover ("Mover") and Swing House Rehearsal and

12  Recording, Inc. ("Swing House"), and Leonard Pena, of the law firm of Pena & Soma, APC,

13  appeared for Defendant Philip Joseph Jaurigui (Jaurigui").

14        After the close of the evidence, the court ordered the parties to lodge proposed findings

15  of fact and conclusions of law, which they did on March 20, 2022 and April 7, 2022

16  respectively [Electronic Case Filing ("ECF") 142 and 143].  On April 20, 2022, the court

17  conducted a final hearing at which time the court heard closing arguments from the appearing

18  parties after the submission of the proposed findings of fact and conclusions of law.  The

19  findings of fact and conclusions of law set forth below only relate to Adversary Proceeding No.

20  2:18-ap-01351-RK.

21        By his Complaint, Plaintiff Mover seeks an award of damages against Defendant

22  Jaurigui on his claims for monetary damages to be excepted from discharge under 11 U.S.C. §§

23  523(a)(2)(A), 523(a)(2)(B) and 523(a)(6) alleging fraud by Jaurigui, inducing Mover to make

24  an initial loan to Jaurigui and Swing House in the sum of $150,000, and a subsequent $50,000

25  loan to Swing House that Jaurigui guaranteed and also inducing Mover to execute agreements

26  with Swing House which include a Consulting Agreement and an Equipment Lease

27  Agreement, and declaratory relief that Jaurigui be denied a discharge of his debts under 11

28  U.S.C. §§ 727(a)(2) and 727(a)(4), alleging that Jaurigui with intent to hinder, delay or defraud

a creditor transferred or concealed his property of approximately $140,000 in home equity within one year of the filing of his bankruptcy case and made false oaths on his bankruptcy schedules.

On May 5, 2021, the court entered its Order Approving Joint Pre-Trial Stipulation, Scheduling Further Pre-Trial Conferences and Trial and Setting Trial Procedures [ECF 60] admitting into evidence each of the documents listed in the parties' Pre-Trial Stipulation, based on the parties' Joint Pre-Trial Stipulation [ECF 56 at Appendixes 1 and 2]. Also, Defendant Jaurigui's request to add Exhibit K, certificate of occupancy for 3229 W. Casitas Avenue, Los Angeles, California 90039: Bates No. 0602, into evidence was granted.

At trial, the court received into evidence the declarations of Jonathan Mover ("Mover Dec.") [ECF 70], Alan Friedman (Friedman Dec.) [ECF 71], Genoveva Winsen ("Winsen Dec.") [ECF 72], Philip J. Jaurigui ("Jaurigui Dec.") [ECF 73], and Jared James Nichols ("Nichols or Jared Dec.") [ECF 74], subject to the court's orders on the Evidentiary Objections.

At trial, the court granted Plaintiffs' Request for Judicial Notice [ECF 78], receiving into evidence the exhibits listed therein.

**Plaintiff's Exhibits**

| No. | Description |
| --- | --- |
| 1. | Mover's Proof of Claim No. 7 filed in Swing House Bankruptcy Case: Bates No. 2313. |
| 2. | Mover's Proof of Claim No. 8 filed in Swing House Bankruptcy Case: Bates No. 2328. |
| 3. | Casitas Lease, Bates No. 0758-0812. |
| 4. | Casitas Certificate of Occupancy: Bates Nos. 0602-0605. |
| 5. | City of Los Angeles Memos re Zoning: Bates Nos. 0431-0601. |
| 6. | Swing House Offering Memorandum, Solicitation Package: Bates Nos. 2167-2253. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

| No. | Description |
|---|---|
| 7. | Swing House Subordinated Convertible Note dated July 23, 2014. |
| 8. | Casitas Construction Contracts with Amendments, Bates Nos. 0816-0838; 1046-1175; 2137. |
| 9. | Los Angeles Department of Building and Safety (LADBS) certificate information re: 3227 W. Casitas Ave.: Bates Nos. 0814-0815. |
| 10. | Jaurigui e-mail re construction cost: Bates Nos. 0750-0751. |
| 11. | Casitas Construction Management Contracts: Bates Nos. 0752-0757. |
| 12. | Declaration Pages from Swing House's insurance policies re use as recording studio; Swing House: Bates Nos. 2725-2754. [1] |
| 13. | Swing House Advertisement re Recording Studio: Bates No. 2500. |
| 14. | Swing House D'Addario Convertible Note dated July 7, 2014: Bates Nos. 2638-2664. |
| 15. | Omitted/Skipped |
| 16. | Swing House, Minutes of Board of Directors, April 8, 2015: Bates Nos. 2509-2510. |
| 17. | Swing House, Minutes of Board of Directors, May 20, 2015: Bates No. 2511. |
| 18. | Swing House, Minutes of Board of Directors, June 1, 2015: Bates No. 2512. |
| 19. | Swing House, Minutes of Board of Directors, December 14, 2014: Bates No. 2513. |
| 20. | 7175 WB/Swing House Lease: Bates Nos. 1235-1265. |
| 21. | 7175 WB Permit Plan re sound stage: Bates Nos. 0917-0939. |
| 22. | Eve Steele demand e-mail September 2014: Bates Nos. 0885-0889. |

---

[1] The Bates numbers listed for Exhibit 12 are taken from Plaintiff Mover's proposed findings of fact and conclusions of law, but the court cannot verify the accuracy of such numbering because there are no Bates numbers on the court's copy of the exhibits.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

| No. | Description |
|-----|-------------|
| 23. | 7175 WB's 3-Day Notice: Bates Nos. 1176-1181. |
| 24. | 7175 WB's Summons and Complaint for Unlawful Detainer: Bates No. 1182. |
| 25. | Certificate of Occupancy-Willoughby: Bates Nos. 1266-1267. |
| 26. | Artist Contracts for Jared and The Tender Box: Bates Nos. 1866-1898; 1912-1984. |
| 27. | Artist Contracts and Related Material for Jared and The Tender Box: Bates Nos. 1866-1877; 2080-2090. |
| 28. | Kobalt Reports: Bates Nos. 0861-0883; 1994-1999; 2006-2009, |
| 29. | Jaurigui e-mail re Kobalt: Bates No. 2081. |
| 30. | Jaurigui e-mail re recording studio: Bates Nos. 0633-0634. |
| 31. | Jaurigui e-mail re recording studio: Bates Nos. 0748-0749. |
| 32. | Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 5, 2018. |
| 33. | Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018. |
| 34. | Silent Music Box Kobalt Statements 2020: Bates Nos. 3511-3526. |
| 35. | Melanie Barker e-mail re Kobalt Silent Music Box, Master Sync Payment: Bates Nos. 3518-3522. |
| 36. | June 12, 2018 e-mails re Sunset Strip Music Festival event: Bates Nos. 3523-3526. |
| 37. | Jaurigui Expenses 2017-2018: Bates No. 3683. |
| 38. | Swing House Income by Customer Summary, January 2009 to December 2020: Bates Nos. 3527-3650. |
| 39. | Jared Tour Dates Printout: Bates Nos. 3651-3682. |
| 40. | Rentals Event Quarterly Reports 2013-2018: Bates No. 3699. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

| No. | Description |
|---|---|
| 41. | Swing House Profit & Loss Statements for 2017 and 2018 and Income by Customer Summaries for January 2009 to December 2015: Bates Nos. 3700-3799. |
| 42. | E-mails re Sunset Strip Music Festival Event: Bates Nos. 3800-3820. |
| 43. | Swing House Ledger Printout for Sunset Strip Music Festival: Bates Nos. 3802-3820. |
| 44. | Jaurigui e-mail dated July 17, 2013: Bates Nos. 3820-3827. |
| 45. | Swing House Note to Jaurigui: July 3, 2014. |
| 46. | Swing House e-mails: Bates Nos. 1403-1416; 2725-2751. |
| 47. | E-mails advising Jaurigui re construction: Bates Nos. 2501-2504; 2740-2744. |
| 48. | E-mails re Knitting Factory and Invoice re DLBA:  Bates Nos. 3381-3390. |
| 49. | E-mails re East of Eli commission:  Bates Nos. 2668-2681. |

**Defendant's Exhibits**

| No. | Description |
|---|---|
| A. | Deposition Transcript of Jonathan Mover January 31, 2020. |
| B. | Deposition Transcript of Genoveva Winsen January 29, 2020. |
| C. | Email Dated 11/7/2014 Melman to Benjamin Kacev: Bates No. 009000. |
| D. | Email Dated 9/1/2016 from Mover to S. Ahmed: Bates No. 009002. |
| E | Email chain dated 9/6/2018: Bates Nos. 009003-009012. |
| F. | Corrected Form 2017 1099 MISC: Bates Nos. 009024-009025. |
| G. | Email Dated 9/7/2018 from Eduardo Vivas to Jaurigui: Bates Nos. 009026-009031. |
| H. | Email Dated 2/6/2014 from J. Mover to Jaurigui: Bates Nos. 009032-009033. |
| I. | Martin McNair Letter Dated 5/30/2001: Bates No. 1079. |
| J. | Plaintiff's Designated Exhibits. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

| K. | Certificate of Occupancy for 3229 W Casitas Ave 90039: Bates No. 0602. |
| L. | Offering Memorandum, Solicitation Package: Bates Nos. 2218-2313 |
| M. | E-mail exchange Jaurigui and Eve Steele Dated 8/24/14: Bates Nos. 0884-0888. |
| N. | Tender Box Recording Expenses Ledger: Bates Nos. 2006-2009 |
| O. | Swing House Rehearsal & Recording, Inc., Transaction Report: Bates Nos. 2665-2666. |
| P. | Willoughby Lease: Bates Nos. 1235-2666. |

**Documents Subject to Judicial Notice**

| 50 | Debtor Philip J. Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Chapter 7 Case, ECF 17 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 51 | Debtor Philip J. Jaurigui's Amended Schedules, ECF 21 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 52 | Debtor Philip J. Jaurigui's Statement of Financial Affairs, ECF 41 in Jaurigui Bankruptcy Case, No. 2:16-bk-24760-RK. |
| 53 | Swing House Rehearsal and Recording, Inc.'s Bankruptcy Schedules, ECF 41 in Swing House Bankruptcy Case, No. 2:16-bk-24758 |
| 54 | Swing House's Statement of Financial Affairs, ECF 41 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |
| 55 | Fourth Amended Plan of Reorganization dated April 16, 2018, for Swing House, ECF 354 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |
| 56 | Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018, ECF 594 in Swing House Bankruptcy Case, No. 2:16-bk-24758. |

The court hereby issues the following findings of fact and conclusions of law after considering the evidence received at trial[2] and the other papers and pleadings relating to this adversary proceeding pursuant to Federal Rule of Civil Procedure 52, made applicable here by the Federal Rule of Bankruptcy Procedure 7052.

## II.    FINDINGS OF FACT

1.    Jaurigui filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., in this Bankruptcy Court on November 8, 2016.  Jaurigui's Chapter 11 bankruptcy case was converted to one under Chapter 7 of the Bankruptcy Code on July 12, 2018.  Joint Pre-Trial Statement ("JPTS")[3], ECF 56, ¶¶ D, E.

2.    Jaurigui in his trial testimony acknowledged that he read and signed his bankruptcy petition, schedules, and statements under penalty of perjury.  Tr. at 79:14-15 (Jaurigui Testimony, Sept. 27, 2021).

3.    Swing House is and all times relevant hereto is a California corporation.  JPTS, ¶ A.

4.    Swing House filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., in this Bankruptcy Court on November 8, 2016.  Swing House's Bankruptcy Petition, Case No. 2:16-bk-24758-RK Chapter 11, ECF 1.

5.    Jaurigui was Chief Executive Officer ("CEO") and majority shareholder of Swing House from 2000 through 2018 as well as its president and secretary until he resigned in

---

[2] The court has reviewed the proposed findings of fact and conclusions of law from the parties, and based on its independent review of these proposed findings of fact and conclusions of law and the evidence received during trial, and consideration of the written and oral arguments of the parties, and further deliberations after closing arguments, the court is adopting many of the proposed findings of fact and conclusions of law of Plaintiff  Mover, which better reflects the evidence in the record than Defendant Jaurigui's, though the court has made substantial modification and corrections to the record cited in Plaintiff Mover's proposed findings of fact and conclusions of law.  The court also adopts references to the Transcript submitted by Plaintiff Mover in the Declaration of Janis G. Abrams, ECF 137, filed on March 28, 2022, which are noted as "Tr."  The declaration of Ms. Abrams, who is one of Plaintiff Mover's attorneys, sets forth accurate summaries of the trial testimony, including many verbatim quotations from the trial testimony.

[3] Throughout these Findings of Fact and Conclusions of Law, references will be made to the Joint Pretrial Stipulation  ("JPTS") [ECF 56], the trial declarations of Jonathan Mover ("Mover") [ECF 70], Alan Friedman ("Friedman") [ECF 71], Genoveva Winsen ("Winsen") [ECF 72], Philip J. Jaurigui ("Jaurigui") [ECF 73], and Jared James Nichols ("Jared" or "Nichols") [ECF 74].

June 2018, following the confirmation hearing of the Fourth Amended Plan of Reorganization in Swing House's Chapter 11 bankruptcy case.  Swing House's Statement of Financial Affairs and Corporate Ownership Statement; ECF 41 in Case No. 2:16-bk-24758-RK; Motion for Order Approving and Directing Legal Expenses by President at 10, ¶ 1, ECF 446 in Case No. 2:16-bk-24758-RK; JPTS ¶ F.

6.      Jaurigui assisted in the preparation of Swing House's Chapter 11 Bankruptcy Petition and Schedules and executed each of them under the penalty of perjury on Swing House's behalf.  Tr. at 79:8-12 (Jaurigui Testimony, Sept. 27, 2021).

7.      Mover is an individual and a Swing House shareholder.  JPTS ¶ B.

8.      Mover and Jaurigui met in 2013, introduced by a mutual business acquaintance, after which Jaurigui pursued Mover as an investor and/or lender to Swing House.  JPTS ¶ L.

9.      Jaurigui told Mover that Swing House operated a recording studio.  Mover Dec., ¶ 10; Tr. 2:17 (Mover Testimony, Aug. 19, 2021).

10.      For more than 40 years, Mover has had a successful career as a professional musician, primarily as a drummer, producer, engineer, and composer.  Mover also co-owned and then solely owned and operated a recording studio known as Alien Flyers and thereafter known as Skyline Digital or Skyline Recording Studios NYC, hosting a variety of artists.  In 2006, Mover co-founded Drumhead Magazine and in 2014 became its sole owner, Managing Member and Editor-in-Chief.  Mover Dec. ¶ 8.

11.      From 1995 to 2012, Mover owned and operated Skyline Recording Studios NYC in New York, New York (Manhattan).  JPTS ¶ L; Tr. at 2:9-12 (Mover Testimony, Aug. 19, 2021).

12.      D'Addario & Co., Inc. ("D'Addario Co.") is a privately held company and manufacturer of musical instrument strings and accessories that is headquartered in New York. James ("Jim") D'Addario is its president.  Jaurigui Dec. ¶ 44; Mover Dec. ¶ 25.  In 2013, Jaurigui had worked with D'Addario Co., for nearly 9 years as an independent contractor and a co-tenant when he approached it about investing in Swing House.  Jaurigui Dec. ¶¶ 44-45.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1   13.     Mover relocated to Los Angeles from the East Coast in November 2015 to co-

2   manage Swing House with Jaurigui at D'Addario Co.'s insistence.  Mover Dec. ¶¶ 35-36.

3   14.     Mover is one of Jaurigui's creditors because Jaurigui and Swing House

4   borrowed $150,000 from Mover on July 23, 2014.  Proof of Claim, Exhibit 1; Subordinated

5   Convertible Promissory Note, Exhibit 7; Declaration of Jonathan Mover ("Mover Dec."), ECF

6   70, ¶ 13.

7   15.     Mover is also one of Jaurigui's creditors because Swing House borrowed

8   $50,000 from Mover on September 8, 2014, for which Jaurigui executed a Personal Guarantee.

9   Mover Dec. ¶ 42; Mover's Proof of Claim No. 8, Exhibit 2 at 4-5.

10   16.     Mover asserts that Jaurigui is indebted to Mover in the sum of $235,554 as of

11   March 29, 2022 from these loans, based on the following calculation.

| 07/23/14 | Subordinated Convertible Promissory Note [4] @ 4.5% interest per annum[5] | $150,000 |
|---|---|---|
| | Interest from 7/23/14 to 7/22/21 | 47,250 |
| | $18.50 Daily interest from 7/23/21 to 3/28/22 (240 days)* | 4,440 |
| | Less: Amounts Disbursed to Class 6 Creditors in Swing House Bankruptcy Case based on Assignment of Class 1 to Class 7 | (16,136)[6] |
| 09/08/14 | Unsecured Promissory Note | 50,000 |

---

[4] Mover in his proof of claim asserted that the note was secured based on a recorded UCC-1 financing statement issued by Swing House.  Mover made the $150,000 loan pursuant to Swing House's private offering of common stock and convertible promissory notes solicited through Swing House's Confidential Private Offering Memorandum ("Offering Memorandum") dated February 17, 2014 that Jaurigui transmitted to him on behalf of Swing House in February 2014.  Mover Dec. ¶ 13;  Mover's Proof of Claim No. 7 in Swing House Bankruptcy Case, Exhibit 1; Offering Memorandum, Exhibit 1 at 1 and 55

[5] Mover in his proposed findings of fact and conclusions of law set forth the interest computations without supporting declarations or other testimony under penalty of perjury as follows: $150,000 x .045=$6,750.00 per annum.  $6755/365 = $18.50/per diem.  Plus $18.50 per diem from March 29, 2022 until date of judgment.

[6] Genoveva Winsen, Swing House's Chief Financial Officer, testified that Swing House in its bankruptcy case disbursed $16,136 to Class 6 claimants, *infra.* Tr. 35:8 (Winsen Testimony, Sept. 3, 2021).

| | | |
|---|---|---|
| | ~~10% interest from 9/8/14 to 11/8/16~~ | ~~10,833~~ [7] |
| | | ~~$246,387~~ $235,554 |

As set forth herein, the court finds that Jaurigui is indebted to Mover in the principal amount of $200,000 for the two loans he made to Swing House and Jaurigui either as borrower or guarantor, plus interest on the $150,000 loan that Jaurigui is the co-borrower with Swing House. However, Mover will need to submit a computation of interest in a declaration under penalty of perjury in order for the court to enter a final judgment which includes interest on the principal amount of the debt.

17.    Mover became the co-CEO of Swing House in 2015 and its CEO in June 2018 and has been the Chair of the Board of Directors of Swing House since the Effective Date of the Plan, November 19, 2018. Mover Dec. ¶ 6.

18.    Mover's Fourth Amended Plan of Reorganization in Swing House's Chapter 11 bankruptcy case was confirmed by the court over Swing House's objection on November 2, 2018 when the court entered the Order Confirming Fourth Amended Plan of Reorganization on November 2, 2018 in Case No. 2:16-24758-RK, ECF 594, Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018, Exhibit 56. [8]

19.    The Effective Date of Swing House's confirmed Chapter 11 Plan of Reorganization was November 19, 2018. Case No. 2:16-24758-RK, ECF 594, Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018 at 12:3-5, Exhibit 56.

20.    Jaurigui was ousted as president of Swing House and his shares in Swing House were canceled pursuant to the order confirming the Fourth Amended Plan of Reorganization in

---

[7] The court disallows contractual interest on the $50,000 loan guaranteed by Jaurigui requested by Mover because the language of the personal guarantee limited the amount of the guarantee to $50,000 and did not provide for accrual of interest. Exhibit 2 at 5.

[8] Exhibit 56 is one of the exhibits that Plaintiff Mover requested the court to take judicial notice as previously stated.

Swing House's Chapter 11 bankruptcy case.  Order Confirming Fourth Amended Plan of Reorganization Dated April 16, 2018 entered November 2, 2018, ECF 594 in Case No. 2:16-24758-RK, Exhibit 56.

21.     Genoveva Winsen ("Winsen") has been Swing House's Chief Financial Officer ("CFO") since 2015 and is a Custodian of Records for Swing House.  Declaration of Genoveva Winsen ("Winsen Dec."), ECF 72, ¶¶ 2-4.

22.     Winsen has been in the music industry for more than 20 years as a recording engineer, a music producer, a recording studio owner, a construction consultant, and a financial and administrative manager of Drumhead Magazine, a drum and percussion instrument magazine. Winsen Dec. ¶¶ 5-6.

23.     Swing House provides comprehensive rehearsal sound stage and engineering services, live production events and rental services for the music industry.  Swing House's Confidential Private Offering Memorandum ("Offering Memorandum") dated February 17, 2014, Exhibit 6 at 61-62; Winsen Dec. ¶ 8.

24.     Swing House in its Offering Memorandum represented that Swing House engaged in artists' development by investing in talent by, for example, paying expenses for making recordings and touring and providing rehearsal space. Offering Memorandum, Exhibit 6 at 8 (Artists Management Revenue and Expenses for year ending 2013); Exhibit 6 at 10 (Artists Management Revenue and Expenses for year ending 2012); and Exhibit 6 at 61 (Description of Services Offered); *see also,* Winsen Dec. ¶ 9.

25.     Exhibit 6 at 1 is the e-mail from Jaurigui on behalf of Swing House to Mover and his accountant, Friedman, dated February 19, 2014, transmitting the Offering Memorandum to them.  Tr. 53:18 (Jaurigui Testimony, Sept. 17, 2021).  Jaurigui's signature block on this Swing House e-mail of February 19, 2014 that he used from at least February 19, 2014 and for a period of years was:

> *Phil Jaurigui-President Swing House,*
> *Artist Management/Event Production/A&R*
> *cell: 323-819-4895,*
> *www.swinghouse.com*

Exhibit 6 at 1; Tr. 53:12 and 53:21 (Jaurigui Testimony, September 17, 2021).

26.    Jaurigui in his trial testimony stated that he intended his signature block to encompass "everything" he did professionally at the time and that it was up to the recipient to determine whether he sent an email as Swing House's principal, or on his own, based on a recipient's "best bet" to figure out whether Jaurigui was communicating on behalf of Swing House or in his personal capacity, based on the e-mail's content.  Tr. 53:26-54:5 (Jaurigui Testimony, Sept. 17, 2021).

27.    Jaurigui used Swing House e-mail for his non-Swing House related business.  Tr. 53-10-21 (Jaurigui Testimony, Sept. 17, 2021).

28.    Jaurigui did Artist Management work, but also worked for Swing House.  Tr. 53:14 (Jaurigui Testimony, Sept. 17, 2021).

29.    According to Jaurigui in his trial testimony, in 2014, Jaurigui, not Swing House, did Artist Management work.  Tr. 54:15 (Jaurigui Testimony, Sept. 17, 2021).  The court finds this testimony to be credible.

30.    Jaurigui's opinion of the definition of Artist Management is someone who helps guide the career of an artist, a manager or consultant.  Tr. 54:15 (Jaurigui Testimony, Sept. 17, 2021).

31.    "A&R" stands for "Artist Relations" or "Artist Repertoire."  Tr. 53:16 (Jaurigui Testimony, Sept. 17, 2021).

32.    Jaurigui in his trial testimony stated that he did A&R work, but that Swing House did not do A&R work.  Tr. 53:17 (Jaurigui Testimony, Sept. 17, 2021).  According to Jaurigui, he personally managed The Tender Box as his, not Swing House's, artists.  Jaurigui Dec. ¶¶ 91, 93. Jaurigui allowed The Tender Box to incur expenses to Swing House for the recording of their music.  Jaurigui Dec. ¶ 92; Tr. at 58:4-8 (Jaurigui Testimony, September 17, 2021).  According to Jaurigui, The Tender Box agreed to repay the expenses owed to Swing House, using the royalties collected by Kobalt, plus a 10 percent administrative fee for administering the funds collected to pay the artists, producers, songwriters and Jaurigui as the manager.  Jaurigui Dec. ¶¶ 91-96; Tr. at 58:5-6 (Jaurigui Testimony, September 17, 2021).  In response to a question to Jaurigui on cross-

1   examination whether Swing House has contractual rights to any monies emanating from the work

2   of The Tender Box for paying its expenses, Jaurigui responded that Swing House is owed money

3   for expenses on recording and rehearsal if there were any, but he stated that he did not think that

4   there was any outstanding expense.  Tr. at 58:5-8 (Jaurigui Testimony, September 17, 2021); *see*

5   *also,* Exhibit N, Tender Box Recording Expenses Ledger.  Jaurigui was then asked whether, based

6   on his testimony, it was a fair statement that he was using Swing House's resources for his personal

7   gain, and he responded no.  Tr. at 58:8-9 (Jaurigui Testimony, September 17, 2021).  Despite

8   Jaurigui's denial that he may have been using Swing House's resources for his personal gain in

9   allowing his personally managed clients like The Tender Box and Jared by having Swing House

10  advance their expenses, the court finds Jaurigui's testimony about the agreement between him, The

11  Tender Box and Swing House to be credible.  As discussed below, Swing House recouped its

12  expenses advanced to The Tender Box as shown on its ledger of such expenses.  *See, e.g.,* Exhibit

13  N, Tender Box Recording Expenses Ledger.

14          33.       As to the artist, Jared James Nichols, as Jared's manager, Jaurigui allowed Jared

15  use of Swing House's rehearsal and recording studios during off hours, even though Jared was

16  Jaurigui's personal client, and in exchange Jared worked at Swing House performing odd jobs

17  which was credited against his rehearsal and recording expenses.  Jaurigui Dec. ¶ 75; Tr. at 59:3-9,

18  61:21-27 (Jaurigui Testimony, September 17, 2021).  This agreement was not in writing and was

19  between Jared, Jaurigui in his personal capacity and Jaurigui as president of Swing House.  Tr. at

20  61:25-62:1 (Jaurigui Testimony, September 17, 2021).  Jaurigui did not provide supporting

21  documentation showing the hours that Jared worked at Swing House.  Tr. at 57:10 -25, 62:2-22

22  (Jaurigui Testimony, September 17, 2021).  Despite Jaurigui's denial that he may have been using

23  Swing House's resources for his personal gain in allowing his personally managed clients like The

24  Tender Box and Jared by having Swing House advance their expenses, the court finds Jaurigui's

25  testimony about the agreement between him, the court finds Jaurigui's testimony about the

26  agreement between him, Jared and Swing House to be credible.  As discussed below, Swing House

27  recouped some, if not all, of its expenses advanced to Jared.  *See, e.g.,* Declaration of Jared James

28  Nichols (describing his barter for use of Swing House rehearsal facilities by doing odd jobs).

34.     Swing House's Offering Memorandum stated that Swing House provides A&R Services.  Exhibit 6 at 61.  The profit and loss statement for Swing House for 2013 in the Offering Memorandum indicated income from artist management fees and artist management expenses for artists, including Jared James Nichols and The Tender Box. Exhibit 6 at 8-9.  Pro forma profit and loss statements for Swing House for November 2013 through October 2016 also indicated income from artist management fees and artist management expenses for artists, including Jared James Nichols. Exhibit 6 at 18-26.  Jaurigui in his trial testimony admitted that the listings of artist management fee income and expenses for Jared James Nichols on these financial statements were in error because he, not Swing House, was personally managing Jared James Nichols.  Tr. at 55:17 – 56:19, 59:3-9 (Jaurigui Testimony, September 17, 2021).  Jaurigui acknowledged that listing artist management fee income and expenses for Jared and The Tender Box was "possibly a mistake," but denied that it was "okay" to make misrepresentations in the Offering Memorandum.  Tr. at 62:27 (Jaurigui Testimony, September 17, 2021).  In his trial testimony, Jaurigui denied that the only reason why artist management fee income and expenses for Jared and The Tender Box were in Swing House's Offering Memorandum was because Swing House had contractual rights in their music and performances and because he did not want to misrepresent the status of Swing House's rights in Jared and The Tender Box.  Tr. at 62:24-27 (Jaurigui Testimony, September 17, 2021).  Because the court finds Jaurigui's testimony about the agreements between him, The Tender Box, Jared and Swing House to be credible, the court finds that Swing House generally did not have contractual rights in their music and performances other than in specific written contracts between them offered into evidence as discussed herein.

35.     Swing House did Event Production.  Tr. 54:12 (Jaurigui Testimony, Sept. 17, 2021); *see also,* JPTS ¶ M.

36.     In 2013, Swing House was located at 7175 Willoughby Avenue in West Hollywood, California ("Willoughby").  JPTS ¶ J.  In 2001, Jaurigui moved Swing House to Willoughby, and Swing House signed a six-year lease for Willoughby, which was extended through August 31, 2013.  Jaurigui Dec. ¶¶ 12-13.  According to Jaurigui, when Swing House moved into Willoughby, it needed to be completely remodeled to convert it from a

1  manufacturing/warehouse facility to a facility that could be used for music rehearsal and recording.

2  Jaurigui Dec. ¶ 14.

3       37.    After Swing House obtained the building permits for the construction work at

4  Willoughby, Jaurigui consulted with the contractor and architect who helped with the design

5  concepts as well as the inspectors at the Los Angeles Department of Building and Safety (LADBS)

6  in order to determine which type of permit allowed for the broadest use of the Willoughby location,

7  and Jaurigui was informed that a "sound score production" permit would allow Swing House to

8  hold rehearsal and recording sessions for film, television and internet.  Jaurigui Dec. ¶ 17.

9       38.    After Swing House obtained the building permit from the Los Angeles Department

10  of Building and Safety for Willoughby, Jaurigui estimated that approximately 70% of Swing

11  House's business was rehearsals and the remaining 30% was a combination of equipment rental

12  and recording.  Jaurigui Dec. ¶ 18.

13       39.    After operating Swing House at Willoughby for approximately 12 years, in 2013,

14  Jaurigui decided it was wise to expand the business and find a new location because the existing

15  lease was expiring and the new landlord indicated an intention to raise the rent by more than 50

16  percent.  Jaurigui Dec. ¶ 20.

17       40.    Jaurigui found a new location for Swing House in approximately January 2014 at

18  3229 Casitas Ave., Los Angeles, CA  90039 ("Casitas").  Jaurigui Dec. ¶ 21.

19       41.    On February 11, 2014, Jaurigui executed a lease on Swing House's behalf to

20  rent Casitas, which was an approximately 22,000 square foot facility.  JPTS ¶ M.

21       42.    The Casitas facility was zoned MR-1.  JPTS ¶ N; Casitas Certificate of

22  Occupancy and Application for Building Permits and Certificate of Occupancy, Exhibit 4 at 2.

23       43.    When Jaurigui executed the lease for the Casitas facility on Swing House's

24  behalf, he knew it was not zoned for use as a recording studio, but was zoned MR-1 for use as

25  a warehouse.  JPTS ¶ N; Jaurigui Dec. ¶ 22.

26       44.    The Casitas facility required significant construction to accommodate Swing

27  House's planned use of that property, including two full production sound stages for tour

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1  rehearsals, filming, events and showcases and two rehearsal rooms.  JPTS ¶ O; Jaurigui Dec. ¶

2  22; Building Plans, Exhibit 13.

3      45.    The Casitas facility also had room to accommodate a recording studio, eight

4  independent producer suites, an equipment display room and a rental and cartage department

5  for in-house and off-site productions.  JPTS ¶ O; Building Plans, Exhibit 13.

6      46.    To pay for the expansion of Swing House and buildout of the Casitas facility,

7  Jaurigui realized he needed additional resources to successfully build out the new facilities and

8  solicited Mover, D'Addario Co. and others to invest and/or lend money to Swing House

9  though its private offering of common stock and convertible promissory notes as described in

10  the Offering Memorandum transmitted by Jaurigui to them.  JPTS ¶¶ L, P, Y; Jaurigui Dec. ¶

11  34; Tr. at 54:21-26 (Jaurigui Testimony, September 17, 2021); Offering Memorandum, Exhibit

12  6.

13      47.    Swing House in its Offering Memorandum given by Jaurigui to Mover and

14  Jaurigui orally represented to Mover that Swing House was a recording studio. JPTS ¶ Y;

15  Offering Memorandum, Exhibit 6 at 18, 21, 24, 52, 60, 61, 64, 67 and 69; Mover Dec. at ¶¶ 9,

16  11 and 26; Winsen Dec. at ¶ 19.  Jaurigui acknowledged in his trial testimony that the Offering

17  Memorandum represents that Swing House is operating a recording studio and did not use the

18  phrase, "sound stage production facility (SSPF)." Tr. at 53:8, 56:20-27 (Jaurigui Testimony,

19  September 17, 2021).

20      48.    Jaurigui in his trial testimony acknowledged that he was the person in charge of

21  Swing House as its president and CEO at the time Swing House's Offering Memorandum

22  (titled "Confidential Private Offering Memorandum" dated February 17, 2014, Exhibit 6 at 53)

23  was prepared, was part of the process of preparing the Offering Memorandum and "definitely

24  contributed" to it, and did his best to make sure that the information contained in the Offering

25  Memorandum was accurate and up to date, understanding that it was important that it be

26  accurate because persons reading it would be relying on the information contained in it.  Tr.

27  54:21-55:8 (Jaurigui Testimony, Sept. 17, 2021).

28

49.    On or about February 19, 2014, Jaurigui sent Swing House's Offering Memorandum, past financial statements, financial projections, loan documents and other documents that are included in Exhibit 6, pages 1-87, to Mover and Friedman by e-mail.  JPTS ¶ W; Tr. at 9:11-12 (Mover Testimony, August 19, 2021).  E-mail correspondence between Jaurigui and Mover and Friedman and Offering Memorandum, Exhibit 6 at pages 1-87; Jaurigui Dec. ¶ 43.

50.    In his trial testimony, Jaurigui stated that he did not have an understanding that if information or facts changed after he transmitted the Offering Memorandum to potential investors, he and/or Swing House had any obligation to update the information to potential investors, saying that he only gave it to two potential investors, D'Addario Co. and Mover.  Tr. 55:9-17 (Jaurigui Testimony, Sept. 17, 2021).

51.    On or about February 19, 2014, Jaurigui and Swing House made material representations in Swing House's Offering Memorandum about Swing House's operating a recording studio at the Casitas facility to Mover because it:

a.    Incorporated a proposed floor plan for the Casitas location that shows space for a Recording Live Room and Control Room.  Offering Memorandum, Exhibit 6 at 2;

b.    Included an advertisement flyer that described Swing House as a "recording" facility."  JPTS ¶ Y; Offering Memorandum, Exhibit 6 at 52, 60, 61, 64, 67 and 69;

c.    Represented that Swing House leases space for rehearsal space and recording studio operations.  JPTS ¶ T; Offering Memorandum, Exhibit 6 at 67;

d.    Represented that Swing House operates a recording studio at its then current location at 7175 Willoughby, Los Angeles, California.  Offering Memorandum, Exhibit 6 at 52, 60, 61, 67 and 69.

e.    Swing House's *pro forma* profit and loss statements which were included as part of the Offering Memorandum, Offering Memorandum, Exhibit 6 at 18, 21, 24, provided line items for recording revenue and expenses; and

f.    Represented that Swing House was building a recording studio at the Casitas facility when it included line items for Recording Studio Sound Proofing in the sum of $20,000

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

and Recording Studio, including wiring in the sum of $25,000 in the 12-Month Cash Flow

Forecast, Offering Memorandum, Exhibit 6 at 27.

*See also,* Tr. at 56:22-57:5 (Jaurigui Testimony, September 17, 2021).

52.    In 2014, Jaurigui represented to Jim D'Addario and D'Addario Co. that Swing

House leases space for rehearsal space and recording studio operations.  JPTS ¶ T.

53.    The Application for Building Permit and Certificate of Occupancy for 3229

Casitas applied for on April 1, 2015 and issued on May 27, 2014 was to change the property's

existing use of Warehouse and Manufacturing to a proposed use of Sound Score Production.

Casitas Certificate of Occupancy and Application for Building Permits and Certificate of

Occupancy, Exhibit 4 at 3, Items 7-8.

54.    In Jaurigui's trial declaration, he explained his thinking for Swing House

applying for a "sound score production" permit for Casitas: "Given my experience with the

permitting process at [the] Willoughby location, the advice of the architects, the LADBS

inspectors and the advice of the contractors building out the Casitas location SH [i.e., Swing

House] opted to obtain a 'sound score production' permit like at the Willoughby location

because it would permit SH to offer the broadest spectrum of services to its rehearsal and

recording customers."  Jaurigui Dec.  ¶ 33.[9]

55.    With respect to Willoughby, Jaurigui explained in his trial declaration: "When

we obtained building permits for the Willoughby location, I consulted with the contractor and

architect that helped with the design concepts, as well as the inspectors at LADBS in order to

determine which type of permit allowed for the broadest use of the Willoughby location and I

was informed that a 'sound score production' permit would allow SH to hold rehearsal and

recording sessions for film, TV and internet."  Jaurigui Dec. ¶ 17; *see also,* Tr. at 52:25 – 53:8

(Jaurigui Testimony, September 17, 2021).  However, as noted above, Jaurigui knew that

Casitas was not zoned for use as a recording studio and was zoned MR-1 for use as a

warehouse.  JPTS ¶ N.

_____

[9] This testimony was offered and received for a non-hearsay purpose regarding Jaurigui's state of mind.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

56.     Casitas's MR-1 Zoning is called "Restricted Industrial Zone" by the City of Los
Angeles Zoning Department of City Planning.  City of Los Angeles, Memoranda re Zoning,
Exhibit 5 at 7.

57.     Sound score production is an allowed use under Casitas's MR-1 Zoning, Exhibit
5 at 5-11, and under Zone C2 Commercial Zone, City of Los Angeles, Memoranda re: Zoning,
Exhibit 5 at 19-31.

58.     Recording studio is not listed as an allowed use under Casitas's MR-1 Zoning in
the City of Los Angeles.  City of Los Angeles, Memoranda re Zoning, Exhibit 5 at pages 7
through 14.

59.     Recording studio is listed as an allowed use under C2 Zoning in the City of Los
Angeles.  City of Los Angeles, Memoranda re Zoning, Exhibit 5 at 19-28.

60.     The Certificate of Occupancy for Swing House's Willoughby location was for
Sound Score Production.  Willoughby Certificate of Occupancy, Exhibit 25.

61.     Swing House's property insurance declarations issued by its insurance carrier
stated that Swing House was a recording studio from at least 2004 to 2017.  Declaration Pages
from Swing House's insurance policies re use as recording studio, Exhibit 12; *see also,* Winsen
Dec. ¶ 12.  Apparently, this designation was made based on Swing House's representations to
the carrier.  *Id.*

62.     After Mover made his loans to Swing House and Jaurigui in 2014, Jaurigui
continued to represent to others that Swing House was a recording studio as shown by an email
to potential client in 2016 that Swing House was a recording studio and that the new studio
would be available in Spring 2017.  Jaurigui e-mail re recording studio, Exhibit 30; *see also,*
Winsen Dec. at ¶ 19.

63.     According to Mover, Jaurigui concealed from Mover the fact that Swing House
could not legally operate a recording studio because the Casitas property was zoned MR-1,
which did not permit the use of those premises as a recording studio under that zoning
classification.  Mover Dec. ¶¶ 11-16.  Mover in his trial testimony stated that he was not
sophisticated about zoning matters as he a music major in college, but did not finish, and had

-20-
FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

no classes in accounting, urban planning, business or zoning, and just began a professional

career as a musician.  Tr. at 8:22-23 (Mover Testimony, August 19, 2021). Mover also testified

that he had no particular knowledge about zoning in Los Angeles and relied upon Jaurigui, and

Jaurigui told him that all was legal, that is, the landlord told him that the company could

operate a recording studio.  Tr. at 8:24-25 (Mover Testimony, August 19, 2021).

64.     Prior to July 23, 2014, Mover's knowledge about Swing House's financial

affairs came exclusively from Jaurigui, including Swing House's Offering Memorandum and

the financial information accompanying the Offering Memorandum.  Mover Dec. ¶ 5; Tr. at

8:24-25 (Mover Testimony, August 19, 2021).

65.     Jaurigui represented to Mover that Swing House operated a recording studio at

7175 Willoughby Avenue, Los Angeles, California, and would be building and operating a

recording studio at Swing House's new location at the Casitas premises.  Mover Dec. ¶¶ 9-11,

19-24; Tr. at 8:24-25, 9:9-20 (Mover Testimony, August 19, 2021); Offering Memorandum,

Exhibit 6; *see also,* Proposed Finding of Fact No. 60, Mover's Proposed Findings of Fact and

Conclusions of Law, ECF 142. This testimony of Mover's indicates that Jaurigui first made

these representations when they first met in 2013, and at Jaurigui's invitation, Mover visited

Swing House at its Willoughby location, at which time Jaurigui referred to Swing House's

Willoughby location as a recording and rehearsal studio. [10]

66.     According to Jaurigui, since he founded Swing House in 1994 until he left in

2018, he had every interest that Swing House be a successful rehearsal and recording company

"as it always was."  Jaurigui Dec. ¶ 22.  Many artists recorded music at Swing House over the

24-year period that Jaurigui was there including world renowned artists like Shakira and

---

[10] Mover's testimony and proposed findings of fact are not very precise about when Jaurigui made the oral
representations to him that Swing House operated a recording studio, except during Mover's first visit to Swing
House's Willoughby location in 2013.  Mover's rather generalized testimony about oral representations by Jaurigui
that Swing House operated a recording studio implies that Jaurigui constantly referred to Swing House as a
recording studio since it is implicit in its name, Swing House Rehearsal and Recording, Inc., and more importantly,
for Mover, his testimony is corroborated by the written representations in Swing House's Offering Memorandum
that Swing House operated a recording studio which constitute Jaurigui's representations to him as such, and thus,
the court generally finds Mover's testimony to be credible regarding that Jaurigui made the representations to him
as he contends and that he justifiably relied on Jaurigui's representations to his detriment.

Aerosmith.  Jaurigui Dec. ¶ 23.   By Jaurigui's own estimation, Swing House's recording

studio activities was a substantial part of its business up to 30% of its business.  Jaurigui Dec. ¶

18 (stating "After obtaining our permit from the LADBS for the Willoughby location I

estimate that approximately seventy percent (70%) of our business was rehearsals and the

remaining thirty percent (30%) was a combination of equipment rental and recording.").

67.     Mover relied on Jaurigui's representations to him as well as the financial reports

contained in Swing House's Offering Memorandum when on July 23, 2014, Mover executed

three agreements with Swing House.  Mover Dec. ¶¶ 9-16; Tr. at 3:4-19, 8:24-25 (Mover

Testimony, August 19, 2021); *see also,* Proposed Finding of Fact No. 61, Mover's Proposed

Findings of Fact and Conclusions of Law, ECF 142. [11]

68.     Swing House's Offering Memorandum did not disclose that Willoughby

property's approved zoning use was for Sound Score Production, not for a Recording Studio.

Exhibit 6 at 1 through 88.

69.     After July 23, 2014, Mover learned the allowed use under the zoning for Swing

House's Willoughby location was for a sound score production facility, not for a recording

studio.  Mover Dec. ¶¶ 17 and 19; Tr. at 10:20-21, 12:19-22 (Mover Testimony, August 19,

2021).

70.     The Certificate Information for 3229 W. Casitas Ave.  90039 from the Los

Angeles Department of Building and Safety (LADBS) accessed on February 12, 2019 relating

to a building permit issued on July 11, 2018 for Swing House's Casitas location listed the

primary use for the location as "(23) SOUND SCORE PRODUCTION" and contained the

following work description for the permit: "EXPAND EXISTING MAZZANINE [sic], AND

ENCLOSE EXISTING COVERED LOADING DOCK IN EXISTING SOUND SCORE

PRODUCTION FACILITY WITH NO RECORDING STUDIO".  Exhibit 9, Certificate

---

[11] This finding is based on Mover's proposed finding of fact no. 61, which does not specify the three agreements
with Swing House.  Mover's testimony actually refers to four agreements with Swing House, which the court
construes from his testimony to be the agreements for the two loans he made to Swing House and Jaurigui, the
consulting agreement and the equipment lease and sale agreement.

Information for 3229 W. Casitas Ave. 90039, Los Angeles Department of Building and Safety; *see also,* Mover Dec. ¶ 20.

71.    Swing House's Offering Memorandum did not disclose that the Casitas property was not approved for use as a Recording Studio but could only be used for Sound Score Production.   Email correspondence between Jaurigui and Mover and Friedman, and Offering Memorandum, Exhibit 6 at 1 through 88.

72.    According to Mover, Jaurigui concealed from Mover the fact that Swing House could not legally operate a recording studio because the Casitas property was zoned MR-1. Mover Dec. ¶¶ 21-24; Tr. at 3:9-19 (Mover Testimony, August 19, 2021).  However, Mover's contention is validated as Jaurigui knew that Casitas was not zoned for use as a recording studio and was zoned MR-1 for use as a warehouse, and Jaurigui did not tell Mover this. *Id.;* JPTS ¶ N.

73.    On or about September 8, 2014, Mover lent Swing House the sum of $50,000 for 160 days ("Bridge Loan" or "Bridge Note") based on Jaurigui's representations that Swing House required additional funding to complete the recording studio at Casitas and for which Jaurigui executed a Personal Guaranty.  Mover Dec. ¶ 42; Tr. at 3:9-12, 10:19-23 (Mover Testimony, August 19, 2021); Mover's Proof of Claim No. 8 in Swing House's Chapter 11 bankruptcy case, Exhibit 2 at 4-5.

74.    Had Mover known the Casitas's MR-1 Zoning did not allow use of the Casitas facility as a recording studio, Mover would not have lent Swing House an additional $50,000 for the Bridge Loan, for which Mover remains unpaid.  Mover Dec. ¶¶ 21-24, 42; Tr. at 3:9-19 (Mover Testimony, August 19, 2021); Mover's Proof of Claim No. 8 with Loan Agreement and Personal Guarantee attached thereto, Exhibit 2.

75.    Mover relied on Jaurigui's representations to him, including the financial reports contained in Swing House's Offering Memorandum when in November 2015, Mover relocated to Los Angeles.  Mover Dec. ¶¶ 15-24.

76.    After July 23, 2014, and after relocating to Los Angeles in November 2015, Mover learned that Swing House never legally operated as a recording studio, but that it

housed production suites that were rented at daily or monthly rates.  Prior to 2014, Mover

lacked experience managing these types of businesses.  Mover Dec. ¶ 19.

77.    On July 7, 2014, D'Addario Co. lent Swing House $500,000, and on November

12, 2014, Jim D'Addario lent Swing House $250,000.  JPTS ¶ CC.

78.    A condition of D'Addario Co.'s loan to Swing House required that Jaurigui lend

to Swing House $50,000 in 2014, and Jaurigui agreed to such a condition.  JPTS ¶ DD.

79.    According to Mover, Jaurigui's loan of $50,000 to Swing House was a

"material" provision to him (Mover) as Mover viewed Swing House as a "failing business"

that D'Addario Co., Mover and Jaurigui were trying to "resuscitate," and that he (Mover)

"wanted [Jaurigui] to have skin in the game."  Mover Dec. ¶ 33.

80.    According to Mover, he relied on Jaurigui's representations that Jaurigui made

the $50,000 loan to Swing House in 2014 and would not have otherwise lent the $150,000 to

Swing House on July 23, 2014.  Proposed Finding of Fact No. 73, Mover's Proposed Findings

of Fact and Conclusions of Law, ECF 142, *citing* Mover Dec. ¶ 33.  However, there is no

evidence cited by Mover that Jaurigui made such representations to him since such

representations were made to D'Addario Co. as Mover in his testimony in paragraph 33 in his

declaration only states that he only "learned" about such representations, not that Jaurigui

made them to him.

81.    According to Mover's accountant, Friedman, Jaurigui's Exhibit O, Swing

House's Transaction Report from its general ledger for the period from January 1, 2014 to

March 8, 2018, is not evidence of Jaurigui's loan to Swing House in the sum of $50,000 in

2014 because the entries on Exhibit O are journal entries and are not corroborated.  Tr. at 6:10-

14 (Friedman Testimony, Aug. 19, 2021); *see also,* Friedman Dec. ¶ 10.

82.    According to Winsen, nothing in Swing House's records substantiate that

Jaurigui lent or invested $50,000 to Swing House in 2014 as he promised D'Addario Co., that

is, the journal entries of such loan or investment by Jaurigui on Swing House's general ledger,

Jaurigui's Exhibit O, are not corroborated.  Tr. 45:2-13 (Winsen Testimony, Sept. 3, 2021);

Winsen Dec. ¶ 29.

83. While the court finds that the testimony of Friedman and Winsen that nothing in Swing House's books and records evidence substantiate a loan from Jaurigui to Swing House in the sum of $50,000 in 2014 to be credible as Jaurigui did not offer evidence to corroborate any loan or investment by him of $50,000 as he promised to D'Addario Co., the testimony is irrelevant as it does not support Mover's claims that Jaurigui made misrepresentations of such a loan to him.

84. According to Mover, had he known the true facts that Swing House's leased premises did not have proper zoning for a recording studio, had undisclosed increases in its construction budget for Casitas, Swing House had lost its largest client, the Sunset Strip Music Festival, and Jaurigui did not make the $50,000 loan to Swing House as he represented to D'Addario Co., Mover would not have executed any of the contracts between Jaurigui, Swing House and Mover on July 23, 2014 or September 8, 2014.  Mover Dec. ¶¶ 9-27, 30-32.

85. Mover relied on Jaurigui's representations and the financial reports contained in Swing House's Offering Memorandum when on or about July 23, 2014, Mover lent Swing House $150,000 pursuant to the Swing House Subordinated Convertible Note ("Mover Note") and grant of security interest dated July 23, 2014 for which Mover remains unpaid on account of the note, in the principal sum of $150,000, plus interest at 4.5% per annum from July 23, 2014 through date of judgment, which he asserts through September 3, 2021 in the sum of $52,575, for a total amount owed by Jaurigui on this note of $202,575.00.  Exhibit 1, Mover's Proof of Claim No. 7 and Loan Agreement and Personal Guarantee attached thereto; Exhibit 7, Promissory Note dated July 23, 2014; Mover Dec. at    ¶¶ 12-13; Swing House's Bankruptcy Schedule D, ECF 41 in Case No. 2:16-bk-24758-RK, at page 14, number 2.4.

86. Mover relied on Jaurigui's representations and the financial reports contained in Swing House's Offering Memorandum when on July 23, 2014, Mover and Swing House executed an Equipment Sale, Lease and Option Agreement with Swing House for which Mover remains unpaid by Swing House.  Mover Dec. ¶ 15; JPTS ¶ KK; Swing House's Bankruptcy Schedule E, ECF 41 in Case No. 2:16-bk-24758-RK, at page 21, number 3.17.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

87.     Mover's inventory of recording, studio and musical instruments and equipment that he leased to Swing House pursuant to the Equipment Lease had a fair market value of $500,000.  JPTS ¶ LL.

88.     Mover relied on Jaurigui's representations and the financial reports contained in Swing House's Offering Memorandum when on July 23, 2014, Mover and Swing House executed a Consulting Agreement pursuant to which Mover was to provide consulting services to Swing House, for which Mover remains unpaid by Swing House.  Mover Dec. ¶ 16; JPTS ¶ MM; Swing House's Schedule E, ECF 41 in Case No. 2:16-bk-24758-RK, at page 21, number 3.17.

89.     In fact no. 82 of Mover's proposed findings of fact and conclusions of law, ECF 142, he asserts that Swing House owes Mover $68,645.53 in fees and $25,040 in expenses on account of the Consulting Agreement.  Exhibit 2, Mover's Proof of Claim No. 8 in Swing House's Chapter 11 bankruptcy case; *see also,* Swing House's Bankruptcy Schedule E, ECF 41 in Case No. 2:16-bk-24758-RK, at page 21 number 3.17.  The court declines to adopt this proposed finding of fact because Mover has not shown how these amounts are computed and substantiated as there is no breakdown of such amounts on his proof of claim in the Swing House bankruptcy case and because Mover has not otherwise shown that such debts arose on account of the Consulting Agreement.

90.     In fact no. 83 of Mover's proposed findings of fact and conclusions of law, ECF 142, he asserts that he relied on Jaurigui's representations to make various short-term loans to Swing House based on Jaurigui's requests when Swing House was "short" and needed infusions of money to meet expenses and that as a shareholder, Mover loaned $19,040 to Swing House to keep it afloat.  Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing Mover Testimony and Swing House's Bankruptcy Schedule E, ECF 41 in Case No. 2:16-bk-24758-RK, at page 21, number 3.17.  The court does not adopt this proposed finding of fact because Mover does not specify the alleged representations made by Jaurigui or otherwise show that such alleged representation proximately caused damages to him.

91.     On or about February 19, 2014, Jaurigui transmitted to Mover Swing House's Offering Memorandum, which represented that the construction budget for the buildout of the Casitas Facility would be $736,500 raised through the private offering to be supplemented by a tenant improvement allowance of $218,000, for a total construction budget of $954,500. Offering Memorandum, Exhibit 6 at 72; Mover Dec. ¶¶ 28-29; *see also,* Winsen Dec. ¶ 20. [12]

92.     Two days before Jaurigui's transmission of Swing House's Offering Memorandum, on February 17, 2014, Jaurigui executed the "Agreement for Construction Management Services" dated as of February 1, 2014, which defined the construction budget as $880,000, plus a construction management fee not to exceed $200,000, for a total budget of $1,080,000.  Exhibit 8, Casitas Construction Contracts with Amendments, at 6, 22; Mover Dec. ¶ 28; Winsen Dec. ¶ 20.

93.     Jaurigui testified that he understood that potential lenders and investors would be relying on Swing House's Offering Memorandum.  Tr. at 55:4-7 (Jaurigui Testimony, Sept. 17, 2021).

94.     Jaurigui was responsible for the validity of the contents of Swing House's Offering Memorandum.  Tr. 54:20 to 55:8 (Jaurigui Testimony, Sept. 17, 2021).

95.     Jaurigui knew that Mover would rely on the Offering Memorandum.  Tr. 55:2-16 (Jaurigui Testimony, Sept. 17, 2021).

96.     Jaurigui testified that the Offering Memorandum was accurate when he sent it to Mover and D'Addario.  Tr. 55 at 5:12-16 (Jaurigui Testimony, Sept. 17, 2021).

---

[12] Mover in his declaration at paragraph 29 asserted that Jaurigui sent Swing House's Offering Memorandum to him pursuant to which Jaurigui as Swing House's principal represented that the budget for construction at Casitas was $765,000.  Mover Dec. ¶ 28, *citing,* Exhibit 6 at 72.  However, Exhibit 6, which is the Offering Memorandum, at page 72 does not refer to a figure of $765,000, but states that funds raised in the private offering in the amount of $736,500 would be used for "Build-out of the space at new premises."  Exhibit 6 at 72.  The court could not verify Mover's cited figure of $765,000.  In any event, Mover's assertion that the construction budget represented to him in the Offering Memorandum was $765,000 is incorrect because he did not take into account the footnote to the $736,500 figure for "Build-out of the space at the new premises", stating: "This amount will be supplemented by a $218,000 tenant improvement allowance."  Exhibit 6 at page 72. On the other hand, Winsen correctly stated that the construction budget of $954,500 based on the $736,500 use of funds from the private offering for construction, plus the $218,000 tenant improvement allowance, was the construction budget represented in the Offering Memorandum.  Winsen Dec. ¶ 20.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

97.     Jaurigui's execution of the "Agreement for Construction Management Services" dated as of February 1, 2014, which defined the construction budget as $880,000, plus a construction management fee not to exceed $200,000, for a total budget of $1,080,000, made the Offering Memorandum false and misleading in representing that the construction costs were only $954,500.  *Compare* Exhibit 8, Casitas Construction Contracts with Amendments, at 6, 22, *with* Offering Memorandum, Exhibit 6 at 72 (representing cost of build-out of the space at new premises at $954,500 based on funds raised in the private offering, plus the tenant improvement allowance at the new premises).  The budget known to Jaurigui based on the execution of this contract was $1,080,000, which was $125,500 (13%) higher than the $954,500 stated in the Offering Memorandum, which he gave to Mover two days later.

98.     Jaurigui testified that he did not believe he had an obligation to update information provided to potential investors and lenders if information changed after he sent it to them, that is, D'Addario and Mover.  Tr. at 55:8-16 (Jaurigui Testimony, Sept. 17, 2021). The Offering Memorandum itself provides: "The delivery of this Memorandum does not imply that any information contained herein is correct as of any time subsequent to the date of this Memorandum.  The Company undertakes no obligation to update this Memorandum and under no circumstances should the delivery of this Memorandum create any implication that there has been no change in the affairs of the Company since the date hereof."  Offering Memorandum, Exhibit 6 at 55.  The date of the Offering Memorandum was February 17, 2014.  Exhibit 6 at 53. The date of the email from Jaurigui transmitting the Offering Memorandum to Mover was February 19, 2014.  Exhibit 6 at 1.

99.     On or about June 16, 2014, after transmission of Swing House's Offering Memorandum, but prior to Mover's $150,000 loan to Jaurigui and Swing House on July 23, 2014, Jaurigui executed a First Amendment to Agreement for Construction Management Services ("First Amendment") stating that the construction budget was $1,225,000.  Exhibit 8, Casitas Construction Contracts with Amendments, at 2-5; *see also,* Winsen Dec. ¶ 21.  The revised $1,225,000 construction budget did not include the $200,000 for construction management services also listed in the First Amendment.  *Id.*  Thus, the total construction

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1  budget for the project as of June 16, 2014 was $1,425,000.  *Id.*  The budget known to Jaurigui

2  before Mover made his first loan to Swing House and him based on the execution of this

3  amended contract was $1,425,000, which was $470,500 (49%) higher than the $954,500 stated

4  in the Offering Memorandum, which he previously gave to Mover.

5          100.    Mover testified in his trial declaration that Jaurigui concealed the June 16, 2014

6  increased construction budget from Mover.  Mover Dec. ¶ 29.  Jaurigui in his trial declaration

7  did not address Mover's testimony on this point or in his trial testimony.  Jaurigui Dec.;

8  Jaurigui Testimony (Sept. 17, 2021).

9          101.    On or about September 30, 2014, Jaurigui, on behalf of Swing House, and

10  individually, executed a Second Amendment to Agreement for Construction Management

11  Services Dated February 1, 2014, providing that the amount of $200,000 for construction

12  management services in the prior versions of the contract may be exceeded and that the

13  construction manager will be compensated $5,500 for each additional week that he remains on

14  the project.  Exhibit 8, Casitas Construction Contracts with Amendments, at 1.

15          102.    Swing House's construction budgets were material facts to Mover in making his

16  loans to Swing House and Jaurigui.  Mover Dec. ¶¶ 9-29.

17          103.    Swing House eventually spent more than $1,800,000 to complete the buildout of

18  its leased premises at the Casitas location as of the receipt of the Certificate of Occupancy

19  issued in April 2015.  Winsen Dec. ¶¶ 22-23.

20          104.    More than 6,000 square feet of the 22,000 square foot building was not rentable

21  to clients as it had not been improved or completed, including an area that Jaurigui had

22  originally designated as a "recording studio."  Winsen Dec. ¶¶ 22-23.

23          105.    Jaurigui asserted in his trial declaration: "Plaintiff Mover alleges that I lied to

24  him about the construction budget, this too is untrue.  Undoubtedly the construction was

25  overbudget.  However, no promises or representations were ever made to Mover other than

26  those contained in the Offering Memorandum that specifically advised him as an investor that

27  . . . there is no assurance that we will complete the build-out of our new facilities on a timely

28  basis or budget.  See Defendant's Exhibit 'L' Offering Memorandum."  Jaurigui Dec. ¶ 62.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

This assertion made by Jaurigui is problematic because by the time Mover had made the loan to Swing House and Jaurigui on or about July 23, 2014 Jaurigui knew that the construction budget was $1,425,000 as reflected in the first amended construction contract which Jaurigui signed on or about June 16, 2014 and Jaurigui did not inform Mover that the construction budget was 49% higher than the amount of $954,500 represented in the Offering Memorandum, a difference of $470,500, which amount would have been material to someone like Mover extending credit to Swing House. Offering Memorandum, Exhibit 6 at 72; Casitas First Amended Construction Contract, Exhibit 8 at 2-5.  The court observes that the latest balance sheet in Swing House's Offering Memorandum as of December 31, 2013 reflected assets of $301,074, liabilities of $13,320 and equity of $301,074.  Exhibit 6 at 6-7.  Factoring in the increased construction costs would have resulted in negative equity for Swing House based on its December 31, 2013 balance sheet.  Jaurigui's testimony does not address why he did not tell Mover what he knew before Mover made his loans to Swing House. Jaurigui's argument in his testimony that Mover knew that there was no assurance that the build-out would be timely or on budget as stated in the Offering Memorandum is beside the point as Jaurigui could have told Mover what he knew about the budget before Mover made his loans to Swing House.

106.    Jaurigui also asserted in his trial declaration: "I spoke to Mover many times after he invested in SH [i.e., Swing House] in July 2014 about the construction, the problems with the construction and the fact that the construction was overbudget."  Jaurigui Dec. ¶ 63.  This assertion by Jaurigui is problematic because he only told Mover about the increased construction budget after Mover invested in Swing House and not before Mover invested and could have decided not to based on the increased construction budget that Jaurigui knew about, but did not tell Mover.

107.    Swing House's construction budget for the Casitas leased premises included line items for "Recording Studio Soundproofing" and "Recording Studio Wiring, etc.," even though Casitas was not legally zoning for use as a recording studio.  Exhibit 6, Offering Memorandum, at 27; Winsen Dec. ¶ 23.

108.    Swing House's business includes an Events Division, which plans, organizes, and manages events for third parties.  That is, Swing House hires and manages personnel to attend and stage a particular event, and procure equipment such as lighting and audio equipment.  Winsen Dec. ¶ 73.

109.    On or about February 19, 2014, Jaurigui made representations to Mover that Swing House's Event Management Division was growing because the Offering Memorandum that Jaurigui sent to Mover included:

a.    Swing House's Profit & Loss Statement for 2012 which represented revenue for Rentals & Cartage in the sum of $816,941.  Exhibit 6, Offering Memorandum, at 12;

b.    Swing House's Profit & Loss Statement for 2012 which represented Total Cost of Goods Sold in the sum of $422,274.  Exhibit 6, Offering Memorandum, at 12;

c.    Swing House's Profit & Loss Statement for 2013 which represented revenue for Rentals & Cartage in the sum of $949,080.  Exhibit 6, Offering Memorandum, at 8;

d.    Swing House's Profit & Loss Statement for 2013 which represented expenses for Cost of Goods Sold in the sum of $575,715.  Exhibit 6, Offering Memorandum, at 8;

e.    Swing House's Pro Forma Projections for the one-year period ending October 2014 which projected revenue for Rentals & Cartage in the sum of $1,161,323.  Exhibit 6, Offering Memorandum, at 18;

f.    Swing House's Pro Forma Projections for the one-year period ending October 2014 which projected expenses for Cost of Sales in the sum of $613,898.  Exhibit 6, Offering Memorandum, at 18;

g.    Swing House's Pro Forma Projections for the one-year period ending October 2015 which represented revenue for Rentals & Cartage in the sum of $1,456,388.  Exhibit 6, Offering Memorandum, at 21;

h.    Swing House's Pro Forma Projections for the one-year period ending October 2015 which projected expenses for Cost of Sales in the sum of $750,262.  Exhibit 6, Offering Memorandum, at 21;

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

i.      Swing House's Pro Forma Projections for the one-year period ending October 2016 which projected revenue for Rentals & Cartage in the sum of $1,820,486.  Exhibit 6, Offering Memorandum, at 24;

j.      Swing House's Pro Forma Projections for the one-year period ending October 2016 which projected expenses for Cost of Sales in the sum of $937,673.  Exhibit 6, Offering Memorandum, at 24;

k.      Swing House's representations on its revenue categories chart indicated that its Event Management Division had grown 25% year over year from 2008 to 2013.  Exhibit 6, Offering Memorandum, at 5;

l.      Swing House's representations that its Event Management Division's 2013 revenue was $949,080 and that expenses attributed to Sunset Strip Music Festival were $227,550.  Exhibit 6, Offering Memorandum, at 8;

m.      Swing House's representations that its Event Management Division 2012 revenue was $816,940 and that expenses attributed to Sunset Strip Music Festival were $32,041.  Exhibit 6, Offering Memorandum, at 12;

n.      Swing House's representations that its Event Management Division 2011 revenue was $589,326; and that expenses attributed to Sunset Strip Music Festival were $18,385.  Exhibit 6, Offering Memorandum, at 16.

o.      Swing House's single largest client prior to February 2014 was Sunset Strip Music Festival, revenue from which was $1,177,405 from 2009-2015, making it Swing House's largest client and more than 350% larger than the next most financially valuable client, Sirius.  Income by Customer Summary, Swing House Rehearsal & Recording, Inc., Exhibit 41 at 3; *see also,* Winsen Dec. ¶ 26.

110.    Jaurigui knew for certain as of July 3, 2014, after he transmitted Swing House's Offering Memorandum package, but before Mover lent $150,000 to Jaurigui and Swing House on July 23, 2014, that Swing House had lost Sunset Strip Music Festival as a client.  E-mails re Sunset Strip Music Festival (SSMF) Event, dated June 27, 28 and July 3, 2014, Exhibit 42 at 1, 2, 20, 21; Jaurigui e-mail dated July 3, 2014, Exhibit 44.

1    111.    Jaurigui in his trial declaration asserted that while the Sunset Strip Music

2    Festival generated a lot of gross revenue, it was expensive for Swing House and the ultimate

3    profit was much lower than the gross and that it was a good thing for Swing House to have

4    been terminated because the following year, the festival failed dramatically with producers and

5    subvendors all going unpaid.  Jaurigui Dec. ¶ 65.  The court finds this testimony not to be

6    credible as there is no evidence corroborating Jaurigui's assertions that Swing House's loss of

7    the Sunset Strip Music Festival contract was somehow beneficial to the company or otherwise

8    not material for disclosure to have been made to Mover before Mover made his loans to Swing

9    House.

10    112.    Jaurigui concealed from Mover the fact that Swing House lost the Sunset Strip

11    Music Festival as a client before Mover lent Jaurigui and Swing House $150,000 on July 23,

12    2014.  Mover Decl. at ¶¶ 31-32; Tr. at 3:4-8 (Mover Testimony, August 19, 2021).

13    113.    Mover in his trial testimony stated that if he had known of Swing House's loss

14    of the Sunset Strip Music Festival as a client, it definitely would have impacted his decision to

15    lend to Swing House and Jaurigui as he would have questioned Jaurigui about it immediately

16    as Mover was supposed to be paid back his loan immediately and the loss of the Sunset Strip

17    Music Festival would impact Swing House's ability to repay his loan.  Tr. at 10:6-8 (Mover

18    Testimony, August 19, 2021).

19    114.    Jared James Nichols ("Jared") is a musician that Jaurigui manages; Jaurigui is

20    and has been Jared's manager as of the time of trial, although they have not executed any

21    written agreements.  Tr. at 59:8-9; 64:27-65:1 (Jaurigui Testimony, Sept. 17, 2021); Tr. at

22    20:21-24, 22:22-23 (Nichols Testimony, Sept. 2, 2021).

23    115.    Jared in his trial declaration stated: "Jaurigui has always acted as a friend and

24    assisted me with my career decisions, however, I do not have any agreement with him

25    regarding any aspect of my career."  Nichols Dec. ¶ 20.  There is no evidence of continuing

26    management of Jared by Jaurigui as Jared manages his own affairs and his band.  *See* Nichols

27    Dec. ¶¶ 18-21; Tr. at 20:21-24, 22:24 - 22-15 (Nichols Testimony, Sept. 2, 2021).

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

116.    In 2011, Jared started bartering rehearsal time at Swing House's Willoughby facility, and then at its Casitas facility, in exchange for performing odd jobs at Swing House like helping to clean bathrooms, moving music equipment, setting up rehearsal equipment for Swing House customers and "pretty much anything that was needed to operate the business." Nichols Dec. ¶ 6; Jaurigui Dec. ¶ 75; Tr. at 59:3-9, 61:21-27 (Jaurigui Testimony, Sept. 17, 2021).

117.    Jaurigui also permitted Jared to rehearse at Swing House for free during the company's off hours (or "downtime") and booked the time used as an expense in the hope that he would pay back the expense at some point, even though Jared was Jaurigui's personal client. Jaurigui Dec. ¶ 75; Tr. at 58:19-59:21 (Jaurigui Testimony, Sept. 17, 2021); Tr. at 21:2-5 (Nichols Testimony, Sept. 2, 2021).

118.    Swing House advanced expenses to Jared for his performances.  Tr. at 58:3-4, 61:19-22; 62:2-5 (Jaurigui Testimony, Sept. 17, 2021); Tr. at 21:2-5, 22:25 (Jared James Nichols Testimony, Sept. 2, 2021).

119.    Jaurigui and Jared in their trial testimony acknowledged that Jaurigui authorized the use of Swing House assets to advance touring expenses for Jared and his band members, even though Jaurigui testified that Jared is Jaurigui's personal client.  Jaurigui Dec. ¶ 75; Tr. at 72:10-73:18 (Jaurigui Testimony, Sept. 17, 2021). Tr. 21:2-5 (Nichols Testimony, Sept. 2, 2021).

120.    Jaurigui in his trial testimony stated that Swing House had the right to recoup expenses from Jared for expenses it advanced for him pursuant to an oral agreement between Jared and Swing House.  Tr. 64:12-15 (Jaurigui Testimony, Sept. 17, 2021).

121.    Jared worked to repay Swing House by providing in-kind services, even though Jared was Jaurigui's personal client.  Jaurigui Dec. ¶ 75; Tr. 73:20-21 (Jaurigui Testimony, Sept. 17, 2021); Tr. at 21:2-5 (Nichols Testimony, Sept. 2, 2021).  According to Jaurigui, he told Jared that as president of Swing House, he was happy to authorize Jared to rehearse at Swing House, but Jared "[had] not made any money back, so you [Jared] gotta start chipping in and doing some labor."  Tr. at 61:25-27 (Jaurigui Testimony, Sept. 17, 2021).  According to

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

Jaurigui, the relationship between Jared and Swing House was a barter transaction, that is, based on their oral agreement between Jared and Jaurigui for Swing House, Jared did labor for Swing House in exchange for rehearsal time at Swing House, and Swing House staff kept track of Jared's hours, though Swing House did not treat him as an employee.  Tr. at 62:1-20 (Jaurigui Testimony, Sept. 17, 2021).

122.    According to Jared in his trial declaration, he stopped working for and using Swing House's services in 2016.  Nichols Dec. ¶ 22.

123.    Jaurigui in his trial testimony stated at the time he filed bankruptcy in 2016, Jared may have owed Jaurigui a few thousand dollars for personally advancing expenses to Jared.  Tr. 74:18 (Jaurigui Testimony, Sept. 17, 2021).  However, the court does not give much credence to this testimony as Jaurigui first stated that he did not recall that and then stated that perhaps Jared owed him that amount, and the court finds that this testimony is too equivocal to be taken as true as suggested by Mover in his proposed findings of fact and conclusions of law.  *See* Proposed Finding of Fact No. 127, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142

124.    Jaurigui's bankruptcy schedules do not disclose that he had managed Jared. Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Exhibit 50 at 27: Part 1 Employment at 29: Attachment for Additional Employment Information.  However, it appears to the court that there is no need for such disclosure as noted above, there is no evidence of continuing management of Jared by Jaurigui as Jared manages his own affairs and his band.  *See* Nichols Dec. ¶¶ 18-21; Tr. at 20:21-24, 22:24 - 22-15 (Nichols Testimony, Sept. 2, 2021).

125.    Swing House's Offering Memorandum included its Profit and Loss Statements which recorded as income Artists' Management fees in the sum of $13,023 on its Profit and Loss Statement for 2013, Offering Memorandum, Exhibit 6 at 8; and expenses attributable to Jared in the sum of $23,258, Offering Memorandum, Exhibit 6 at 9.

126.    In Swing House's *pro forma* Profit and Loss projections, it represented Artists' Management fees of $13,380 attributable from its management of Jared for 2014-2016, Offering Memorandum, Exhibit 6 at 18, 21, and 24.

127.     In Swing House's *pro forma* Profit and Loss projections, it projected expenses for Jared of $15,675 for 2014, Offering Memorandum, Exhibit 6 at18, and of $6,000 for 2015 and 2016, Offering Memorandum, Exhibit 6 at 21 and 24.

128.     Swing House is identified as Licensor in the Agreement dated August 10, 2014 executed by Jaurigui on Swing House's behalf and Laurent Merle, trading as Listenable Records ("Listenable Agreement").  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1; *see also,* Winsen Dec. ¶ 39; Tr. 22:11 (Nichols Testimony, Sept. 2, 2021).  In the Listenable Agreement, Swing House as Licensor granted an exclusive license to Listenable Records to use the Licensed Master Recordings ("Licensed Masters") of Jared in compositions on a new First Album and a First Option Album in the covered Territory defined to be enumerated countries on the continent of Europe for a term of 10 years from the commercial release of such album which will be extended for one year periods unless terminated by either party.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1-12.

129.     According to Winsen, a "Master Recording" is defined as the original audio recording in the music and recording business from which all copies are derived and is typically owned by a recording label or by another investor.  Winsen Dec. at ¶ 9.

130.     Jaurigui executed the Listenable Agreement on Swing House's behalf.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1; Tr. 63:2-7 (Jaurigui Testimony, Sept. 17, 2021).

131.     Jaurigui is not a party to the Listenable Agreement in his individual capacity, which he did not deny.  Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 1-10; *see also,* Winsen Dec. ¶ 40.

132.     Jaurigui executed the Listenable Agreement on Swing House's behalf, warranting Swing House as Licensor, that "it is the owner of all right, title and interest in and to the Licensed Masters including copyrights or similar property laws recognized by law in the Territory." Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 7, ¶¶ 10(a) and 10.

133.     Jaurigui executed the Listenable Agreement on behalf of Swing House as Licensor, warranting that "Licensor's copyright interest in and to the Album, the Licensed

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1  Masters and the performances fixed therein shall be and remain the property of the Licensor.

2  Licensor hereby expressly reserves all rights in and to the Album and the Licensed Masters not

3  specifically granted hereunder together with any other rights not specifically granted to

4  Licensee herein and to any income derived from the sale or other exploitation of such reserved

5  rights." Jared Artist Contracts, Listenable Agreement, Exhibit 26 at 2, ¶¶ 2(d) and 10; *see also,*

6  Winsen Dec. ¶¶ 39 and 41.

7        134.     According to Jared in his trial declaration, the Listenable contract to license two

8  albums by Jared did not generate income to him as the advances that Listenable made to Jared

9  of $4,000 for the first album and $6,000 for the second optional album under the contract went

10  to pay expenses of his band, and he still owes Listenable for these expenses.  Nichols Dec. ¶¶

11  9-14.  According to Jared, "Listenable's sales of my albums were dismal, and I understand they

12  sold just a few thousand albums and were never able to cover all the expenses related to

13  promoting my music." *Id.*  The court finds this testimony to be credible.  Mover's evidentiary

14  showing that Swing House is entitled to payment of advances or income from the Listenable

15  contract with Jared or that Swing House's rights in the contract had value according to the

16  Winsen Declaration is not credible as there is no corroborating evidence that Jared's

17  performance of the Listenable contract generated income or other payment due to Swing House

18  as Jared's testimony is credible that the only money received on the contract was advances by

19  Listenable totaling $10,000 which went to pay expenses of the band, including plane tickets for

20  touring in Europe, and that the rights in the contract had any value.  *Id.; see also,* Winsen Dec.

21  ¶¶ 39-46, 55.   In so finding, the court notes that Mover did not call any witness from

22  Listenable or offer documentary evidence from Listenable to establish that Listenable made

23  any other payments on behalf of its contract with Jared other than advancing the $10,000 to

24  Jared and his band on the two contracted albums, which were offset against band expenses as

25  Jared had testified. *Id.*

26        135.     Jaurigui executed an agreement on behalf of Swing House the Company with

27  Jared and Warren Huart for the services of Jared as the Artist and Warren Huart as producer to

28  record, engineer, and mix nine master recordings of compositions entitled "Let You Go," "Can

You Feel It," "Sometimes," "All Your Pain," "Get Down," "Take My Hand," "Now or Never,"
"Come In My Kitchen," and "Playing for Keeps" and to mix one master recording of the
composition entitled "Blackfoot," dated May 1, 2013, which agreement is referred to herein as
the Warren Huart Letter Agreement.  Jared Artist Contracts, Warren Huart Letter
Agreement, Exhibit 26 at 46.

136.    Swing House is identified as the "Company" in the Warren Huart Letter
Agreement executed between Swing House by Jaurigui, Jared, and Warren Huart.  Jared Artist
Contracts, Warren Huart Letter Agreement, Exhibit 27 at 46.

137.    Swing House was entitled to recoup costs pursuant to the Warren Huart Letter
Agreement.  Jared Artist Contracts, Warren Huart Letter Agreement, Jared Artist Contracts,
Exhibit 26 at 47, ¶ 4; Tr. at 64:13-16, 65:23 (Jaurigui Testimony, Sept. 17, 2021).

138.    The Warren Huart Letter Agreement executed by Jaurigui on Swing House's
behalf warranted that "[t]he Masters and all material shall, from the inception of their
creation be entirely the property of Company and Artist in perpetuity. . . ."  Jared Artist
Contracts, Warren Huart Letter Agreement, Exhibit 26 at 50, ¶ 9.

139.    Swing House and Jared own the Master Recordings pursuant to the Warren
Huart Letter Agreement, Exhibit 26 at 50, ¶ 9, which provides that "The Masters and all other
material shall, from the inception of their creation, be entirely the property of Company and
Artist in perpetuity throughout the universe, free of any claim whatsoever by Producer or by
any third party deriving any right or interest therefrom, and upon Company's request, Producer
shall executed and deliver to Company any documents which Company may reasonably
require to vest in Company and Artist (and their designees, if applicable), the rights herein
granted in respect of the Masters and other material mixed hereunder." *Id.;* Tr. at 65:25-27;
66:4 (Jaurigui Testimony, Sept. 17, 2021).

140.    Jaurigui in his trial testimony acknowledged that Swing House is entitled to
royalties for video exploitation of Jared's work pursuant to Warren Huart Letter Agreement,
and one other contract with Extreme Music, but no others.  Tr. at 65:3-66:5 (Jaurigui

Testimony, Sept. 17, 2021); *see also,* Jared Artist Contracts, Warren Huart Letter Agreement, Exhibit 26 at 48, ¶ 6(d)(iii).

141.    Swing House's ownership of the Master Recordings of 10 songs of Jared pursuant to the May 1, 2013 Warren Huart Letter Agreement is not disclosed in Swing House's bankruptcy schedules.  RJN Exhibit 53, Swing House's Schedules A/B; Property, at 8, Part 4: Investments (none); Part 10: Intangibles and Intellectual Property at 10.

142.    Swing House performed its obligations pursuant to its contracts with Jared by paying certain designated expenses for him.  JPTS ¶ RR.

143.    According to Winsen in her trial declaration, Swing House held itself out to the recording industry as a record label in its two contracts for Jared's music with Listenable Records and Warren Huart, for example, by exploiting the recorded works of artists it developed and managed by securing  revenue generating performances and other agreements on behalf of the artists, and by overseeing  the administration of funds received under and through these agreements for fees, which Jaurigui did not deny.  Winsen Dec. ¶¶ 38, 39, 41 and 42; Jared Artist Contracts, Exhibit 26 at 47, ¶ 4, 50, ¶¶ 9 and 10, Exhibit 26 at 7, ¶ 10, and Exhibit 26 at 2, ¶ 2(d), 3, ¶ 5 and 11.

144.    According to Jared in his trial declaration, none of the contracts he had with Listenable, Extreme Music and Team Rock to promote, distribute and get his music to be heard publicly resulted in any significant source of revenue for him, that is, all of the contracts were "losers and never generated enough to pay for the expense related to distribution of my music." Nichols Dec. ¶ 9; *see also,* Jaurigui Dec. ¶¶ 79-80 ("The contract with Extreme is a blanket licensing agreement of three songs to Extreme a company that puts background music on television shows and video games . . . [and] was a bitter disappointment and 8 years later none of the songs placed in a television show or video game helped generate larger public interest or income.  No money is owed SH and never was . . ."), ¶ 83 ("The license with Team Rock yielded $0.00."), ¶¶ 84-90 ("Again, the Listenable contract proved to be without any financial success for SH or Jared and the producers and engineers of the music on those 2 albums are

still owed for their services."). Mover offered no credible evidence to rebut Jared's and Jaurigui's testimony that Jared's contracts were losers, such as offering testimony from authorized representatives of Listenable, Extreme Music or Team Rock.

145. According to Jaurigui in his trial declaration, Jared has not achieved monetary success in his professional music career as all of the contracts that Jared entered into have proven to be failures and that all of the music that Jared has written and licensed has been proven to be without mainstream popularity.  Jaurigui Dec. ¶ 76.

146. According to Winsen's opinion testimony in her trial declaration, Swing House is entitled to total funds not received relating to its contracts relating to Jared's music, which includes: (1) $6,000 second album advance on the Listenable Records contract; (2) 16% of the suggested wholesale price of a first album for physical sales under the Listenable Records contract; (3) 17% of the suggested wholesale price of the second (or first option) album for physical sales under the Listenable Records contract; (4) 25% for actual amounts received for digital sales of Jared's music; (5) 25% of gross receipts on account of the Extreme Music license; and (6) 100% of all monies from the exploitation of the master recordings of Jared's music that Swing House owns exclusive rights, which Jared, Jaurigui or Old Glory Music, Jared's music company, received instead of Swing House.  Mover's evidentiary showing in support of these claims in Jared's music based on the Winsen Declaration is not credible as there is no corroborating evidence that Jared's performance under the various contracts in Exhibit 26 generated income or other payment due to Swing House as Jared's testimony is credible that the contracts were "losers" in Jared's words and never generated enough revenue to pay for the expenses of distribution of his music.  Winsen Dec. ¶¶ 39-55; Nichols Dec. ¶¶ 7-19.  In so finding, the court notes that Mover did not call any witness from Listenable, Extreme Music, Team Rock or Warren Huart or offer documentary evidence from these entities to establish that the revenue generated from Jared's music on their contracts with Jared and Swing House were sufficient to cover the expenses incurred to distribute his music.

147.    The Tender Box was an American band consisting of five members that did business as Silent Music Box.  Jaurigui Dec. ¶ 91.  The terms Silent Music Box and The Tender Box are used interchangeably throughout this document.  The Tender Box rehearsed and recorded music at Swing House, and incurred expenses advanced by Swing House for the recording of their music.  *Id.;* Tr. at 58:4-6 (Jaurigui Testimony, September 17, 2021).  These facts are not disputed.  *See* Winsen Dec. ¶ 56. [13]

148.    The band, The Tender Box, was formed in 2006, and the band split up in 2012.  Jaurigui Dec. ¶ 91.  *Id.*

149.    Jaurigui was The Tender Box's manager.  Jaurigui Dec. ¶¶ 91-93; Tr. at 76:27 (Jaurigui Testimony, Sept. 27, 2021).  According to Jaurigui, he was its manager during the time that it was together, i.e., between 2006 and 2012.  *Id.;* Tr. at 83:18-25 (Jaurigui Testimony, September 17, 2021).   The court finds this testimony of Jaurigui on these points to be credible.  Based on this evidence, the court infers that Jaurigui was no longer the band's manager after it broke up in 2012.

150.    Jaurigui permitted Tender Box to rehearse at Swing House at Swing House's expense.  Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 6:3-9.

151.    The agreements between The Tender Box, Swing House and Jaurigui were that Swing House advanced the expenses of the band, Swing House was to take 50% of the royalties of the master licenses of The Tender Box recordings until Swing House recouped all of its expenses advanced on behalf of the band over the years, then the rights to the master recordings reverted to the band, Swing House received a 10% administrative fee to account for and administering funds for the band and those working with the band, the artists themselves, the songwriters, the producers and the manager, and Jaurigui was to receive a 20%

---

[13] According to Winsen, the band had four members while Jaurigui said that it had five members.  Jaurigui has personal knowledge of the band because he was its manager.  Winsen does not appear to have personal knowledge of the band since she only began her association and work with Swing House in October 2015, and according to Jaurigui, the band broke up in 2012.  The 2006 Kobalt Co-Publishing Agreement, which is a central document in this dispute, listed four members of the band. In his trial testimony, Jaurigui stated there were four core members, plus two members who had a shorter time period.  Tr. at 86:3-4 (Jaurigui Testimony, September 17, 2021)

management fee.  Jaurigui Dec. ¶¶ 92, 96, 101 and 103; Tr. at 84:14-25 (Jaurigui Testimony,

Sept. 17, 2021).  The management fee to Jaurigui was 20% of any profit after expense of

income.   Tr. at 83:19-20 (Jaurigui Testimony, Sept. 17, 2021).  According to Jaurigui, the

agreements provided that Swing House was to recoup its expenses first before his management

fee was to be paid and royalties to be paid to the producers.  Jaurigui Dec. ¶¶ 101 and 103.

These agreements were oral "handshake" agreements, not written.  Tr. at 83:12-13, 84:22-25

(Jaurigui Testimony, Sept. 17, 2021); *but see,* Tr. at 97:1-25 (Mover Testimony, Sept. 27,

2021) (rebuttal testimony expressing skepticism about a handshake agreement between

Jaurigui and The Tender Box).

152.    According to a ledger of Swing House that kept a running total of the expenses

and payments on behalf of Tender Box, Swing House's funds were used to pay The Tender

Box's expenses during the time period from 2006 to 2014.  Tender Box Recording Expenses

Ledger, Exhibit N; [14]  Tr. at 83:1-15, 84:7-12 (Jaurigui Testimony, Sept. 17, 2021); Jaurigui

Dec. ¶¶ 91-96, 102, 103.  Swing House's Tender Box Recording Expenses ledger indicates as

of June 20, 2014, the amount outstanding owed by The Tender Box for unpaid expenses to

Swing House was zero.  *Id.*  Based on this evidence, the court finds that Swing House recouped

its expenses that it advanced for The Tender Box pursuant to their agreement with Jaurigui.

153.    Jaurigui stated in his trial declaration that at the end of 2015, the members of

The Tender Box asked Swing House to stop administering their royalties since they had broken

up the band three years earlier and very little money was coming in, so they wanted to

administer it themselves.  Jaurigui Dec. ¶ 105; Tr. at 84:9-11 (Jaurigui Testimony, September

17, 2021). According to Jaurigui, no more money flowed through Swing House, and no new

master synchs or licenses have been received since at least 2017.  *Id.*

---

[14]    The Tender Box Recording Expenses ledger was maintained by Swing House personnel primarily by Jaurigui
and Melanie Baker, Swing House vice-president.  Tr. at 83:1-15, 84:7-12 (Jaurigui Testimony, Sept. 17, 2021); *see
also,* Jaurigui Dec. ¶ 96; Finding of Fact No. 175 below (referring to Melanie Baker as Swing House's vice-
president). Mover refers to the ledger as a "chart."  Based on Jaurigui's testimony, the ledger or chart was maintained
by Swing House as a running total of expenses incurred by Swing House on behalf of The Tender Box and payments
and credits received on behalf of The Tender Box which were applied to the outstanding expenses, and in the court's
view, the exhibit is more properly characterized as a ledger rather than a mere chart as a record of regularly conducted
business activity of Swing House, although maintained by Jaurigui, Mover's party opponent.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

154.    At his meeting of creditors in his bankruptcy case on September 26, 2018, Jaurigui testified that he had received about $2,000 to $3,000 within the previous 12 months for royalties on account of Tender Box for the past two or three years during his Chapter 11 case.  Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 16-17.

155.    On or about February 19, 2014, Jaurigui made material representations to Mover about Swing House's Artists Management Division because the Offering Memorandum that Jaurigui sent to Mover included:

a.    Swing House's Profit & Loss Statement for 2013 shows expenses for Silent Music Box of $840.00.  Offering Memorandum, Exhibit 6 at 9;

b.    Swing House's Profit & Loss Statement for 2012 shows expenses for Silent Music Box for Public Relations in the sum of $6,725.00.  Offering Memorandum, Exhibit 6 at 17; and

c.    Swing Houses' *pro forma* projections for 2014, 2015 and 2016 has a line item for Silent Music Box, but shows zero as expenses.  Offering Memorandum, Exhibit 6 at 18, 21 and 24.

156.    Jaurigui in his trial testimony stated that Jared and Silent Music Box/Tender Box, each listed on Swing House's Profit & Loss Statements for 2011, 2012, 2013 and pro forma projections, was each his personal client, and not Swing House's.  Tr. 58:27-59:4 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Offering Memorandum, Exhibit 6 at 8-9, 17, 18, 21, and 24.

157.    On September 22, 2006, Kobalt Music Services America, Inc., and Ricardo Munoz, Jose Medina, Steven Mungarro and Carlos Gil, individually and collectively doing business as Silent Music Box executed a Co-Publishing and Exclusive Administration Agreement ("Kobalt Co-Publishing Agreement"), between Kobalt as the Publisher and Silent Music Box and its members as the Owner to exploit old and new musical compositions by Silent Music Box described therein for a period of ten (10) years with options to extend in exchange for royalties to be paid by Kobalt to Silent Music Box.  Kobalt Co-Publishing

Agreement, Exhibit 26 at 59-102; Winsen Dec. ¶ 57; *see also,* Proposed Finding of Fact No. 140, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142

158.    According to Winsen, Kobalt is a music publishing company that administers rights that may accrue to artists, record companies or those in the music industry, by collecting royalties from record companies, reports them, and makes royalty payments on quarterly basis. Tr. at 24:12 (Winsen Testimony, Sept. 2, 2021).  *See also,* Proposed Finding of Fact No. 142, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.  According to Jaurigui, Kobalt is a publishing company that owns a percentage of millions of songs and places artists' music in television, film and other similar media.  Jaurigui Dec. ¶ 94.  The understanding of the parties, Mover through Winsen, and Jaurigui, of what Kobalt is as described herein is consistent.

159.    The Kobalt Co-Publishing Agreement applies to the titles listed at in that agreement, that is, 19 so-called "old" song compositions, and new song compositions to be created by the members of the Tender Box, owned by Silent Music Box as publisher. Kobalt Co-Publishing Agreement, Kobalt Co-Publishing Agreement, Exhibit 26 at 59, 60, 88 and 89. The court declines to adopt Mover's Fact No. 144 in Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, which does not accurately describe the applicable song titles.

160.    Swing House was identified in the Kobalt Co-Publishing Agreement as Swing House Quality Recordings, US, which was intended to be Swing House Rehearsal and Recording, Inc.  Kobalt Co-Publishing Agreement, Exhibit 26 at 59-102; Tr. 75:1 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Proposed Finding of Fact No. 145, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

161.    The Kobalt Co-Publishing Agreement requires Kobalt to pay royalties to Owner, Silent Music Box, Exhibit 26 at 59, for income from public performances, mechanical rights, synchronization ("synch") and video uses, print and Black Box Funds, other income and for cover compositions. Kobalt Co-Publishing Agreement, Exhibit 26 at 63-64, ¶ 5(a); Tr. at 24:22-24 (Winsen Testimony, Sept. 2, 2021); *see also,* Proposed Finding of Fact No. 146, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

162.    However, as Jaurigui in his trial declaration stated Swing House is not a signatory to the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-102.  Jaurigui Dec. ¶ 95. This is not a disputed fact as Mover's witness, Winsen, in her trial declaration acknowledged that "SH [Swing House] is not a signatory to this agreement."  Winsen Dec. ¶¶ 57-58.

163.    According to Jaurigui in his trial declaration, "[t]he only reason that Kobalt paid money to SH [Swing House] was on account of the expenses that SH had incurred on Tender Box's behalf when they recorded their music."  Jaurigui Dec. ¶ 95.  As Jaurigui further stated in his trial declaration, "[b]etween 2006-2014 SH was paid all the proceeds collected by Kobalt to repay the expenses owed to SH and a 10% fee to account for and administer the funds to the artist, producers, songwriters and manager.  After 2014, no further monies were owed to SH for their expenses or administration."  Jaurigui Dec. ¶ 96; *see also,* Tr. at 82:22-83:5 (Jaurigui Testimony, September 17, 2021).

164.    As the court stated previously, the agreements between The Tender Box, Swing House and Jaurigui were that Swing House advanced the expenses of the band, Swing House was to take 50% of the royalties of the master licenses of The Tender Box recordings until Swing House recouped all of its expenses advanced on behalf of the band over the years, then the rights to the master recordings reverted to the band, Swing House received a 10% administrative fee to account for and administering funds for the band and those working with the band, the artists themselves, the songwriters, the producers and the manager, and Jaurigui was to receive a 20% management fee.  Jaurigui Dec. ¶¶ 92, 96, 101 and 103.  According to Jaurigui, the agreements provided that Swing House was to recoup its expenses first before his management fee was to be paid and royalties to be paid to the producers.  Jaurigui Dec. ¶¶ 101 and 103.  As stated previously, these agreements were oral "handshake" agreements, not written.  Tr. at 83:12-13, 84:22-25 (Jaurigui Testimony, September 17, 2021); Exhibit N, Tender Box Recording Expenses Chart; *but see,* Tr. at 97:1-25 (Mover Testimony, September 27, 2021) (rebuttal testimony expressing skepticism about a handshake agreement between Jaurigui and The Tender Box).

165.    As Jaurigui stated in his trial declaration, "[i]t took more than 7 years for anyone to receive a payment from the The Tender Box/Kobalt contract because SH had to recoup all of its costs first."  Jaurigui Dec. ¶ 102; *see also,* Jaurigui Dec. ¶ 96; Exhibit N, Tender Box Recording Expenses Chart.  Regarding Swing House's recoupment of expenses for The Tender Box and payment of commissions and fees under the Kobalt contract, Jaurigui further stated in his trial declaration: "In addition to recouping 50% of master licenses, SH [Swing House] received a 20% commission of managerial fees paid to me by which I waited until SH fully recouped its expenses, plus a 10% administration fee paid to SH."  Jaurigui Dec. ¶ 103.

166.    In fact no. 145 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover asserts that based on Winsen's trial testimony, Swing House is identified as a label in the Kobalt Co-Publishing Agreement, which affords it certain recording rights in certain songs.  Proposed Finding of Fact No. 145, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Co-Publishing Agreement for Tender Box, Kobalt Co-Publishing Agreement, Exhibit 26 at 102 and Tr. at 24:11, 25:7 (Winsen Testimony, Sept. 2, 2021).  This proposed finding of fact is accurate so far as it goes, but it is based on a rider to the Kobalt Co-Publishing Agreement, Exhibit 26 at 102, which is an information schedule containing exploitation information for one product that refers to Swing House as a "label" with respect to only one album by The Tender Box called "The Score" consisting of 11 tracks.  Kobalt Co-Publishing Agreement, Exhibit 26 at 101-102.  In his proposed finding of fact no. 145, Mover reads too much into this rider to the Kobalt Co-Publishing Agreement.  It would be misleading to infer from this evidence that Swing House is the label for other albums or music of The Tender Box, also known as Silent Music Box.

167.    In his trial testimony, Jaurigui acknowledged that Swing House is a record label as defined by Exhibit 26 at 102, the Kobalt Co-Publishing Agreement re: Tender Box, but denied that Swing House owns licensing, distribution rights, master sync rights, publishing rights to the Tender Box compositions that are the subject of the Kobalt Co-Publishing Agreement.  Jaurigui Testimony, Tr. 75:2-10 (Jaurigui Testimony, Sept. 17, 2021); Kobalt Co-

1  Publishing Agreement, Exhibit 26 at 102; *see also,* Proposed Finding of Fact No. 141, Mover's

2  Proposed Findings of Fact and Conclusions of Law, ECF 142.  In her trial testimony, Winsen

3  stated that the licensing rights, distribution rights, master sync rights and publishing rights to

4  the Tender Box song compositions were owned by Swing House. Winsen Testimony, Tr. 24:7

5  (Winsen Testimony, Sept. 2, 2021).  In this regard, Jaurigui's testimony is credible while

6  Winsen's is not because the plain language of the Kobalt Co-Publishing Agreement indicates

7  that the owner of the song compositions are the members of the Tender Box, individually and

8  collectively doing business as Silent Music Box as indicated on page one of the Kobalt Co-

9  Publishing Agreement, and that the publisher of the subject song compositions on Schedule A

10 of the agreement is Silent Music Box.  Kobalt Co-Publishing Agreement, Exhibit 26 at 59, 88,

11 89.  Swing House is not indicated as the owner of the compositions in the agreement.  *Id.*

12 Moreover, as the court previously found, it cannot be inferred from one rider to the Kobalt Co-

13 Publishing Agreement relating to one album of The Tender Box consisting of 11 tracks listing

14 Swing House as the label for all the albums or music of The Tender Box.  Kobalt Co-

15 Publishing Agreement, Exhibit 26 at 101-102 (rider to agreement for the album, "The Score").

16 Accordingly, the court finds that Jaurigui is justified in denying that Swing House owns

17 licensing, distribution rights, master sync rights, publishing rights based on the Kobalt Co-

18 Publishing Agreement contrary to the implications of Mover's Proposed Finding of Fact No.

19 141 in his Proposed Findings of Fact and Conclusions of Law, ECF 142.  *See also,* Tr. at

20 25:8:10 (court's comments).

21      168.   Jaurigui in his testimony at his meeting of creditors on September 26, 2018

22 acknowledged that "Publishing" is "when they own part of a songwriting of the artist."

23 Transcript of Jaurigui's 11 U.S.C. § 341(a) Meeting of Creditors Hearing of September 26,

24 2018, Exhibit 33 at 9:1-2; *see also,* Proposed Finding of Fact No. 143, Mover's Proposed

25 Findings of Fact and Conclusions of Law, ECF 142.

26      169.   In fact no. 147 of Mover's proposed findings of fact and conclusions of law,

27 ECF 142, Mover asserts that with respect to the Kobalt Co-Publishing Agreement for Tender

28 Box, advances are based on 100% ownership in album[s] where Swing House is the label.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

Proposed Finding of Fact No. 147, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Co-Publishing Agreement, Exhibit 26 at 65 at Paragraph 5(d)(iii).  The court declines to adopt this proposed finding of fact because Mover's proposed finding of fact is not an accurate statement of what the contract provision says, which is that advances are made based on the assumption of 100% ownership of the specific album and will be prorated if this assumption is not correct and the language of the provision does not specifically refer to Swing House.

170.    In fact no. 149 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover asserts that Exhibit 28 at 1 is an account balance summary accessible through Kobalt's portal to which Swing House has access, Exhibit 28 at 1-2, indicates that Kobalt paid $45,592.43 in royalties to Swing House from First Quarter 2012 through Third Quarter 2018, although Swing House's record[s] do not show receipt of such royalties.  Proposed Finding of Fact No. 149, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at 24:20 (Winsen Testimony, Sept. 2, 2021).  The court declines to adopt Mover's Proposed Finding of Fact No. 149 for lack of foundation.  The document relied upon for this proposed finding of fact is an AWAL account balance summary, Exhibit 28 at 1-2.  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the document means lacks foundation as her testimony is not based on the underlying agreement(s) referred to in the AWAL record, that the only agreement referred to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on Swing House and she has not otherwise shown that she has no personal knowledge of the underlying agreement(s) that purportedly confers rights on Swing House, so that the purported payments were earned and paid to Swing House.  The court therefore finds that Winsen's testimony does not support her opinions, and the court declines to adopt Mover's fact no. 149 in his proposed findings of fact and conclusions of law, ECF 142, based on Winsen's trial testimony and the AWAL record.

171.    In fact no. 150 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover asserts that Master Synch Rights accrue to the label, Swing House, which allows Swing House to license music "synchs," placing the music in line with images with rights to 48 songs and the territory is defined as the World.  Proposed Finding of Fact No. 150, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. 24:11-12 (Winsen Testimony, Sept. 2, 2021), and AWAL record regarding agreements, Exhibit 28 at 3-4.  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the document means lacks foundation as her testimony is not based on the underlying agreement(s) referred to in the AWAL record, that the only agreement referred to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on Swing House and she has not otherwise shown that she has no personal knowledge of the underlying agreement(s) that purportedly confers rights on Swing House.  Having reviewed the relevant documents, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the AWAL account balance summary and agreement detail, Exhibit 28 at 1-3 and the Kobalt Reports, Exhibit 28 at 4, the court finds that Winsen's testimony that Swing House is entitled to payment of the $45,592.43 in royalties indicated on the AWAL account balance summary based on its purported royalty rights in the Kobalt Co-Publishing Agreement not to be supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which also included the AWAL record, Joint Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the documents mean lacks foundation as her testimony is not based on the underlying business records of AWAL and Kobalt, that she has not otherwise shown that she has no personal knowledge of the underlying business records of AWAL and Kobalt and Mover has not called competent witnesses with personal knowledge from AWAL and Kobalt as to what the documents mean.  Accordingly, the court determines that there is no competent and admissible evidence to prove that these records accurately reflect that royalties of $45,592.43 were purportedly paid on account of the Kobalt

Co-Publishing Agreement between Kobalt and Silent Music Box.  Winsen misstates the

evidence in the Kobalt Co-Publishing Agreement that the royalties are payable to Swing House

as the relevant provisions of the agreement, Exhibit 26 at 63, ¶ 5, and subparagraphs, indicate

that the royalties are payable to the "Owner," a defined term in the agreement referring to

Silent Music Box and its members, not Swing House.  The court cannot infer from the AWAL

and Kobalt documents on which Winsen's testimony is based that Swing House was entitled to

royalty payments based on contract because those documents do not contain the underlying

contract showing that Swing House was so entitled.  The only contract that Mover refers to is

the Kobalt Co-Publishing Agreement, which Swing House is not a signatory to, and which

does not provide that the royalties on the subject song compositions owned by Silent Music

Box are payable to Swing House, but to Silent Music Box as the owner.  Accordingly, the

court declines to adopt Mover's proposed fact no. 150 in his proposed findings of fact and

conclusions of law, ECF 142, based on Winsen's testimony.  The court therefore finds that

Winsen's testimony does not support her opinions, and the court declines to adopt Mover's fact

no. 150 in his proposed findings of fact and conclusions of law, ECF 142, based on Winsen's

trial testimony.

172.    In fact no. 151 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover asserts that the Kobalt Co-Publishing Agreement affords Swing House

several different types of royalty rights, including performance rights, Exhibit 26 at 63, ¶

5(a)(i); Mechanical Rights at Exhibit 26 at 63, ¶ 5(a)(ii); Synch Rights, Exhibit 26 at 63, ¶

5(a)(iii); Print Income at Exhibit 26 at 63, ¶ 5(a)(iv); Black Box Funds at Exhibit 26 at 63, ¶

5(a)(v); other income at Exhibit 26 at 64, ¶ 5(a)(vi); and cover compositions at Exhibit 26 at

63, ¶ 5(a)(vii).  Proposed Finding of Fact No. 151, Mover's Proposed Findings of Fact and

Conclusions of Law, ECF 142, citing, Winsen Dec. ¶ 58.  Having reviewed the relevant

document, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the court finds that

Winsen's testimony that Swing House possesses several types of royalty rights in the song

compositions of The Tender Box, dba Silent Music Box, is not credible as the testimony is not

supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of

Mover's Exhibit 26 at 59-102, the Kobalt Co-Publishing Agreement, the court determines that

Winsen misstates the evidence in the Kobalt Co-Publishing Agreement that the royalties are

payable to Swing House as the relevant provisions of the agreement, Exhibit 26 at 63, ¶ 5, and

subparagraphs, indicate that the royalties are payable to the "Owner," a defined term in the

agreement referring to Silent Music Box and its members, not Swing House.  The court cannot

infer from the AWAL and Kobalt documents on which Winsen's testimony is based that Swing

House was entitled to royalty payments based on contract because those documents do not

contain the underlying contract showing that Swing House was so entitled.  The only contract

that Mover refers to is the Kobalt Co-Publishing Agreement, which Swing House is not a

signatory to, and which does not provide that the royalties on the subject song compositions

owned by Silent Music Box are payable to Swing House, but to Silent Music Box as the owner.

Accordingly, the court declines to adopt Mover's fact no. 151 in his proposed findings of fact

and conclusions of law, ECF 142, based on Winsen's testimony.

173.    In fact no. 152 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover asserts that Swing House's rights as label in The Tender Box/Silent Music

Box in the Kobalt Co-Publishing Agreement are not found in Swing House's Chapter 11

Schedules or Statement of Financial Affairs.  Proposed Finding of Fact No. 151, Mover's

Proposed Findings of Fact and Conclusions of Law, ECF 142, citing Exhibit 53, Swing

House's Bankruptcy Schedules A/B; Property, at 8, Part 4: Investments (none); Part 10:

Intangibles and Intellectual Property at 10.  The court declines to adopt Mover's fact no. 152 in

his proposed findings of fact and conclusions of law, ECF 142, because as discussed above, the

court finds that Swing House does not have such rights.

174.    Jaurigui is listed in the Kobalt Co-Publishing Agreement as Silent Music Box's

manager, using Swing House's address, and Jaurigui's aol.com account.  Kobalt Co-Publishing

Agreement, Exhibit 26 at 97; *see also,* Proposed Finding of Fact No. 153, Mover's Proposed

Findings of Fact and Conclusions of Law, ECF 142

175.    Melanie Barker, Swing House's Vice-President, and Warren Huart, a Swing

House employee, are listed in the Kobalt Co-Publishing Agreement as additional contacts for

1    Silent Music Box.  Exhibit 26 at 98; *see also,* Proposed Finding of Fact No. 154, Mover's

2    Proposed Findings of Fact and Conclusions of Law, ECF 142

3        176.    In fact no. 155 of Mover's proposed findings of fact and conclusions of law,

4    ECF 142, Mover contends that based on Winsen's testimony that Swing House's records

5    demonstrate that it has not received any money from Kobalt on account of Silent Music Box

6    Recording Rights since 2015, despite the fact that Kobalt's reports show that it paid royalties in

7    the sum of $259,954.20 as a result of Publishing Rights for the Third Quarter 2007 through

8    Third Quarter 2018, Kobalt Reports, Exhibit 26 at 103-104, and $31,765 for Master Sync

9    Rights for First Quarter 2009 through Second Quarter 2014, Kobalt Reports, Exhibit 26 at 104.

10    Winsen Dec. ¶ 66.  Although Jaurigui stipulated to the admission and authenticity of Mover's

11    Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial

12    Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the

13    document means lacks foundation because she lacks personal knowledge as what the Kobalt

14    Reports mean.  Thus, there is no competent and admissible evidence to prove that these records

15    accurately reflect that royalties in the amount of $259,954.20 were purportedly paid on account

16    of the Kobalt Co-Publishing Agreement between Kobalt and Silent Music Box.  Moreover, in

17    asserting that Swing House's records demonstrate that it has not received any money from

18    Kobalt on account of Silent Music Box Recording Rights since 2015, Mover does not

19    acknowledge that the Kobalt Reports only show payment of royalty income by Kobalt on

20    account of Silent Music Box for 2016 and afterwards of only a total of $2,689.08 and payment

21    of royalties on Master Sync Rights of $-0- for 2016 and afterwards.  *Id.*  Accordingly, the court

22    declines to adopt Mover's fact no. 155 in his proposed findings of fact and conclusions of law,

23    ECF 142.

24        177.    In fact no. 156 of Mover's proposed findings of fact and conclusions of law,

25    ECF 142, Mover contends that based on Winsen's testimony, Swing House's internal itemized

26    accounting demonstrate that for the period November 27, 2002 through June 20, 2014 Swing

27    House charged to the Tender Box's account a 20% management fee and a 10% administration

28    fee based on revenue from Kobalt, Playstation, Plastic the Movie and other miscellaneous

income.  Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt

Reports, Exhibit 28 at 7-10 and Winsen Dec. ¶ 67.  The court declines to adopt Mover's fact

no. 156 in his proposed findings of fact and conclusions of law, ECF 142, because the

proposed finding of fact is based on Winsen's trial declaration which in turn is based on

"Swing House's internal itemized accounting," which as described in Winsen's trial

declaration consists of the Kobalt Reports, Exhibit 28 at 7-10, which are not Swing House's

records, but the third party records of Kobalt for which there is a lack of foundation for

Winsen's testimony on what those records mean as she has not shown that she has personal

knowledge of what the records are based on and mean.

178.    In fact no. 157 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover contends that based on Winsen's testimony, Swing House charged to Tender

Box's account a 50% fee based on "CD Baby Split."  Mover's Proposed Findings of Fact and

Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 28 at 7-10 and Winsen Dec. ¶

68.  The cited exhibits referenced by Winsen in her trial declaration, Exhibit 28 at 7-10, are

Kobalt Reports, which do not relate to CD Baby or royalties from sales of The Tender Box

music from sales through CD Baby, and thus, the citation to such exhibits is inaccurate.

Winsen in her trial testimony discussed the 50% CD Baby Splits, referring to Exhibit 28 at 30-

33, the Swing House ledger sheets for the Tender Box Recording Expenses.  Tr. at 26:10-16

(Winsen Testimony, September 2, 2021).  The court also notes that the Swing House ledger

sheets for Tender Box Recording Expenses are also Exhibit N, which lists five entries for a

"50% CD Baby Splits" between December 10, 2012 and July 2, 2013, but the aggregate

amount of such splits is modest, $263.00.  Exhibit N, Tender Box Recording Expenses; *see

also,* Tr. at 93:12-14 (Jaurigui Testimony, September 17, 2021).  Based on Exhibit N, Tender

Box Recording Expenses, Swing House collected $263.00 from "50% CD Baby Splits," which

funds were applied to recoup expenses advanced by Swing House to The Tender Box for its

rehearsal and recording expenses.

179.    In fact no. 158 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover contends that based on Winsen's testimony, Kobalt's reports state that it paid

Swing House $45,592 from First Quarter 2012 through Third Quarter 2018 for Master Sync

rights, although Swing House's records fail to demonstrate receipt of these funds. Mover's

Proposed Findings of Fact and Conclusions of Law, ECF 142, citing Tr. at 24:20 (Winsen

Testimony, Sept. 2, 2021). Although Jaurigui stipulated to the admission and authenticity of

Mover's Exhibit 28 described as Kobalt Reports, Joint Pretrial Stipulation, ECF 56 at 24, the

court determines that Winsen's testimony about what the Kobalt Reports means lack

foundation because she lacks personal knowledge as what the reports mean. Thus, there is no

competent and admissible evidence to prove that these records accurately reflect that royalties

of $45,592 were purportedly paid on account of the Kobalt Co-Publishing Agreement between

Kobalt and Silent Music Box. Based on the agreements between The Tender Box, Swing

House and Jaurigui, as shown by Exhibit 6, Swing House recouped its expenses advanced on

behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's

managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for

Swing House to receive. Accordingly, the court declines to adopt Mover's fact no. 158 in his

proposed findings of fact and conclusions of law, ECF 142, based on Winsen's trial testimony.

180.    In fact no. 159 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover contends that Swing House is identified as the record label at Trial Exhibit 26

at 102, which lists Swing House as the owner of "master synch rights" in 48 songs as described

in the "rights summaries" at Exhibit 26 at 3. Mover's Proposed Findings of Fact and

Conclusions of Law, ECF 142, citing, Exhibit 26 at 102 and Exhibit 26 at 3. The court

declines to adopt Mover's proposed finding of fact no. 159 because it is not supported by the

evidence: (1) the identification of Swing House as a record label on a rider to the Kobalt Co-

Publishing Agreement relating to a single album by The Tender Box entitled "The Score" does

not show that Swing House is the label on other albums by The Tender Box; (2) the citation of

Exhibit 26 at 3 is incorrect as that citation relates to the Listenable Records agreement with

Jared, not The Tender Box, and apparently, Mover was referring to the AWAL business record

pertaining to agreements in Exhibit 28 at 3 as the record he relies upon; (3) there is no

competent and admissible evidence from a witness with personal knowledge of what the

AWAL business record pertaining to agreements purportedly describing rights of Swing House means; (4) the AWAL business record pertaining to agreements is also objectionable because it is inadmissible hearsay and not the best evidence of the underlying agreement which may define the rights of the parties, such as Kobalt, Silent Music Box and Swing House, Federal Rules of Evidence 801 *et seq.* and 1001 *et seq.*, and (5) the underlying agreement, the Kobalt Co-Publishing Agreement, indicates that the "owner" of the rights of the song compositions of Silent Music Box is Silent Music Box and its members, and Mover has not shown that the agreement itself provides that Swing House is the owner of the rights.

181.    In fact no. 160 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that the territory, as described in the Co-Publishing Agreement, is described as "the world."  Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Exhibit 26 at 7.  The court declines to adopt Mover's proposed finding of fact no. 160 because it is not supported by the evidence as the citation of Exhibit 26 at 7 is incorrect as that citation relates to the Listenable Records agreement with Jared, not The Tender Box, and apparently, Mover was referring to the Kobalt Co-Publishing Agreement in Exhibit 26 at 74 which defines "Territory" as "the universe."

182.    In fact no. 161 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Kobalt's reports substantiate Swing House's rights to 30% of royalties pursuant to the terms of the Kobalt Co-Publishing Agreement.  Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 103-104.  The court declines to adopt Mover's proposed finding of fact no. 161 because it is not supported by the evidence: (1) although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, Joint Pretrial Stipulation, ECF 56 at 24, there is no competent and admissible evidence from a witness at Kobalt with personal knowledge of what its reports mean; (2) as the court has previously found, Swing House does not have rights to Silent Music Box's royalties based on the Kobalt Co-Publishing Agreement, that is, the Kobalt Co-Publishing Agreement, indicates that the "owner" of the royalties of the song compositions of Silent Music Box is Silent Music Box and its members, and Mover has not

1  shown that the terms of the agreement itself provide that Swing House is an owner of the

2  royalties; (3) the only agreements as to Swing House's right to royalties are between Swing

3  House, Silent Music Box and Jaurigui, and such agreements provide that for advancing

4  expenses of The Tender Box, Swing House was entitled to recoup its expenses from 50% of

5  the master license royalties of Silent Music Box until such expenses were repaid, Swing House

6  was entitled to a 10% administrative fee from Silent Music Box's royalties for handling The

7  Tender Box's administrative matters and Jaurigui was entitled to a 20% management fee from

8  Silent Music Box's royalties for managing the band.  That is, it is undisputed that as between

9  themselves, Silent Music Box and Swing House, had an agreement that Swing House was

10 entitled to recoup 50% of the royalties on the master licenses of the recordings of The Tender

11 Box until Swing House recouped its expenses spent on The Tender Box and to receive a 10%

12 administrative fee on royalties earned by The Tender Box.  Jaurigui Dec. ¶¶ 101-106.  As to

13 the 20% management fee owed by The Tender Box for "artist management", the parties

14 dispute whether or not Jaurigui is entitled to the fee personally as the manager for The Tender

15 Box or Swing House is entitled to the fee for Jaurigui's services as an agent of Swing House.

16 Based on Jaurigui's testimony, which the court finds credible, Jaurigui managed The Tender

17 Box personally and was entitled to the 20% management fee in his personal capacity.   Based

18 on the agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit

19 6, Swing House recouped its expenses advanced on behalf of The Tender Box by June 2014,

20 Swing House's administrative work and Jaurigui's managerial work ended at the request of the

21 Tender Box in 2015, and thus, there were no funds for Swing House to receive.

22        183.    In fact no. 162 of Mover's proposed findings of fact and conclusions of law,

23 ECF 142, Mover contends that Swing House received the sum of $5,178.80 from Kobalt,

24 Exhibit 26 at 104 and paid itself its 20% Management Fee and 10% Administration Fee in the

25 sum of $1,553.64 on or about September 24, 2015.  Mover's Proposed Findings of Fact and

26 Conclusions of Law, ECF 142, citing, Exhibit 27 at 13, Tr. at 76:10-12 (Jaurigui Testimony,

27 Sept. 27, 2021) and Winsen Dec. ¶ 69.  The court declines to adopt Mover's proposed finding

28 of fact no. 161 because it is not supported by the evidence: (1)  the Kobalt Reports, Exhibit 26

1   at 104, purportedly showing Swing House's receipt of royalty payment funds is not properly

2   authenticated by a custodian of records of Kobalt, and there is no competent and admissible

3   evidence from a witness with personal knowledge of what the records means; and (2) the

4   Kobalt Reports are also objectionable because they are inadmissible hearsay and not the best

5   evidence of the underlying agreement which may define the rights of the parties, such as

6   Kobalt, Silent Music Box and Swing House, Federal Rules of Evidence 801 *et seq.* and 1001 *et*

7   *seq.*  Based on the testimony of Jaurigui and Winsen and the check in the amount of $1,553.64,

8   the court finds that Swing House received funds from Kobalt for Silent Music Box for the

9   second quarter of 2015, of which $1,553.64 was disbursed by check to Swing House for its

10  "Kobalt 2Q split" for 2015, that is, for its share of the funds payable to Silent Music Box from

11  Kobalt.  Based on Jaurigui's trial declaration, the court finds that based on agreements between

12  Swing House and Silent Music Box, Swing House was entitled to recoup its expenses paid on

13  behalf of The Tender Box, doing business as Silent Music Box, from 50% of the master license

14  royalties, and a 10% administrative fee from the royalties earned by The Tender Box.  As to

15  the 20% management fee owed by The Tender Box for "artist management", the parties

16  dispute whether or not Jaurigui is entitled to the fee personally as the manager for The Tender

17  Box or Swing House is entitled to the fee for Jaurigui's services as an agent of Swing House.

18  Based on Jaurigui's testimony, which the court finds credible, Jaurigui managed The Tender

19  Box personally and is entitled to the 20% management fee in his personal capacity.  However,

20  the court acknowledges and finds that the check payable to Swing House in the amount of

21  $1,553.64 represents 30% of the amount of $5,178.80, the amount reflected on the Kobalt

22  Reports for the second quarter of 2015, and that the check on Silent Music Box's checking

23  account was signed by Jaurigui for Silent Music Box and made payable to Swing House, and

24  not also to himself personally as the manager of The Tender Box.

25      184.    Exhibit 27 at 20 is an email from Melanie Barker to Jaurigui which attached a

26  spreadsheet breaking down how Kobalt's royalty payment was to be distributed between

27  administrative, management and writer's fees, but the attachment with the breakdown was not

28  part of the exhibit.  Accordingly, the court declines to so find that the email had broken down

1   Kobalt's royalty payment to be distributed between administrative, management and writer's

2   fees as set forth in Mover's proposed finding of fact no. 163.  *See* Mover's Proposed Findings

3   of Fact and Conclusions of Law, ECF 142.

4         185.    On September 25, 2015, Jaurigui signed a check from Silent Music Box to

5   Swing House for Kobalt Q2 Split in the sum of $1,553.64.  Exhibit 27 at 13.

6         186.    In fact no. 164 of Mover's proposed findings of fact and conclusions of law,

7   ECF 142, Mover contends that on July 1, 2015, Melanie Barker, Swing House's Vice-President

8   forwarded paperwork to arrange payment to The Tender Box by bank transfer, Mover's

9   Proposed Findings of Fact and Conclusions of Law, ECF 142, citing,  Exhibit 27 at 14, and that

10  since 2015, Swing House has not received any money directly from Kobalt, Mover's Proposed

11  Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at 27:3 (Winsen Testimony,

12  Sept. 2, 2021).  The court declines to find that Melanie Barker on behalf of Swing House

13  forwarded paperwork to arrange payment to The Tender Box by bank transfer as the email

14  does not describe the paperwork and its purpose and the paperwork which was an attachment

15  to the email was not made part of the exhibit.  With respect to the proposed finding of fact that

16  since 2015, Swing House has not received any money directly from Kobalt, it must be clarified

17  that the finding of fact relates only to the Kobalt Co-Publishing Agreement relating to The

18  Tender Box, dba Silent Music Box.  Presumably, this paperwork enabled Silent Music Box to

19  receive its royalties under the Kobalt Co-Publishing Agreement from Kobalt directly as Silent

20  Music Box, Swing House and Jaurigui agreed at the end of 2015 that Silent Music Box would

21  handle its own administration and management since The Tender Box disbanded, there was no

22  further need for administration and management outside the band, and the revenues were

23  declining.

24        187.    In fact no. 165 of Mover's proposed findings of fact and conclusions of law,

25  ECF 142, Mover contends that Kobalt's summary of accounts dated December 4, 2020,

26  Exhibit 34 at 3 shows that Kobalt paid $1,732.64 in royalties on accounts of its publishing

27  rights in Silent Music Box for the Third Quarter of 2020, at Exhibit 34 at 7, Kobalt's Royalty

28  Value Analysis Split by Right Type for the end of the Third Quarter 2020 demonstrates that

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1    Silent Music Box has been generating revenues for 2017-2018 and Swing House did not

2    receive any monies from Kobalt for this time period.  Mover's Proposed Findings of Fact and

3    Conclusions of Law, ECF 142, citing, Winsen Dec. ¶¶ 70-71.  Although Jaurigui stipulated to

4    the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, Joint

5    Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the

6    Kobalt Reports means lack foundation because she lacks personal knowledge as what the

7    reports mean. Thus, there is no competent and admissible evidence to prove that these records

8    accurately reflect that royalties were purportedly generated in 2017-2018 and paid in 2020 on

9    account of the Kobalt Co-Publishing Agreement between Kobalt and Silent Music Box.

10    Accordingly, the court declines to adopt Mover's fact no. 165 in his proposed findings of fact

11    and conclusions of law, ECF 142.   Based on the agreements between The Tender Box, Swing

12    House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, and Jaurigui's

13    testimony, which the court finds credible, Swing House recouped its expenses advanced on

14    behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's

15    managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for

16    Swing House to receive.  Mover did not call members of The Tender Box, the other parties to

17    the agreements, as witnesses at trial to refute this evidence, that is, Exhibit N, the Tender Box

18    Recording Expenses Chart, and Jaurigui's testimony.

19            188.    In fact no. 166 of Mover's proposed findings of fact and conclusions of law,

20    ECF 142, Mover contends that Swing House's records do not reflect that it assigned any of its

21    rights in Silent Music Box.  Proposed Finding of Fact No. 166, Mover's Proposed Findings of

22    Fact and Conclusions of Law, ECF 142, citing, Tr. at 28:6 (Winsen Testimony, September 2,

23    2021).  The court declines to adopt Mover's fact no. 166 in his proposed findings of fact and

24    conclusions of law, ECF 142, because as discussed above, the evidence does not prove that

25    Swing House had rights in Silent Music Box from the relevant agreement, the Kobalt Co-

26    Publishing Agreement between Kobalt and Silent Music Box.  There was no assignment of

27    rights by Swing House because it did not have any such rights.

28

189.    In fact no. 167 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that based on Winsen's trial testimony, an AWAL business record relating to synchs, Exhibit 28 at 14, shows instances of activity pursuant to which Swing House earned money and should have been paid, for recording rights for synchs.  Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at 28:4, 15 (Winsen Testimony, Sept. 2, 2021).  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which included the AWAL record, Joint Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the document means lacks foundation as her testimony is not based on the underlying agreement(s) referred to in the AWAL record, that the only agreement referred to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on Swing House and she has not otherwise shown that she has no personal knowledge of the underlying agreement(s) that purportedly confers rights on Swing House, so that the purported payments were earned and paid to Swing House.  Accordingly, there is no competent and admissible evidence to prove that this record shows synch activity for which Swing House earned money and was not paid.  Accordingly, the court declines to adopt Mover's fact no. 167 in his proposed findings of fact and conclusions of law, ECF 142, based on Winsen's testimony.

190.    In fact no. 168 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that based on Winsen's trial testimony, a Kobalt report relating to synchs, Exhibit 28 at 16 shows instances of activity pursuant to which Swing House earned money and should have been paid for its publishing rights.  Proposed Finding of Fact No. 168, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Tr. at 28:16 (Winsen Testimony, Sept. 2, 2021).  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, Joint Pretrial Stipulation, ECF 56 at 24, the court determines that Winsen's testimony about what the Kobalt Report means lacks foundation as her testimony is not based on the underlying agreement(s) referred to in the Kobalt Report, that the only agreement referred to in her testimony is the Kobalt Co-Publishing Agreement which does not confer rights on Swing House and she has not otherwise shown that

1   she has no personal knowledge of the underlying agreement(s) that purportedly confers rights

2   on Swing House, so that the purported payments were earned and paid to Swing House.

3   Accordingly, there is no competent and admissible evidence to prove that this record shows

4   synch activity for which Swing House earned money and was not paid.  Based on the

5   agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N,

6   Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of

7   The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial

8   work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing

9   House to receive. Accordingly, the court declines to adopt Mover's fact no. 168 in his

10  proposed findings of fact and conclusions of law, ECF 142, based on Winsen's testimony.

11          191.    In fact no. 169 of Mover's proposed findings of fact and conclusions of law,

12  ECF 142, Mover contends that Kobalt's reports show that Silent Music Box's royalties for its

13  publishing rights for the period Quarter 3 2006 through Quarter 3 2017 were $259,954.

14  Proposed Finding of Fact No. 168, Mover's Proposed Findings of Fact and Conclusions of

15  Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 103 and 104.  Although Jaurigui stipulated

16  to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which

17  included the Kobalt account balance summary record, Joint Pretrial Stipulation, ECF 56 at 24,

18  Mover has not called competent witnesses with personal knowledge from Kobalt as to what the

19  reports mean, and thus, there is no competent and admissible testimony about what the

20  underlying information on which the reports are based and what the reports mean.  Based on

21  the agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N,

22  Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of

23  The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial

24  work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing

25  House to receive. Accordingly, the court declines to adopt Mover's fact no. 169 in his

26  proposed findings of fact and conclusions of law, ECF 142.

27          192.    In fact no. 170 of Mover's proposed findings of fact and conclusions of law,

28  ECF 142, Mover contends that based on Jaurigui's and Winsen's testimony Swing House

should have been paid 20% of $259,954.20 for its management fee, but it was not.  Proposed

Finding of Fact No. 170, Mover's Proposed Findings of Fact and Conclusions of Law, ECF

142, citing, Exhibit 28 at 104 and 105 and Exhibit 27 at 13.   The court declines to adopt

Mover's proposed finding of fact no. 170 in his proposed findings of fact and conclusions of

law, ECF 142, because: (1) although Mover states that he relies upon Jaurigui's and Winsen's

testimony in support of his proposed finding of fact, he does not cite to any specific testimony

of these witnesses; (2) the only evidence cited to for this proposed finding of fact is a Kobalt

report for account balance summary and a copy of a check written by Jaurigui on the Silent

Music Box checking account dated September 24, 2015 payable to Swing House in the amount

of $1,553.64 for "Kobalt Q2 Split"; (3) regarding the Kobalt reports, Mover has not called

competent witnesses with personal knowledge from Kobalt as to what the reports mean, and

thus, there is no competent and admissible testimony about what the underlying information on

which the reports are based and what the reports mean; (4) regarding the one check for the

"Kobalt 2Q Split" in the amount of $1,553.64, a check in that small amount on Silent Music

Box's checking account does not substantiate purported royalty payments in much larger

amount by Kobalt, a different payer (though the check with Jaurigui's "Kobalt 2Q" notation is

some evidence of a Kobalt royalty payment to Silent Music Box and a subsequent distribution

from that payment to Swing House); (5) as the court previously stated, it finds that The Tender

Box, dba Silent Music Box, was managed by Jaurigui personally, and thus, he, not Swing

House, was entitled to the 20% management fee on Silent Music Box's royalties based on their

agreements; and (6) the cited evidence, the Kobalt Reports and the single Silent Music Box

check of September 2015 do not support an inference that the 20% management fee owed by

Silent Music Box to Jaurigui was not paid.  Based on the agreements between The Tender Box,

Swing House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, Swing

House recouped its expenses advanced on behalf of The Tender Box by June 2014, Swing

House's administrative work and Jaurigui's managerial work ended at request of the Tender

Box in 2015, and thus, there were no funds for Swing House to receive.

193.    In fact no. 171 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that based on Jaurigui's and Winsen's testimony Swing House should have been paid 10% of $259,954 for its administrative fee, but it was not.  Proposed Finding of Fact No. 171, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing Exhibit 28 at 104-105; Exhibit 27 at 13. The court declines to adopt Mover's fact no. 170 in his proposed findings of fact and conclusions of law, ECF 142, because: (1) although Mover states that he relies upon Jaurigui's and Winsen's testimony in support of his proposed finding of fact, he does not cite to any specific testimony of these witnesses; (2) the only evidence cited to for this proposed finding of fact is a Kobalt report for account balance summary and a copy of a check written by Jaurigui on the Silent Music Box checking account dated September 24, 2015 payable to Swing House in the amount of $1,553.64 for "Kobalt Q2 Split"; (3) regarding the Kobalt reports, Mover has not called competent witnesses with personal knowledge from Kobalt as to what the reports mean, and thus, there is no competent and admissible testimony about what the underlying information on which the reports are based and what the reports mean; (4) regarding the one check for the "Kobalt 2Q Split" in the amount of $1,553.64, a check in that small amount on Silent Music Box's checking account does not substantiate purported royalty payments in much larger amount by Kobalt, a different payer (though the check with Jaurigui's "Kobalt 2Q" notation is some evidence of a Kobalt royalty payment to Silent Music Box and a subsequent distribution from that payment to Swing House); (5) ) the cited evidence, the Kobalt Reports and the single Silent Music Box check of September 2015 do not support an inference that the 10% management fee owed by Silent Music Box to Jaurigui was not paid; and (6) as the court previously found, The Tender Box, dba Silent Music Box, paid Swing House, its 10% administrative fee on Silent Music Box's royalties based on their agreements.  Based on the agreements between The Tender Box, Swing House and Jaurigui, as shown by Exhibit N, Tender Box Recording Expenses, Swing House recouped its expenses advanced on behalf of The Tender Box by June 2014, Swing House's administrative work and Jaurigui's managerial work ended at request of the Tender Box in 2015, and thus, there were no funds for Swing House to receive.

194.     Jaurigui testified that he, not Swing House, had a right to payment for management fees for management of The Tender Box arising out of any royalty payments made by Kobalt to Silent Music Box, but such rights are not listed as an asset in his bankruptcy schedules. Tr. at 76:27, 77:3 (Jaurigui Testimony, Sept. 17, 2021); *see also,* Proposed Finding of Fact No. 172, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142. However, Jaurigui was only the manager of The Tender Box during the time the band was together between 2006 and 2012 and was no longer the band's manager when the band split up in 2012. Jaurigui Dec. ¶¶ 91 and 93.   Jaurigui had management fee rights "if money came in," but little money came in. Tr. at 85:5-9 (Jaurigui Testimony, September 27, 2021).  According to Jaurigui, he waived his management fee for many years to make sure that Swing House got paid its expenses first and did not take any fees personally until Swing House's expenses were paid, which were fully paid in 2014.  Tr. at 85:5-10 (Jaurigui Testimony, September 27, 2021); Exhibit N, Tender Box Recording Expenses.  Afterwards, Jaurigui received "some payments after 2014," "2-3 times for 2014 to 'now'," a "[f]ew thousand dollars."  *Id.*  As noted previously, Jaurigui testified at his meeting of creditors on September 26, 2018 that he received $2,000 to $3,000 in royalties attributable to The Tender Box in the twelve months before the meeting.  Exhibit 33 at 16-17.  In his trial declaration, Jaurigui stated that he "believed that [he] received approximately $1,333.00 during the period of 2014-2017."  Jaurigui Dec. ¶ 108.

195.     In fact no. 173 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Kobalt provided quarterly royalty accountings to Swing House from 2006 through March 31, 2018 and Exhibit 26 at 103 and 104 show that Kobalt paid royalties for publishing rights in the sum of $259,954 for the Third Quarter of 2007 through Third Quarter 2017.  Proposed Finding of Fact No. 173, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 103 and 104.  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which included the Kobalt account balance summary record, Joint Pretrial Stipulation, ECF 56 at 24, Mover has not called competent witnesses with personal knowledge from Kobalt as to what the reports mean, and thus, there is no competent and admissible

testimony about what the underlying information on which the reports are based and what the reports mean. Accordingly, the court declines to adopt Mover's proposed finding of fact no. 173 in his proposed findings of fact and conclusions of law, ECF 142.

196. In fact no. 174 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Exhibit 26 at 104 shows that Kobalt paid royalties due for master synch rights in the sum of $31,765 for First Quarter 2009 through Second Quarter 2014. Proposed Finding of Fact No. 174, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Kobalt Reports, Exhibit 26 at 104. Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 28 described as Kobalt Reports, which included the Kobalt account balance summary record, Joint Pretrial Stipulation, ECF 56 at 24, Mover has not called competent witnesses with personal knowledge from Kobalt as to what the reports mean, and thus, there is no competent and admissible testimony about what the underlying information on which the reports are based and what the reports mean. Accordingly, the court declines to adopt Mover's fact no. 174 in his proposed findings of fact and conclusions of law, ECF 142.

197. In fact no. 175 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Swing House is the master owner of the song "Here We Go". Proposed Finding of Fact 175, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Exhibit 27 at 22. The court declines to adopt Mover's fact no. 175 in his proposed findings of fact and conclusions of law, ECF 142, because the proposed finding of fact is based on an email exchange between a Kobalt sales representative, Guy Sylvester, and Jaurigui and Melanie Barker at Swing House on November 24, 2011 in which Sylvester was relaying a sales proposal to Swing House which he made to a prospective customer called Lovefilm, which was a DVD rental service, for use of the song, "Here We Go," based on a 50/50 split of royalties as "Master owner" between Silent Music Box and Swing House, that is, the reference that the "Master owner" was 50% Swing House was made by Sylvester at Kobalt, and not an admission by Jaurigui for Swing House, and thus, such representation by a third party does not prove that Swing House was a 50% master owner of the song since there is no

evidence of acquisition of ownership of rights to the song by Swing House, such as an agreement between Swing House and The Tender Box, dba Silent Music Box, as the artist/composer.

198.     Abarth is a Spanish car company that licensed the Tender Box song composition, "Here We Go," in 2017.  AWAL Royalty Printout, Exhibit 28 at 22; Email correspondence relating to licensing of "Here We Go," Exhibit 35 at 4; *see also,* Proposed Finding of Fact No. 176, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

199.     Jaurigui represented to Kobalt that "we take 20% on the publishing fee and 15% on the master fee" under the "admin" agreement.  Email correspondence relating to licensing of "Here We Go," Exhibit 35 at 4; *see also,* Proposed Finding of Fact No. 176, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

200.     Jaurigui testified that the song placement of "Here We Go" was secured in 2015 and the payment was made in 2017.  Tr. 85:18 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 177, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

201.     Jaurigui admitted that he still received [a] Kobalt report from its portal, but did not offer as evidence to demonstrate his position that The Tender Box earned no money.  Tr. 85:20 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 178, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

202.     Jaurigui testified that The Tender Box earned $5,000 to $10,000 from Kobalt royalties in 2018, and the money was split among each band member, "a few thousand to each," there being six band members, four core members and two shorter time members.  Tr. 86:1-4 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 179, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

203.     Jaurigui testified that The Tender Box earned between $1200 to $2500 from Kobalt royalties in 2020, and the money is split among the band members, "a couple of hundred dollars to each band member." Tr. 85:25-26 (Jaurigui Testimony, Sept. 27, 2021); *see*

*also,* Proposed Finding of Fact No. 180, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.  That the members of The Tender Box split royalties among themselves after 2015 is consistent with other evidence that they no longer used Jaurigui as their manager when the band broke up in 2012 and split the royalties received from Kobalt after 2016 among themselves after taking over their own financial management in 2015.  Jaurigui Dec. ¶¶ 91-93, 105.

204.    In fact no. 181 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover asserts that Jaurigui's denials about the rights granted to Swing House as a result of the Co-Publishing Agreement executed between the Silent Music Box, dba Tender Box and the Kobalt Publishing Agreement dated September 22, 2006 ("Co-Publishing Agreement") are not credible.  Proposed Finding of Fact No. 181, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Winsen Dec. ¶ 58.  As the court previously stated, having reviewed the relevant document, the Kobalt Co-Publishing Agreement, Exhibit 26 at 59-101, the court found that Mover's evidence primarily consisting of Winsen's testimony for his contention that Swing House possesses several types of royalty rights in the song compositions of The Tender Box, dba Silent Music Box, is not credible as the testimony is not supported by the evidence.  Although Jaurigui stipulated to the admission and authenticity of Mover's Exhibit 26 at 59-102, the Kobalt Co-Publishing Agreement, the court determined that Winsen misstates the evidence in the Kobalt Co-Publishing Agreement that the royalties are payable to Swing House as the relevant provisions of the agreement, Exhibit 26 at 63, ¶ 5, and subparagraphs, indicate that the royalties are payable to the "Owner," a defined term in the agreement referring to Silent Music Box and its members, not Swing House.  The court cannot infer from the AWAL and Kobalt documents on which Winsen's testimony is based that Swing House was entitled to royalty payments based on contract because those documents do not contain the underlying contract showing that Swing House was so entitled. The only contract that Mover refers to is the Kobalt Co-Publishing Agreement, which Swing House is not a signatory to, and which does not provide that the royalties on the subject song compositions owned by Silent Music Box are payable to Swing House, but to Silent Music

Box as the owner.  Accordingly, the court declines to adopt Mover's fact no. 181 in his

proposed findings of fact and conclusions of law, ECF 142, because the evidence justifies

Jaurigui's denial of Swing House's purported rights from the Kobalt Co-Publishing

Agreement.

205.    On August 31, 2017 Jaurigui, while he was Swing House's president, made a

demand for his commissions to meet personal expenses for an event known as Long Beach

NYE (New Year's Eve) for December 31, 2016 for Swing House's clients Downtown Long

Beach Associates ("DBLA") and The Knitting Factory, in E-mails re Knitting Factory and

Invoice re DLBA, Exhibit 48 at 9-11; *see also,* Proposed Finding of Fact No. 182, Mover's

Proposed Findings of Fact and Conclusions of Law, ECF 142.  Jaurigui used his aol.com e-

mail address, not his Swing House e-mail address.  *Id.*

206.    On February 13, 2018, Jaurigui admitted that he has deleted previous e-mails

about an event called "East of Eli" from Swing House's server.  Swing House e-mails, Exhibit

46 at 20 and 24.  Tr. 77:20 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of

Fact No. 183, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

207.    Jaurigui knew that at least one member of his team, Megan, was uncomfortable

doing a deal outside of Swing House as reflected in Swing House e-mails, Exhibit 46 at 21; *see

also,* Proposed Finding of Fact No. 184, Mover's Proposed Findings of Fact and Conclusions

of Law, ECF 142.

208.    Jaurigui testified, without corroboration, Swing House's Chapter 11 bankruptcy

counsel told him to delete e-mails because someone else at the company who had a competing

reorganization plan (i.e., Mover) was reading his emails and might have "spoiled" Swing

House's efforts to find investors to confirm Swing House's plan to take it out of bankruptcy.

Tr. 87:18-27 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 185,

Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

209.    In fact no. 186 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover contends that after Winsen became Director of Operations in October 2015,

Mover discovered that Jaurigui concealed from Mover and Swing House's board of directors

the full nature and extent of Swing House's dispute with 7175 WB, and that Swing House had

defaulted on the Willoughby lease in August 2014.  Proposed Finding of Fact No. 186,

Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Mover Dec. ¶

38 and Winsen Dec. ¶¶ 30-31.  The court declines to adopt Mover's no. 186 in his proposed

findings of fact and conclusions of law, ECF 142, as stated because the cited testimony in the

Mover and Winsen Declarations only stated that Jaurigui failed to disclose to them that Swing

House had defaulted on its lease with 7175 WB, not that Jaurigui "concealed from Mover and

the Swing House's board of directors the full nature and extent of Swing House's dispute with

its Willoughby landlord, 7175 WB." However, based on the cited testimony in the Mover

Declaration, the court will find that Jaurigui concealed from Mover that Swing House had

defaulted on the Willoughby lease in August 2014, which was material as to Mover's making

of his second loan of $50,000 to Swing House in September 2014.

210.    Mover was unaware of Swing House's rent arrearages to 7175 WB as late as

September 2014 when he lent the additional $50,000 to Swing House, and this would have

been a material fact for him to consider before making this additional loan to Swing House.

Tr. at 11:6-8 (Mover Testimony, August 19, 2021).

211.    In fact no. 187 of Mover's proposed findings of fact and conclusions of law,

ECF 142, Mover contends that Jaurigui did not disclose to Mover or Winsen that 7175 WB

filed its lawsuit against Swing House owed $37,981 for unpaid rent, $556,759 for removal of

improvements, $163,478 for lost rent and $192,295 in interest and attorneys' fees.  Proposed

Finding of Fact No. 174, Mover's Proposed Findings of Fact and Conclusions of Law, ECF

142, citing Mover Dec. ¶ 38.  The court declines to adopt Mover's fact no. 187 in his proposed

findings of fact and conclusions of law, ECF 142, as stated because the cited testimony in the

Mover Declaration does not attest to the amounts that Swing House allegedly owed for unpaid

rent, removal of improvements, lost rent and interest and attorneys' fees.  However, based on

the cited testimony in the Mover Declaration, the court will find that Jaurigui had not disclosed

to Mover or Winsen that 7175 WB filed its lawsuit against Swing House on or about October

8, 2015.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

212.    In Mover's opinion, Jaurigui had three opportunities to settle the litigation with 7175 WB.  Proposed Finding of Fact No. 188, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.  According to Mover, the first time, in or about the first or second quarter of 2016 when Swing House was located at Casitas, Jaurigui showed Mover and Winsen a demand letter from 7175 WB's attorneys seeking approximately $56,000 in damages to settle the then-pending lawsuit, and Jaurigui asked for advice from Mover and Winsen and told them that the demand was unfounded.  *Id.,* citing, Mover Dec. ¶ 39.  Mover advised Jaurigui to settle the matter by paying the past due rent since Swing House owed the rent.  *Id.,* citing, Mover Dec. ¶¶ 39-40; Tr. at 4:20, 11:1-8 (Mover Testimony, August 19, 2021).

213.    In Mover's opinion, the second time that Jaurigui had an opportunity to settle the lawsuit with 7175 WB, 7175 WB's counsel demanded $100.000, and Mover and Winsen suggested to Jaurigui to settle the case for $100,000.  Proposed Finding of Fact No. 189, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Mover Dec. ¶ 40.  In the Fall of 2016, Jaurigui made a $100,000 offer to settle the lawsuit, but 7175 WB would not accept that settlement proposal.  Mover Dec. ¶ 41.

214.    According to Jaurigui in his trial declaration, in late 2014, he engaged in numerous email exchanges with Eve Steele and Peter Gelles, the owners of landlord 7175 WB, regarding a settlement of 7175 WB's claims against Swing House, and Jaurigui hired the law firm of Greenberg & Bass to resolve the disputes with the 7175 WB landlord, and Greenberg & Bass advised him to stipulate to a surrender of the Willoughby property.  Jaurigui Dec. ¶¶ 67-68.  On October 16, 2015, 7175 WB sued Jaurigui for over $900,000 in the state court related to the Willoughby lease.  Jaurigui Dec. ¶ 69.  On the eve of filing Swing House's bankruptcy, Jaurigui offered the landlord $125,000 cash to resolve the disputes with them that they rejected.  Jaurigui Dec. ¶ 68.  The 7175 WB landlord also sued Jaurigui in the bankruptcy court.  Jaurigui Dec. ¶ 69.

215.    Regarding Mover's advice to him regarding the disputes with the Willoughby landlord, Jaurigui stated in his trial declaration: "Ironically, I vividly remember a conversation I had with Mover where we were discussing 7175's demands where Mover said to me 'it's too

1    much *uck them, don't pay them.'  Mover encouraged me to file bankruptcy for SH rather than

2    pay the landlord any monies."  Jaurigui Dec.  ¶ 71.  Moreover, Jaurigui recalled in his trial

3    declaration that Mover sent an email to a representative of D'Addardio Co., and him dated

4    September 1, 2016, Exhibit D, writing: ". . . it's come to the point where it looks like the best

5    move for phil is to file bankruptcy, the former landlord is being relentless and ridiculous and

6    absolutely out of control."  Jaurigui Dec. ¶ 72; *see also,* Tr. at 4:21-23 (Mover Testimony,

7    August 19, 2021).

8        216.    Jaurigui has owned the residence at 1483 N. Occidental Boulevard, Los

9    Angeles, California since 2002.  Tr. 94:15 (Jaurigui Testimony, Sept. 27, 2021); *see also,*

10   Proposed Finding of Fact No. 190, Mover's Proposed Findings of Fact and Conclusions of

11   Law, ECF 142.

12       217.    Jaurigui purchased the residence with his ex-wife and kept the residence

13   following their divorce in 2008.  Tr. 94:16-18 (Jaurigui Testimony, Sept. 27, 2021); *see also,*

14   Proposed Finding of Fact No. 191, Mover's Proposed Findings of Fact and Conclusions of

15   Law, ECF 142.

16       218.    Jaurigui put Alexandra Greenberg ("Greenberg") on title on his residence at

17   1483 N. Occidental Boulevard, Los Angeles, California in 2011.  Tr. 94:19-20 (Jaurigui

18   Testimony, Sept. 27, 2021); *see also,* Proposed Finding of Fact No. 192, Mover's Proposed

19   Findings of Fact and Conclusions of Law, ECF 142.

20       219.    Jaurigui and Greenberg hold title to the residence at 1483 N. Occidental

21   Boulevard, Los Angeles, California as Joint Tenants.  Tr. 89:3 (Jaurigui Testimony, Sept. 27,

22   2021); *see also,* Proposed Finding of Fact No. 193, Mover's Proposed Findings of Fact and

23   Conclusions of Law, ECF 142.

24       220.    Jaurigui and Greenberg have never married.  Tr. 89:4 (Jaurigui Testimony, Sept.

25   27, 2021); *see also,* Proposed Finding of Fact No. 194, Mover's Proposed Findings of Fact and

26   Conclusions of Law, ECF 142.

27       221.    Jaurigui testified that when Greenberg was added to the title of 1483 N.

28   Occidental Boulevard, she did not pay Jaurigui any money, but she had made monthly

1   mortgage payments.  Tr. 94:21-24 (Jaurigui Testimony, Sept. 27, 2021); *see also,* Proposed
2   Finding of Fact No. 195, Mover's Proposed Findings of Fact and Conclusions of Law, ECF
3   142.

4          222.    Jaurigui produced no evidence of the amount of money that Greenberg allegedly
5   paid to him or that she had made mortgage payments on the residence at 1483 N. Occidental
6   Boulevard, Los Angeles, California.  Tr. 95:5-11 (Jaurigui Testimony, Sept. 27, 2021); *see*
7   *also,* Proposed Finding of Fact No. 196, Mover's Proposed Findings of Fact and Conclusions
8   of Law, ECF 142.

9          223.    Jaurigui and Greenberg refinanced the Occidental Boulevard residence within
10  90 days of Jaurigui's filing his Chapter 11 bankruptcy case and took $140,000 cash out of the
11  refinancing proceeds.  Tr. 95:12-13; 89:8 (Jaurigui Testimony, Sept. 27, 2021); *see also,*
12  Proposed Finding of Fact No. 197, Mover's Proposed Findings of Fact and Conclusions of
13  Law, ECF 142.

14         224.    Jaurigui in his trial testimony stated that he spent the funds he obtained from the
15  refinancing proceeds on attorneys' fees, including a deposit for filing the bankruptcy case on
16  behalf of Swing House to Kurt Ramlo at Levene Neale, et al., fees to Greenberg and Bass
17  which was handling his case with 7175 WB and a deposit for filing his personal bankruptcy
18  case to Leonard Pena.  Tr. at 87:3-6 (Jaurigui Testimony, September 17, 2021).  Jaurigui
19  testified at his 11 U.S.C. § 341(a) meeting of creditors hearing that he paid his bankruptcy
20  attorney with cash he obtained from the 2016 refinance, which he failed to identify (or amend)
21  on his Form 2030 Disclosure of Attorney's Compensation.  Transcript of Jaurigui's 11 U.S.C.
22  § 341(a) Meeting of Creditors Hearing of September 26, 2018, Exhibit 33 at 21:17-24; 26:14-
23  16; Jaurigui's Bankruptcy Schedules and Statement of Financial Affairs, Exhibit 50 at 44; *see*
24  *also,* Proposed Finding of Fact No. 198, Mover's Proposed Findings of Fact and Conclusions
25  of Law, ECF 142.

26         225.    Jaurigui testified at trial that he provided a breakdown of how the refinancing
27  proceeds were spent to the Chapter 7 trustee at the 11 U.S.C. § 341(a) meeting of creditors.  Tr.
28  at 89:9-12 (Jaurigui Testimony, September 17, 2021)

226.    Jaurigui did not object to Mover's claim in his bankruptcy case.  Schedule F, Jaurigui's Bankruptcy Petition, ECF 17 (scheduling Mover's unsecured claim as not disputed, not contingent and not unliquidated), and Claims Register and Case Docket, Bankruptcy Case No. 2:16-bk-24760-RK; *see also,* Proposed Finding of Fact No. 199, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

227.    Jaurigui did not object to Mover's claims in Swing House's Chapter 11 bankruptcy case.  Claims Register and Case Docket, Bankruptcy Case No. 2:16-bk-24758-RK; *see also,* Proposed Finding of Fact No. 200, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

228.    In fact no. 201 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Jaurigui participated in the plan confirmation process in Swing House's Chapter 11 bankruptcy case.  *See* Proposed Finding of Fact No. 201, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.  The court declines to adopt Mover's fact no. 201 in his proposed findings of fact and conclusions of law, ECF 142, because he failed to cite evidence to support his proposed finding of fact.

229.    In fact no. 202 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Jaurigui is in privity with Swing House.  Proposed Finding of Fact No. 202, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142 (no citation of evidence for this proposed finding of fact).  The court declines to adopt Mover's fact no. 202 in his proposed findings of fact and conclusions of law, ECF 142, because it calls for a legal conclusion.

230.    Mover's secured claim, Proof of Claim No. 7 in the sum of $165,000 in Class 1 of Swing House's Fourth Amended Plan of Reorganization has not been paid to Mover, but has been assigned to 7175 WB on its Class 6 claim.  Tr. 13:13-27 (Mover Testimony, Aug. 20, 2021); *see also,* Proposed Finding of Fact No. 203, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

231.    Winsen testified that Swing House disbursed $16,136 to Class 6 claimants.  Tr. 35:8 (Winsen Testimony, Sept. 3, 2021); *see also,* Proposed Finding of Fact No. 204, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

232.    Mover testified that he has not received any money on his claims in the Swing House bankruptcy case as a result of the confirmation of Swing House's Fourth Amended Plan of Reorganization.  Tr. 13:4 (Mover Testimony, Aug. 20, 2021); *see also,* Proposed Finding of Fact No. 205, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

233.    Swing House has made no plan payments since the Covid-19 pandemic started. Tr. 35:3 (Winsen Testimony, Sept. 3, 2021); *see also,* Proposed Finding of Fact No. 206, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.

234.    In fact no. 207 of Mover's proposed findings of fact and conclusions of law, ECF 142, and its subparagraphs, Mover contends that each time Jaurigui was confronted during trial with a fact from Swing House's records adverse to his position, he testified that Swing House's records were the result of a mistake or error by various persons or entities:

a.    Jaurigui contends that Swing House has no interest in The Tender Box or Jared James Nichols, but contends that inclusion of artists' management fees and expenses in Swing House's Offering Memorandum for both The Tender Box and Jared James Nichols is a mistake.  Tr. at 62:27 (Jaurigui Testimony, Sept. 17, 2021).

b.    Jaurigui contends that Swing House has no interest in Jared James Nichols, but states that he might have made a mistake when he signed the Warren Huart Letter Agreement, Exhibit 26 at 46-53, on behalf of Swing House Rehearsal and Recording, Inc. with respect to that contract between Warren Huart, Jared James Nichols, and Swing House.  Tr. at 63:4 (Jaurigui Testimony, Sept. 17, 2021).

c.    Jaurigui contends that the projected expenses in Swing House's *pro forma* projections for Jared James Nichols in Swing House's Offering Memorandum, Exhibit 6-18 was an error.  Tr. at 56:18 (Jaurigui Testimony, Sept. 17, 2021).

d.    Jaurigui contends that categories of expenses and income for Jared James Nichols were mismarked.  Tr. at 55:17-21; 58:17-27; (Jaurigui Testimony, Sept. 17, 2021).

e.      Jaurigui contends that Team Rock made a mistake on an agreement that Jaurigui signed on behalf of Swing House Artists' Management.  Tr. at 96:11 (Jaurigui Testimony, Sept. 27, 2021).

f.      Proposed Finding of Fact No. 207, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142.  The court declines to adopt Mover's fact no. 207 in his proposed findings of fact and conclusions of law, ECF 142, and its subparagraphs, because it is not supported by the evidence as discussed herein.

235.    In fact no. 208 of Mover's proposed findings of fact and conclusions of law, ECF 142, Mover contends that Jaurigui denies that Swing House accrued any rights is identified as a label in the Co-Publishing Agreement but offered no credible explanation why Kobalt's reports show Swing House's Master Recording Rights,  Proposed Finding of Fact No. 208, Mover's Proposed Findings of Fact and Conclusions of Law, ECF 142, citing, Exhibit 28 at 1 through 5 or Synch Rights, Exhibit 28 at 23.  The court declines to adopt Mover's fact no. 208 in his proposed findings of fact and conclusions of law, ECF 142, because it is not supported by the evidence as discussed herein.

III.    CONCLUSIONS OF LAW

In this adversary proceeding, Mover seeks a determination of his claims that the debts owed by Jaurigui to him are nondischargeable pursuant to 11 U.S.C. § 523.  This statute contains provisions for excepting debts owed by a debtor to a creditor from discharge.  Mover asserts specifically that the debts owed to him by Jaurigui should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B) and (a)(6).  "Creditors seeking a nondischargeability determination must first establish an *enforceable claim* under state law (whether or not the claim has been filed in the bankruptcy proceeding)."  March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy*, ¶ 22-1641 (online edition, December 2021 update) (emphasis in original), *citing, In re Dobos*, 603 B.R. 31, 38-39 (9th Cir. BAP 2019) ("the existence of a valid claim is a precondition to any action under § 523" (dismissing nondischargeability complaint where creditors' state-court judgment had expired and was thus no longer enforceable).  This is so because the statutory language of 11 U.S.C. §

523 does not provide for the creation of debts, but rather for determination of such existing

debts as nondischargable under certain conditions.  *Del Bino v. Bailey* (*In re Bailey*), 197 F.3d

997, 1001 (9th Cir. 1999) (bankruptcy law governs whether a claim is nondischargeable

pursuant to 11 U.S.C. § 523, state law determines whether the creditor has a claim against

debtor, such as for the tort of conversion).

In Mover's proposed findings of fact and conclusions of law, he contends that Jaurigui

owes him a debt of $246,387,   Mover's Proposed Findings of Fact and Conclusions of Law

after Trial, ECF 142 at 39-40 (internal page citation 36-37).  However, since none of the debts

allegedly owed by Jaurigui have been determined and liquidated in any legal action, and to

determine Mover's claims for nondischargeability of debt, the court will have to determine

whether there are underlying debts owed by Jaurigui to him under state law.

Mover's adversary complaint does not allege any state law claims against Jaurigui. The

complaint only alleges federal law claims under the Bankruptcy Code, 11 U.S.C., for

determination of dischargeability of debt and for denial of discharge.  In his first claim for

relief under 11 U.S.C. § 523(a)(2), Mover alleges that the debt owed by Jaurigui is for money

and property that were obtained through false pretenses, false representations and/or actual

fraud.   Complaint, ECF 1, ¶¶ 86-94.  In his second claim for relief under 11 U.S.C. §

523(a)(2)(B), Mover alleges that the debt owed by Jaurigui is for fraud on a written financial

statement.  Complaint, ECF 1, ¶¶ 95-104. In his third claim for relief under 11 U.S.C. §

523(a)(6), Mover alleges that the debt owed by Jaurigui to him is for a willful and malicious

injury.  Complaint, ECF 1, ¶¶ 105-123. The substantive basis under state law for these claims

asserting debts owed by Jaurigui is fraud. Fraud is not alleged by Mover in separate claims

under state law, but as the basis for his three federal bankruptcy claims for relief under 11

U.S.C. § 523(a).

The amount of the debt that Jaurigui may owe Mover has not been previously

liquidated as Mover has not filed any lawsuit in state court against Jaurigui. Mover in this

adversary proceeding asserts liability of Jaurigui for a debt owed to him based on the tort of

fraud. In his complaint, Mover asserts a claim for nondischargeability of debt under 11 U.S.C.

1  § 523(a)(2)(A) which provides in pertinent part that "[a] discharge under section 727 ... of this

2  title does not discharge an individual debtor from any debt ... (2) for money, property, services

3  ... to the extent obtained by ... (A) false pretenses, a false representation, or actual fraud, other

4  than a statement respecting the debtor's or an insider's financial condition." The elements of a

5  claim under 11 U.S.C. § 523(a)(2)(A) are: (1) the debtor made representations; (2) that at the

6  time the debtor knew they were false; (3) the debtor made those representations with the

7  intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on these

8  representations; and (5) the creditor sustained losses as a proximate result of the debtor's

9  representations. *Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d 1219, 1222 (9th Cir. 2010); *In*

10  *re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000).

11       In his complaint, Mover also asserts a claim for nondischargeability of debt under 11

12  U.S.C. § 523(a)(2)(B) which provides in pertinent part that "[a] discharge under section 727 ...

13  of this title does not discharge an individual debtor from any debt ... (2) for money, property,

14  services ... to the extent obtained by ... (B) use of a statement in writing---(i) that is false; (ii)

15  respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom

16  the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that

17  the debtor caused to be made or published with intent to deceive; . . . ." Similar to 11 U.S.C. §

18  523(a)(2)(A), the elements of a claim under 11 U.S.C. § 523(a)(2)(B) are that a creditor

19  seeking to establish nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(B) must

20  show: (1)  it provided the debtor with money, property, services or credit based on a written

21  representation of fact by the debtor respecting the debtor's or an insider's financial condition;

22  (2) the representation was materially false; (3) the debtor made the representation with the

23  intention of deceiving the creditor; (4) the creditor relied on the representation; (5) the

24  creditor's reliance was reasonable; and (6) damage proximately resulted from the

25  representation.  *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992); *In re Candland*, 90 F.3d 1466,

26  1469 (9th Cir. 1996).

27       Claims under 11 U.S.C. § 523(a) are proven by a preponderance of the evidence.

28  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Under California law, "[t]he elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Medical Group, Inc*., 15 Cal.4th 951, 973–981 (1997). The elements of a claim for the tort of fraud under California law is substantially similar, if not identical, to the elements of a claim under 11 U.S.C. § 523(a)(2)(A). Fraud is shown under California law by a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal.3d 278, 287-293 (1977), citing inter alia, California Evidence Code § 115.

As discussed below, Mover has shown by a preponderance of the evidence all the elements to establish Jaurigui's liability in tort for a debt owed to him based on fraud under California law and that such debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).

A.    Mover's Claim under 11 U.S.C. § 523(a)(2)(B).

The court discusses Mover's second claim for relief under 11 U.S.C. § 523(a)(2)(B) before his first claim under 11 U.S.C. § 523(a)(2)(A) out of sequence in the complaint because the evidence on the "(B)" claim is more compelling than the "(A)" claim.  Mover's second claim for relief that Jaurigui's debts owed to him are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) is based on Jaurigui's false representations to him by "use of a statement respecting the debtor's or an insider's financial condition" to induce him to make loans to Swing House and Jaurigui through the Offering Memorandum.  As stated previously, a creditor seeking to establish nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(B) must show: (1)  it provided the debtor with money, property, services or credit based on a written representation of fact by the debtor respecting the debtor's or an insider's financial condition; (2) the representation was materially false; (3) the debtor made the representation with the intention of deceiving the creditor; (4) the creditor relied on the representation; (5) the creditor's reliance was reasonable; and (6) damage proximately resulted from the representation.  *In re Siriani*, 967 F.2d at 304; *In re Candland*, 90 F.3d at 1469.  Recently, the Supreme Court clarified that any written statement by the debtor that has a direct relation to or impact on his or

1    her overall financial condition comes within the scope of 11 U.S.C. § 523(a)(2)(B) which may

2    include a written statement about a single asset. *Lamar, Archer & Cofrin, LLP v. Appling*, 138

3    S.Ct. 1752, 1761 (2018).

4        The court finds that Mover has proven his claim under 11 U.S.C. § 523(a)(2)(B) based

5    the written representations in the Offering Memorandum for Swing House, presented to him by

6    Jaurigui respecting the financial condition of Swing House, which is a statutory insider of

7    Jaurigui, the debtor in this bankruptcy case, pursuant to 11 U.S.C. § 101(31)(A)(iv).  With

8    respect to element (1), it is undisputed that Mover provided Jaurigui with money or credit.

9    Initially, he made a $150,000 loan to Swing House and Jaurigui jointly then made a second

10   $50,000 loan to Swing House, guaranteed by Jaurigui personally, based on the written

11   representations of fact by the debtor, Jaurigui, in the Swing House Offering Memorandum

12   respecting the financial condition of Swing House, Jaurigui's insider.  The Swing House

13   Offering Memorandum which Jaurigui drafted and transmitted to Mover contained false

14   representations.  Through financial statements and otherwise in the Offering Memorandum,

15   Jaurigui made material misprepresentations to induce Mover to make the loans to Swing House and

16   him that: (1) Swing House could legally operate a recording studio on its premises showing

17   income and expenses generated from operating a recording studio; (2) Swing House was

18   engaged in the business of management of performing artists like Jared and The Tender Box

19   based on representations of income and expenses from such artist management activities on

20   financial statements included in the Offering Memorandum; (3) the budgeted costs of

21   construction for Swing House's new facility at Casitas were only $954,500 as represented in the

22   Offering Memorandum while Jaurigui signed agreements increasing the budget construction

23   costs by 49% to $1,425,000 without disclosing the increases to Mover before Mover made his

24   loans;  (4) the event production income on Swing House's revenue categories chart for 2008 to

25   2013 and pro forma projections of income and expenses for 2014 to 2016 reflecting 25%

26   increases in the Offering Memorandum were misleading because Jaurigui knew before Mover

27   made his loans that Swing House lost its largest event production client, the Sunset Strip Music

28   Festival, but Jaurigui did not disclose this fact to Mover; and (5) Swing House had defaulted on

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

its rent owed to its landlord at Willoughby in August 2014 before Mover made his second loan

to Swing House in September 2014, but Jaurigui did not disclose this fact to Mover or tell him

that the rent expense projections on the financial statements in the Offering Memorandum

became inaccurate.

With respect to element (2), these representations of Swing House's financial condition

included in the Offering Memorandum were untrue as known to Jaurigui because Jaurigui knew

that the zoning was M-1 which did not permit the use as a recording studio and that the income

and expenses for a recording studio were based on operation of a business use of Swing House's

premises not permitted under the applicable zoning regulations, which illegality was not

disclosed by Jaurigui to Mover.  The representations in the Offering Memorandum were also

untrue that the performing artists like Jared and The Tender Box were Jaurigui's personal

clients, not Swing House's, and thus, their income and expenses were not attributable to Swing

House as shown in the financial statements included in the Offering Memorandum.  These

misrepresentations were material to Mover in making his decision to make the loans to Swing

House and Jaurigui misrepresented that Swing House's financial condition was stronger than it

actually was, i.e., Swing House was represented as being legally operated as a recording studio,

having income from such operation, Swing House was represented as having an artist

management business with income and expenses as reflected on its income and expense

statements in the Offering Memorandum when actually that business was Jaurigui's business

personal to him and that Swing House's construction budget of $954,500 represented in the

Offering Memorandum was actually higher at $1,080,000 by $125,500 or 13% as Jaurigui had

signed the actual construction contract in the higher amounts two days before he transmitted the

Offering Memorandum to Mover.  Likewise, Mover was harmed because Jaurigui failed to

disclose material facts to Mover before he made his loans to Swing House and him indicating

that the information in the Offering Memorandum may have become inaccurate or misleading,

specifically, Swing House's construction budget for its new facilities at Casitas increased from

$954,500 as stated in the Offering Memorandum to $1,425,000, or an increase of 49%, as

reflected in the amended construction contracts signed by Jaurigui before Mover made his loans

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

to Swing House with Jaurigui informing Mover about the cost increases, Swing House's events

income as reflected on the income and expense statements in the Offering Memorandum

reflected income from Swing House's activities producing the Sunset Strip Music Festival, its

largest events client, even though Jaurigui knew Swing House lost that client, and Swing

House's rent obligations increased as reflected on its income and expense statements in the

Offering Memorandum in light of Swing House's rent default in August 2014 before Mover

made his second loan in September 2014.

The preponderance of the evidence shows that Jaurigui at the time he made the

misrepresentations to Mover, knew these statements were false as the statements were within

his knowledge about his business.  Either actual knowledge of falsity, or reckless disregard for

its truth satisfies the scienter requirement for a nondischargeability action.  *In re Grabau*, 151

B.R. 227, 234 (N.D. Cal. 1993).  Jaurigui had actual knowledge that Swing House's facilities,

first at Willoughby and then at Casitas was zoned M-1, which did not permit a use as a

recording studio.  Jaurigui wanted to expand Swing House's business operations by moving its

facility to a new location, and his plans included building a new "recording studio".  However,

the expansion of Swing House required additional capital, and Jaurigui solicited new investors,

such as Mover and D'Addario Co., to invest in Swing House.  Jaurigui knew that Swing House

was legally operating a sound score production facility based on existing M-1 zoning, and

admittedly knew that M-1 zoning did not permit a use as a recording studio, contending that

there is no difference between the two.  But Jaurigui offered no evidence to support his

contention that the City of Los Angeles's Department of Building and Safety makes a

distinction and differentiates the different types of zoning required for recording studio use as

opposed to sound score production facility.  Jaurigui never denied making the representations to

Mover about Swing House's "recording studio" at its two locations, even though Jaurigui knew

that Swing House's facilities were not zoned for use as a recording studio.  Before Mover made

his loans to Swing House, Jaurigui knew that the information in the Offering Memorandum

regarding construction costs and the projected revenue from event production was inaccurate

and misleading from his signing the construction contracts as amended which stated higher

construction budgets than was represented in the Offering Memorandum and the loss of Swing

House's largest event production client, the Sunset Strip Music Festival, and Swing House was

in default on its rent obligations, but concealed these adverse facts from Mover.

The preponderance of the evidence demonstrates that at the time Jaurigui made the

written misrepresentations to Mover in the Offering Memorandum regarding Swing House's

financial condition, and that Jaurigui made omissions of material fact by failing to disclose

information to Mover that the representations in the Offering Memorandum regarding Swing

House's financial condition were inaccurate or misleading, Jaurigui knew the representations

were false before Mover made his loans to Swing House because Jaurigui would have known

about his business.

With respect to element (3), Jaurigui made the representations in the Swing House

Offering Memorandum and concealed other material facts afterwards with the intention of

deceiving Mover, the creditor, as Jaurigui needed to induce Mover to make the loans to raise

funds to pay for Swing House's business expansion.

With respect to element (4), as indicated in Mover's testimony in his trial declaration

and orally at trial, he relied upon Jaurigui's representations in the Offering Memorandum,

including the various financial statements included in the Offering Memorandum relating to

Swing House's recording studio, artist management and events production activities and rent

obligations.

With respect to element (5), Mover justifiably relied on Jaurigui's statements to him. In

*Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court stated that "a person is justified in

relying on a factual representation without conducting an investigation, so long as the falsity of

the representation would not be patent upon cursory examination." *Id*. at 72-75.   "Justification

is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of

a particular case, rather than the application of a community standard of conduct to all cases."

*Id*. at 71.  Mover testified that he relied on Jaurigui's statements and, subsequently on the

documents that Jaurigui provided to Mover, particularly the Offering Memorandum.  The falsity

of Jaurigui's statements here was not "patent upon cursory examination." Patent means "readily

visible or intelligible, obvious," see Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/patent (online edition, accessed on August 26, 2022).

The preponderance of the evidence shows that Mover's reliance on Jaurigui's misrepresentations was justifiable because Mover had no reason to doubt Jaurigui's representations given Jaurigui's long-term ownership and management of Swing House, which included operating the business as a rehearsal and recording studio. Mover's reliance on Jaurigui's representations in the Swing House Offering Memorandum was reasonable as Jaurigui had owned, operated and managed Swing House for over 12 years. Mover testified he had no reason to question Jaurigui because Mover who had not lived or worked in the Los Angeles area before he met Jaurigui lacked knowledge of the business conditions and the zoning in the area. "A person may justifiably rely on a representation 'even if the falsity of the representation[s] could have been ascertained upon investigation.'" March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy*, § 22:481, *citing, In re Eashai*, 87 F.3d 1081, 1090 (9th Cir. 1996)(citation omitted). Mover's ability to investigate zoning requirements for a recording studio does not preclude his reliance being justifiable since he did not know better and had no reason to inquire because under Jaurigui's management, Swing House was operating as a rehearsal and recording studio without proper zoning to operate as a recording studio. Jaurigui admitted the fact that he knew that Swing House's new operating facilities at Casitas were zoned M-1, which did not permit operation of a recording studio. Jaurigui knew this, but did not tell Mover before Mover lent Swing House and Jaurigui $150,000. Jaurigui also knew that the construction budget for Casitas was substantially higher than represented in Swing House's Offering Memorandum that he had given Mover, but he did not tell Mover before Mover made his loans. Jaurigui also knew that Swing House had lost its largest events production client, the Sunset Strip Music Festival, which had a potential adverse impact on Swing House's event production revenue, but he did not tell Mover before Mover made his loans. Jaurigui also knew that Swing House defaulted on its rent in August 2014, and therefore, the rent expense obligations stated in financial statements in the Offering

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

Memorandum were incorrect before Mover made his second loan to Swing House in September 2014.

With respect to element (6), the damage resulted from Jaurigui's representations in the Offering Memorandum as Mover made the loans totaling $200,000 that he would not have made if he had not relied on the misrepresentations regarding Swing House's financial condition and performance which were not as strong as represented. The true facts were not fully disclosed to him by Jaurigui, including the facts that Swing House could not legally operate as a recording studio, which was a substantial part of its business, that it did not have income from managing performing artists like Jared and The Tender Box, that Swing House would incur increased construction costs and that Swing House's future events income would be adversely affected by loss of its biggest client, the Sunset Strip Music Festival, and that Swing House had increased rental obligations in light of its rent default in August 2014.

Regarding the computation of damages on Mover's claim under 11 U.S.C. § 523(a)(2)(B), on his bankruptcy schedules, Jaurigui listed Mover as an unsecured creditor, owing a debt of $220,318.34, which was not listed as contingent, unliquidated, or disputed.  In other words, Jaurigui admitted that he owed a debt of $220,318.34 as of the date of the filing of his bankruptcy petition. This amount is consistent with Mover's evidence of the debt owed by Jaurigui from the loans of $150,000 to Swing House and Jaurigui jointly and of $50,000 to Swing House guaranteed by Jaurigui, which are documented in the two Proofs of Claim that Mover filed in the Swing House bankruptcy case, Exhibits 1 and 2, as proof of his damages. The amount of the debt owed by Jaurigui from these loans appears to be as set forth in Finding of Fact No. 16 above, or $235,554, subject to verification of the computation of interest.

Based on the foregoing, Mover has proven his claim under 11 U.S.C. § 523(a)(2)(B) by a preponderance of the evidence.

B.    Mover's Claim under 11 U.S.C. § 523(a)(2)(A).

Regarding his claim under 11 U.S.C. § 523(a)(2)(A), Mover asserts that he and Jaurigui met sometime in 2013 when Jaurigui was soliciting investors to expand Swing House and that

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

Jaurigui told Mover that Swing House operated a recording studio at its Willoughby location and would operate a recording studio at its new Casitas facility.  Mover asserts that Jaurigui knew but withheld from Mover that neither of Swing House's locations, Willoughby nor Casitas, were legally zoned for use as a recording studio, but only as sound score production facilities instead.  Mover further asserts that leading up to his transmission of Swing House's Offering Memorandum, Jaurigui also told Mover that he was going to lend $50,000 to Swing House in order to comply with a condition to D'Addario's loan to Swing House, but that Jaurigui had no intention of lending Swing House $50,000 in 2014.  According to Mover, Jaurigui testified at trial, without much credibility, that he had "invested" more than $50,000 in Swing House over the years under his management, but that cumulative short term cash infusions are not the same as loaning Swing House $50,000 in 2014, as required by D'Addario.  On July 23, 2014, Mover lent Jaurigui and Swing House $150,000 and executed the Consulting Agreement and Equipment Agreement with Swing House.  Mover asserts that Jaurigui told him that Swing House required an additional $50,000 to complete the recording studio, after which Mover extended the Bridge Loan, which Jaurigui personally guaranteed on September 8, 2014.

11 U.S.C. § 523(a)(2)(A) excludes statements respecting a debtor's or insider's financial condition.  In this case, section 523(a)(2)(A) applies to Jaurigui's oral statements because none of these statements were made "respecting the debtor's or insider's financial condition".  Such phrase is not defined by the Bankruptcy Code, but the Ninth Circuit Bankruptcy Appellate Panel has stated that the Ninth Circuit takes a narrow view and has concluded that the phrase includes "only statements providing information as to the debtor's net worth, overall financial health, or an equation of assets and liabilities."  *In re Belice*, 461 B.R. 564, 574 (9th Cir. BAP 2011).  In *Belice*, the debtor made various oral statements relating to some of his assets but did not:

> reveal anything meaningful or comprehensive about his overall net worth. . . .
> Accordingly, under our interpretation of the financial condition phrase, Belice's alleged misrepresentations do not amount to a statement respecting his financial condition.  At most, they are isolated representations regarding various items that might ultimately be included as assets in a balance sheet.

*Id.* at 579.  In *Belice*, the BAP reversed the bankruptcy court's ruling that the creditor had not stated a claim for relief under 11 U.S.C. § 523(a)(2)(A).  According to Mover, the BAP's ruling is directly relevant to this case and Jaurigui's oral statements about Swing House's recording studio, his promise to make a $50,000 loan to Swing House in 2014 and the need for the Bridge Loan to complete the "recording studio".

The court finds that Mover has proven his claim under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence showing that Jaurigui made oral and written misrepresentations regarding the facts pertaining to Swing House's operation of a recording studio.   As previously stated, the elements of a claim under 11 U.S.C. § 523(a)(2)(A) are: (1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) the debtor made those representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on these representations; and (5) the creditor sustained losses as a proximate result of the debtor's representations. *Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d at 1222; *In re Slyman*, 234 F.3d at 1085.

With respect to element (1), the evidence indicates that Jaurigui made oral representations to Mover and written representations to Mover in the Swing House Offering Memorandum that Swing House was operating a recording studio, but Jaurigui never disclosed to Mover that the zoning for Swing House's leased premises either at Willoughby or Casitas was M-1 zoning, which did not legally permit use as a recording studio.  Jaurigui made written representations through the Swing House Offering Memorandum that Swing House was operating a recording studio, implicitly legally operating such a studio, representing up to 30% of Swing House's business based on Jaurigui's own estimation, despite his knowledge that Swing House's premises were not properly zoned for such use.  These written representations do not fall within 11 U.S.C. § 523(a)(2)(B) as they do not pertain to the financial condition of the debtor or an insider of the debtor, and may be properly considered under 11 U.S.C. § 523(a)(2)(A).  According to Mover's testimony, which the court finds credible, Jaurigui made such oral representations when he asked Mover for the second $50,000 loan which Jaurigui falsely represented to Mover that Swing House required an additional $50,000 to complete the

"recording studio", when Jaurigui knew that Swing House was not building a recording studio. This false oral statement led Mover to loan Swing House $50,000 on September 8, 2014, for which Jaurigui executed a personal guaranty.

Regarding Mover's allegations that Jaurigui made oral misrepresentations to him when Jaurigui purportedly told Mover that he was going to lend $50,000 to Swing House in order to comply with a condition to D'Addario's loan to Swing House, but that Jaurigui had no intention of lending Swing House $50,000 in 2014, the court finds that such allegations are not supported by the evidence as Mover in his proposed findings of fact and conclusions of law did not cite to anything in the evidentiary record that Jaurigui made such representations to Mover and the court was not able to locate evidence in the record to support such allegations.

With respect to element (2) that at the time the debtor knew his representations were false, Jaurigui orally represented to Mover that Swing House was operating a recording studio on its leased premises, even though Jaurigui knew that the zoning was M-1, which did not permit use as a recording studio. Despite Jaurigui's knowledge that Swing House's premises were zoned M-1, he did not tell Mover this, so that Mover would have known that any operation of the premises by Swing House as a recording studio was illegal under the zoning laws.

With respect to element (3) that the debtor made those representations with the intention and purpose of deceiving the creditor; Jaurigui made those representations to Mover to induce Mover to make the loans to Swing House and Jaurigui, knowing that the representations were not true, or otherwise, Mover may not have made the loans if Mover had known that Swing House's premises were not legally zoned for use as a recording studio, that Swing House did not have an artist management business managing artists such as Jared and The Tender Box, that Swing House lost its biggest events client, the Sunset Strip Music Festival, which would adversely affects its events income and that Swing House had a dispute with its former landlord, 7175 WB, over rent arrearages and property damage at its former leased premises at Willoughby.

With respect to element (4) that the creditor justifiably relied on these representations. Mover's claims under 11 U.S.C. § 523(a)(2)(B) and (a)(2)(A) are supported by the evidence

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

that Mover relied on Jaurigui's experience in owning and operating Swing House for over 12

years.  With respect to element (5) that the creditor sustained losses as a proximate result of the

debtor's representations, the same evidence proving Mover's damages from his justifiable

reliance on Jaurigui's misrepresentations on his claim under 11 U.S.C. § 523(a)(2)(B) is

applicable to his claim under 11 U.S.C. § 523(a)(2)(A), that is, Mover incurred damages from

making the loans to Swing House and Jaurigui in the principal amount of $200,000, plus

interest, and the amount of the loss from making these loans is computed for the claim under 11

U.S.C. § 523(a)(2)(B).  Based on the foregoing, the court finds that Mover has proven his claim

under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence.

C.       Mover's Claim under 11 U.S.C. § 523(a)(6)

In his third claim for relief, Mover alleges that the debts owed by Jaurigui to him are

nondischargeable pursuant to 11 U.S.C. § 523(a)(6), which provides that debts incurred as the

result of willful and malicious injury are not dischargeable. 11 U.S.C. § 523(a)(6).  Mover did

not submit any proposed conclusions of law in his proposed findings of fact and conclusions of

law in support of his claim under 11 U.S.C. § 523(a)(6).  However, the court does not consider

Mover's failure to propose conclusions of law on this claim as an abandonment of the claim as

the parties stipulated that the claim remained for trial in their joint pretrial stipulation and

Mover argued in support of his claim in his trial brief.  In his trial brief filed before trial started,

Mover argued as follows in support of his claim under 11 U.S.C. § 523(a)(6):

> Section 523(a)(6) prevents discharge because of Defendant's willful and
> malicious injury to Mover or his property. Section 523(a)(6) looks to state law to
> determine whether an act falls within an underlying tort. *In re Baily*, 197 F.3d 997,
> 1000 (9th Cir. 1999.)

> Willful injury means deliberate or intentional. *Kawaauhau v. Geiger*, 523 U.S.
> 57, 61 (1998). Mover meets this standard because he demonstrates that Defendant had a
> subjective motive to inflict the injury or the debtor believed the injury was substantially
> certain to occur as a result of his or her conduct. *In re Hamilton*, 584 B.R. 310 (9th Cir.
> BAP 2018).

> Defendant cannot defend sending Mover the Offering Memorandum on
> February 19, two days after he signed a new increased budget. Neither can Defendant
> defend against withholding the loss of the Sunset Strip Music Festival between
> February 19 and July 23 when Mover sent Swing House his initial $150,000. Defendant

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

lied to Mover when he asked for $50,000 in additional funds to "complete the recording studio." Mover executed the Equipment Sale, Lease and Option Agreement as a result of Defendant's fraud in the Offering Memorandum by which Swing House accessed a significant portion of Mover's musical instrument and recording equipment inventory.

A malicious injury involves a wrongful act; done intentionally; that necessarily causes injury and that is committed without just cause or excuse. *In re Jercich*, 238 F.3d 1202 (9th Cir. BAP 2001). "Maliciousness" may be implied from circumstances surrounding the debtor's conduct, even without proof that the debtor acted with spite, hatred, or ill-will toward the victim." *In re Ormsby*, 591 F.3d 1199 (9th Cir. 2010.)

A finding of fraud results in a nondischargable debt pursuant to Section 523(a)(6). *In re Diamond*, 285 F.3d 822 (9th Cir, 2002). As above, regarding Section 523(a)(2)(B) (Mover v. Jaurigui, Second Claim for Relief), Mover demonstrates that Defendant engaged in fraud, satisfying Section 523(a)(6) as to Mover.

Plaintiffs' Joint Trial Brief, ECF 76 at 21-22.

Regarding a claim under 11 U.S.C. § 523(a)(6), the Ninth Circuit has stated, "The Supreme Court in *Kawaauhau v. Geiger (In re Geiger),* 523 U.S. 57, 118 S.Ct. 974, 140 L. Ed. 2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the act itself." *Ormsby v. First American Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).  Both willfulness and maliciousness must be proven to prevent discharge of the debt.  Id.  But reckless or negligent acts are not sufficient to establish that a resulting injury falls within the category of willful and malicious injuries under § 523(a)(6).  *Kawaauhau v. Geiger*, 523 U.S. at 64.

Willfulness means intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. at 61.  "The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *In re Plyam*, 530 B.R. 456, 463 (9th Cir. BAP 2015) (*quoting Kawaauhau v. Geiger*, 523 U.S. at 61) (emphasis in original).  The court may consider circumstantial evidence that may establish what the debtor actually knew when conducting the injury creating action and not just what the debtor admitted to knowing.  *In re Ormsby*, 591 F.3d at 1206 (citation omitted).  Recklessly inflicted injuries, covering injuries from all degrees of recklessness, do not meet the willfulness requirement of § 523(a)(6).  *In re Plyam*, 530 B.R. at 464.  Reckless conduct requires an intent to act instead of an intent to cause injury.  Id.  Therefore, the willful injury requirement "… is met when the debtor has a subjective motive to inflict injury or when

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1    the debtor believes that injury is substantially certain to result from his own conduct." *Carillo*
2    *v. Su (In re Su),* 290 F.3d 1140, 1142 (9th Cir. 2002) (citation omitted).

3         A malicious injury is one that involves; "(1) a wrongful act, (2) done intentionally, (3)
4    which necessarily causes injury, and (4) is done without just cause or excuse*." Petralia v.*
5    *Jercich (In re Jercich),* 238 F.3d 1202, 1209 (9th Cir. 2001). In *Jercich*, the court found that
6    the debtor's withholding of wages to his employee, despite his ability to pay the employee, and
7    use of the wage money for his own personal benefit without any just cause or excuse for
8    withholding the wages, was substantially certain to cause injury to the employee and therefore
9    fulfilled the malicious prong of § 523(a)(6). *Id*.  "Malice may be inferred based on the nature of
10   the wrongful act", but to make such an inference, willfulness must be established first.  *In re*
11   *Ormsby*, 591 F.3d 1199 at 1207.

12        Mover argues that by proving fraud by Jaurigui on his claims under 11 U.S.C. §
13   523(a)(2)(A) or (B) that Jaurigui induced him to loan money to Swing House and Jaurigui
14   through material misrepresentations, he has also proven his claim against Jaurigui based on
15   willful and malicious injury under 11 U.S.C. § 523(a)(6).  The court agrees because Mover
16   proved that Jaurigui made fraudulent misrepresentations of material fact to induce him to loan
17   money to Swing House and Jaurigui. As set forth in the Offering Memorandum and orally,
18   Jaurigui represented that Swing House was legally operating as a recording studio, that the
19   construction budget for the new leased facility at Casitas was only $954,500 as stated in the
20   Offering Memorandum, compared with $1,425,000 as Jaurigui authorized in signing amended
21   construction contracts, and income and expense data for Swing House included the Sunset
22   Strip Music Festival. These representations were false when made or became false before
23   Mover made his loans to Swing House and Jaurigui.  Jaurigui knew that Swing House's
24   facilities were not zoned for a recording studio, that the construction budget was higher than
25   represented in the Offering Memorandum and that Swing House no longer had the Sunset Strip
26   Music Festival as a client, and that Swing House went into default on its rent obligations, and
27   thus, Swing House's financial situation was not as favorable as represented in the Offering
28   Memorandum. These facts indicate that Jaurigui believed that injury was substantially certain

1   to result from his own conduct, that is, by making material factual misrepresentations, he

2   induced Mover to loan money to a business that he knew was financially weaker than as

3   represented. The establishment of these facts prove willfulness under 11 U.S.C. § 523(a)(6).

4        In proving fraud under 11 U.S.C. § 523(a)(2)(A) and (B), Mover has also proven the

5   element of malicious injury on his claim against Jaurigui under 11 U.S.C. § 523(a)(6) in that

6   Jaurigui's fraudulent misrepresentations constituted (1) wrongful acts, (2) done intentionally,

7   (3) which necessarily causes injury, and (4) done without just cause or excuse.  When Jaurigui

8   made fraudulent misrepresentations to Mover in the Offering Memorandum and orally stated

9   that Swing House was legally operating as a recording studio under the zoning of its leased

10  premises, that the construction budget was lower than he then knew and the income and

11  expense statements for Swing House reflecting the Sunset Strip Music Festival which he knew

12  had been lost as a client were not accurate, and that Swing House went into default on its rent,

13  Jaurigui knew the statements were inaccurate.  The misstatements were wrongful acts done by

14  Jaurigui intentionally, which necessarily caused harm to Mover and done without just cause or

15  excuse as Jaurigui has not provided a reasonable explanation for his misrepresentations.

16  Mover proved sufficient evidence to satisfy the malice requirement of 11 U.S.C. § 523(a)(6).

17  The amount of the debt excepted from discharge under 11 U.S.C. § 523(a)(6) is the same debt

18  for the tort of fraud determined on Mover's claims under 11 U.S.C. §§ 523(a)(2)(A) and

19  523(a)(2)(B).  Based on the foregoing, the court finds that Mover has proven his claim against

20  Jaurigui under 11 U.S.C. § 523(a)(6) by a preponderance of the evidence.

21        D.    Mover's Claim under 11 U.S.C. § 727(a)(2).

22        Mover claims that Jaurigui's discharge should be denied pursuant to 11 U.S.C. §

23  727(a)(2) because he made a property transfer or concealed property with the intent to hinder,

24  delay or defraud. A Chapter 7 discharge may be denied if, with intent to "hinder, delay, or

25  defraud" a creditor or an officer of the estate charged with custody of property, the debtor

26  transferred, removed, concealed, mutilated or destroyed (or caused to be transferred, removed,

27  concealed, mutilated or destroyed): (1) property of the debtor within one year before the

28  petition filing date; or (2) estate property, after the petition filing date. 11 U.S.C. §

727(a)(2)(A) and (B); see also, *In re Lawson*, 122 F.3d 1237, 1240-1241 (9th Cir. 1997). Proof of harm to creditors is not a prerequisite to denial of discharge under 11 U.S.C. § 727(a)(2). *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986). To warrant denial of a discharge, the debtor's intent to hinder, delay or defraud creditors must be actual, rather than constructive. *In re Adeeb*, 787 F.2d at 1342-1343. But a 11 U.S.C. § 727(a)(2) denial of discharge does not require a finding of intent to defraud; a finding of either intent to hinder or intent to delay is sufficient under the statute. *In re Retz*, 606 F.3d 1189, 1200 (9th Cir. 2010). The debtor must have had the intent to hinder, delay or defraud a creditor, and the property transfer or concealment occurred, within the same one year time period before the filing of the bankruptcy petition to deny the discharge on this ground. *In re Lawson*, 122 F.3d at 1240.

Intent to hinder or delay creditors may be established by circumstantial evidence or by inferences drawn from a course of conduct. *In re Adeeb*, 787 F.2d at 1343; *In re Beverly*, 374 B.R. 221, 235 (9th Cir. BAP 2007). The so-called "badges of fraud" are indicative of intent to hinder, delay or defraud, including whether the transfer was to an insider, whether the debtor retained possession or control of the property transferred after the transfer, whether the transfer or obligation was disclosed or concealed, whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit and whether the debtor removed or concealed assets. California Civil Code, § 3439.04(b)(1)-(11); *see also*, *In re Beverly*, 374 B.R. at 237-238. The debtor's intent to hinder, delay or defraud a single creditor is sufficient to deny the debtor's discharge under the statute. *In re Adeeb*, 787 F.2d at 1343.

Denial of a discharge pursuant to 11 U.S.C. § 727(a)(2) requires that the debtor had an interest in the property transferred, concealed the property or destroyed the property. 11 U.S.C. § 727(a)(2)(A); *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993). Whether a property interest exists is a matter of state law. *In re Harrell*, 73 F.3d 218, 219 (9th Cir. 1996)(citation omitted); *see also* California Civil Code § 654 (defining property ownership). On the other hand, federal bankruptcy law governs the extent to which a debtor's property is included in the bankruptcy estate. 11 U.S.C. § 541; *Begier v. I.R.S.,* 496 U.S. 53, 58-59 (1990); *see also, In re*

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

*Farmers Markets, Inc*., 792 F.2d 1400, 1402 (9th Cir. 1986); *In re MacDonald*, 164 B.R. 325,

328 (Bankr. C.D. Cal. 1994).

A debtor's concealment of his or her property with the intent to hinder, delay or defraud

creditors is also a ground for denial of discharge pursuant to 11 U.S.C. § 727(a)(3); *see also*,

*Rosen v. Bezner*, 996 F.2d at 1532. This means a concealment of the debtor's property as

opposed to the concealment of the debtor's transfer of property. *Id*. As the Third Circuit has

pointed out, "In a situation involving a transfer of title coupled with retention of the benefits of

ownership, there may, indeed, be a concealment of property." *Rosen v. Bezner*, 996 F.2d at

1532. The Third Circuit further explained:

> Where this is the case, however, the concealment is present not because retention of the
> benefits of ownership conceals the fact that the debtor no longer has legal title, but
> rather because the transfer of title represents to the world that the debtor has transferred
> all his interest in the property while in reality he has retained some secret interest---a
> secret interest of which retention of the benefits of ownership may be evidence. A
> legally relevant concealment can exist, however, only if there is, in fact, some secret
> interest in the property retained by the debtor.

*Id*. (citations omitted).

Mover notes that Jaurigui's transfer of one-half of his interest in his residence in 2011

or 2012 without consideration to his domestic partner, Alexandra Greenberg, occurred beyond

the reach of the one-year limit of 11 U.S.C. § 727(a)(2), but contends that Jaurigui's refinance

of his residence and transfer of cash to Greenberg 90 days before he and Swing House filed

Chapter 11 bankruptcy cases on November 8, 2016, coupled with his failure to disclose many

"badges of fraud", justifies denial of discharge pursuant to 11 U.S.C. § 727(a)(2).

Alternatively, Mover contends that Jaurigui's discharge should be denied pursuant to 11 U.S.C.

§ 727(a)(2) because he concealed his property or property of the bankruptcy estate, that is, by

failing to disclose his rights to money arising out of his management of performing artists,

Jared and The Tender Box on his bankruptcy schedules.

Regarding the 2016 refinance transaction, while Mover notes that Jaurigui and

Greenberg own the residence as joint tenant, he points out that Jaurigui originally purchased it

with his ex-wife in 2002 and kept it after their divorce, but added Greenberg on title, though

1    she did not pay him any sum of money for being added on title.  As Mover described Jaurigui's

2    testimony at the meeting of creditors in this case, within 90 days of the filing of Jaurigui's

3    Chapter 11 bankruptcy case, they refinanced the residence, taking out $140,000 in cash from

4    equity, and Greenberg kept at least one half of the cash, and Jaurigui used the balance to pay

5    his own and Swing House's attorneys' fees.  Mover points out that neither Jaurigui's refinance

6    of his personal residence nor his transfer of equity as a result of the 2016 refinance was

7    disclosed in his bankruptcy schedules.  These facts are generally undisputed, but Mover's

8    characterization of the refinance implies that Jaurigui made a transfer of realized equity in his

9    residence of $140,000, half to Greenberg, and half to his lawyers.  Mover argues that "badges

10   of fraud" for these transfers are indicated by the close personal relationship between Greenberg

11   and Jaurigui, the refinance was made in anticipation of settling the litigation between Swing

12   House and its landlord, 7175 WB, and payment of attorneys' fees, and Jaurigui was in poor, if

13   not dire, financial condition at the time of the refinance.  According to Mover, the creation of a

14   new trust deed and transfer of cash, transferring a portion of Jaurigui's equity in the residence,

15   created an impediment to a bankruptcy trustee's sale of his residence, which is another "badge

16   of fraud."

17          In considering the refinance transaction, the court determines that even though Jaurigui

18   made a gift to Greenberg of a one-half interest in his residence, she is a co-owner of the

19   property as a joint tenant, and was legally entitled to one-half of the surplus refinancing

20   proceeds of $140,000, or $70,000.  While Greenberg and Jaurigui had a close personal

21   relationship, she is a co-owner of the property, and it is thus incorrect to imply that her one-half

22   share of the surplus refinancing proceeds, $70,000, should be considered as property of the

23   debtor for purposes of 11 U.S.C. § 727(a)(2).  There has been no judicial determination that

24   Jaurigui's transfer of a one-half interest in the residence to Greenberg in 2011 or 2012 was a

25   fraudulent transfer to warrant consideration of her share of the equity taken out in the refinance

26   transaction for denying Jaurigui's discharge under 11 U.S.C. § 727(a)(2).  Thus, the amount to

27   be considered as property of the debtor for purposes of 11 U.S.C. § 727(a)(2) is Jaurigui's one-

28   half share of the equity taken out from the residence, or $70,000.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

Jaurigui's credible and uncontroverted testimony at trial was that when he undertook the refinance transaction, he was planning to use his $70,000 share of the refinance proceeds to fund the anticipated settlement between Swing House and its landlord, 7175 WB, but when the settlement fell through, he used the funds to pay attorneys' fees for filing bankruptcy cases on behalf of Swing House and himself.  There is no dispute that Jaurigui used his share of the refinance proceeds for attorneys' fees to fund the filing and prosecution of this bankruptcy case and Swing House's Chapter 11 bankruptcy case.  As to Greenberg's share of the refinance proceeds, Jaurigui gave credible and uncontroverted testimony at trial that she used the funds to pay for household expenses for herself, for Jaurigui and their son.

This circumstantial evidence does not indicate an intent to "hinder, delay, or defraud" a creditor or an officer of the estate charged with custody of property, though the debtor, Jaurigui, transferred his property, i.e., $70,000 in equity taken out of his and Greenberg's residence, within one year before the petition filing date.  Greenberg who was entitled to her $70,000 share of the refinance proceeds used the funds to pay for household expenses for herself, for Jaurigui and for their son since they were still living together at the time.  Jaurigui's intent to take out the equity from the residence was to fund the settlement that Swing House was reaching with its former landlord, 7175 WB, which was something that Mover had encouraged.  However, when the settlement between Swing House and 7175 WB did not go through, Jaurigui used his share of the refinance proceeds to pay fees for attorneys to file Chapter 11 bankruptcy cases for Swing House and himself, which is also something that Mover had encouraged as shown by one of his emails to D'Addario Co. and Jaurigui.  Thus, the subject property, Jaurigui's $70,000 share of the refinance proceeds was not concealed or transferred with intent to hinder, delay or defraud a creditor, but originally, to resolve a litigation dispute to avoid bankruptcy, and when that settlement attempt failed, Jaurigui used the funds to seek bankruptcy relief to address the financial distress that he and his business, Swing House, were having.  Jaurigui's transfers of his $70,000 share of the refinance proceeds to pay attorneys' fees of bankruptcy counsel to file and prosecute Chapter 11 bankruptcy cases for Swing House and himself were transfers for fair consideration to the lawyers for their

1   anticipated services in preparing to file Swing House's and Jaurigui's Chapter 11 bankruptcy

2   cases, which are not transfers with intent to hinder, delay or defraud creditors as "substantial"

3   or fair consideration was given by the attorneys rendering services to Swing House and

4   Jaurigui.  *See* March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy*,

5   ¶ 22:870, *citing*, *In re Goldstein*, 66 B.R. 909, 918 (Bankr. W.D. Pa. 1986).

6           As to Mover's claim that Jaurigui concealed his property or property of the bankruptcy

7   estate, that is, by failing to disclose his rights to money arising out of his management of

8   performing artists, Jared and The Tender Box on his bankruptcy schedules, the court finds

9   there was no concealment.  First, as to Jared, Jaurigui was Jared's manager at one time, but

10  they had no written agreement, and based on their trial testimony, while Jared is still

11  performing, Jaurigui stopped managing Jared and is not managing Jared at this time.  Mover

12  made no showing that Jaurigui had any existing rights to Jared's future income or royalties.

13  Jaurigui admitted in his trial testimony that Jared may owe him a few thousand dollars, but this

14  testimony was vague and nonspecific and did not evidence the existence of a continuing debt.

15  Second, as to The Tender Box, Jaurigui was the band's manager at one time, but they had no

16  written agreement, and based on Jaurigui's uncontroverted trial testimony, the band is no

17  longer performing, Jaurigui is no longer managing it.  Mover has not made an adequate

18  showing that Jaurigui had any continuing rights to The Tender Box's future income or royalties

19  that had value at the time of Jaurigui's bankruptcy filing in 2016 as The Tender Box had

20  disbanded four years earlier in 2012 and Jaurigui was no longer its manager and the monies

21  paid to Jaurigui for his prior management of the band after 2014 when Swing House's

22  advanced expenses were fully paid were *de minimis*.  The court finds that Mover has not shown

23  that with respect to the alleged rights to money for managing Jared and The Tender Box, there

24  is any such property of Jaurigui that Jaurigui allegedly concealed from his creditors.

25  Accordingly, the court determines that Mover has not proven his claim against Jaurigui under

26  11 U.S.C. § 727(a)(2) by a preponderance of the evidence.

27

28

E.      Mover's Claim for Relief under 11 U.S.C. § 727(a)(4).

Mover claims that Jaurigui's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) for making a false oath or claim in bankruptcy. A discharge may be denied if the debtor has made a false oath, claim or promise, or withheld information from any officer of the estate, in or in connection with the present case. 11 U.S.C. § 727(a)(4)(A)-(D). The elements of a claim under 11 U.S.C. § 727(a)(4) are: (1) the debtor made a false oath in connection with the bankruptcy case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. *In re Retz*, 606 F.3d at 1197 (citation omitted). The false statements must be made under oath during the course of bankruptcy proceedings. *In re Beeber*, 239 B.R. 13, 29 (Bankr. E.D.N.Y. 1999) (filing a false tax return is not a ground for denial of discharge).

The debtor's bankruptcy schedules are signed under penalty of perjury. Thus, a false oath under § 727(a)(4) can involve a false statement or omission in the debtor's schedules. *Premier Capital, LLC v. Crawford* (*In re Crawford*), 841 F.3d 1, 8-9 (1st Cir. 2016) (schedules omitted debtor's interest in retirement account); *Tan v. Tranche 1 (SVP-AMC), Inc.,* (*In re Tan*), 350 B.R. 488, 493-495 (Bankr. N.D. Cal. 2006) (schedules omitted debtor's interests in several closely held corporations).

The debtor's amendment of false schedules does not negate the initial false oath in the original schedules: "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (internal quotation marks omitted).  However, "a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A)." *In re Khalil,* 379 B.R. 163, 172 (9th Cir. BAP 2007), citing *In re Fogal Legware of Switz., Inc. v. Wills* (*In re Wills*), 243 B.R. 58, 63 (9th Cir. BAP 1990).

Mover asserts that Jaurigui's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) because he made false oaths in signing his bankruptcy schedules under penalty of

perjury wherein the schedules were incomplete and inaccurate because he did not list his 2016

residential refinance transaction and his ownership interests in the future careers and royalty

income in Swing House's artists, Jared and The Tender Box, and because he testified at his

meeting of creditors under 11 U.S.C. § 341(a) on September 4, 2018 that his bankruptcy

schedules were correct, which had omitted disclosure of his 2016 refinance transaction.

Mover's Proposed Findings of Fact and Conclusions of Law at 47-50.

It is not disputed that Jaurigui made an oath for purposes of 11 U.S.C. § 727(a)(4) when

he signed his bankruptcy petition and schedules under a declaration of penalty of perjury. One

of the elements that Mover must prove by a preponderance of the evidence is that the allegedly

false oath made by Mover related to a material fact. While Jaurigui's schedules were not

complete and accurate, it does not appear that the omissions identified by Mover were material.

With respect to the 2016 residential refinancing transaction not disclosed on the bankruptcy

schedules, the nondisclosure became known at one of Jaurigui's meeting of creditors when he

was asked by the Chapter 7 trustee about the transaction.  Jaurigui disclosed at the meeting of

creditors that he and his partner, Alexandra Greenberg, refinanced the loan and existing trust

deed on their residence with a new loan and trust deed of $140,000.  As previously discussed

regarding Mover's claim under 11 U.S.C. § 727(a)(2), the amount of equity taken out by

Jaurigui from his and Greenberg's residence is $70,000, and that is the amount at issue

regarding Mover's claim under 11 U.S.C. § 727(a)(4) as Greenberg as a co-owning joint tenant

was entitled to half of the equity taken out in the refinancing, regardless of whether she

received her interest in the property from Jaurigui as a gift.  As previously discussed, Jaurigui's

$70,000 share of the refinance proceeds was not concealed or transferred with intent to hinder,

delay or defraud a creditor, but originally, to resolve a litigation dispute to avoid bankruptcy,

and when that settlement attempt failed, Jaurigui used the funds to seek bankruptcy relief to

address the financial distress that he and his business, Swing House, were having.  Jaurigui's

transfers of his $70,000 share of the refinance proceeds to pay attorneys' fees of bankruptcy

counsel to file and prosecute Chapter 11 bankruptcy cases for Swing House and himself were

transfers for fair consideration to the lawyers for their anticipated services in preparing to file

Swing House's and Jaurigui's Chapter 11 bankruptcy cases, which are not transfers with intent to hinder, delay or defraud creditors as "substantial" or fair consideration was given by the attorneys rendering services to Swing House and Jaurigui.  The transfers of equity realized from Jaurigui's refinance transaction to the attorneys should have been disclosed on his statement of financial affairs but the transfers are not material as they were given for fair consideration for work to be performed by the attorneys in preparing to file Swing House's and Jaurigui's Chapter 11 bankruptcy cases, which would not be avoidable preferential or fraudulent transfers.

With respect to Jaurigui's omission on his schedules of the alleged ownership interests in the future careers and royalty income in the artists, Jared and The Tender Box, there is no showing that this omission is material and prejudicial to creditors since these items of personal property were of *de minimis* value.  First, as to Jared, Jaurigui was Jared's manager at one time, but they had no written agreement, and based on their trial testimony, while Jared is still performing, Jaurigui is not managing Jared at this time.  Mover made no showing that Jaurigui had any existing rights to Jared's future income or royalties.  Jaurigui admitted in his trial testimony that Jared may owe him a few thousand dollars, but this testimony was vague and nonspecific and did not evidence the existence of a continuing debt.  Second, as to The Tender Box, Jaurigui was the band's manager at one time, but they had no written agreement, and based on Jaurigui's uncontroverted trial testimony, the band is no longer performing, Jaurigui is no longer managing it.  Mover made no showing that Jaurigui had any existing rights to The Tender Box's future income or royalties. Given the minimal value of these assets, which probably have little liquidation value, the omission of these items is not material. Given the lack of evidence demonstrating materiality of the facts that Jaurigui allegedly had made a false oath, the court finds that Mover has not met her burden of proving his claim under 11 U.S.C. § 727(a)(4) to deny Jaurigui's discharge by making a false oath by a preponderance of the evidence.

IV.    JAURIGUI'S AFFIRMATIVE DEFENSES

1.    As set forth in the Joint Pretrial Stipulation, Jaurigui has withdrawn or waived his First, Second, Third, Fourth, Fifth, Tenth and Twelfth Affirmative Defenses.

2.    Jaurigui asserts as Sixth and Ninth Affirmative Defense that Mover was aware of Swing House's business at all times and continued to transact business with Jaurigui and Swing House.  Based on the analysis herein, the court finds that Jaurigui has not met his burden of proving these affirmative defenses by a preponderance of the evidence and that such affirmative defenses should be denied.   *See* Jones, Rosen, Jones, Wegner and Wegner, *Rutter Group Practice Guide: Federal Civil Trials and Evidence,* ¶ 8:4805.2 (online edition, June 2022 update) ("defendant has the burden to establish the essential elements of the affirmative defenses raised in defendant's pleadings"), *citing inter alia, Meacham v. Knolls Atomic Power Laboratory,* 554 U.S. 84, 94 (2008).

3.    Jaurigui asserts as a Seventh and Eighth Affirmative Defenses are that Mover has suffered no damage and is being paid.  Based on the analysis herein, the court finds that Jaurigui has not met his burden of proving these affirmative defenses by a preponderance of the evidence and that such affirmative defenses should be denied.

V.    CONCLUSION

Based on the foregoing, the court will grant in part and deny in part Mover's claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(6) and will enter judgment in his favor against Jaurigui in the sum of $235,554, subject to the verification of the computation of interest, which amount is non-dischargeable, and the court will deny Mover's claims under 11 U.S.C. §§ 727(a)(2) and (a)(4).

///

///

///

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)

1       Mover is hereby directed to lodge a proposed judgment in this adversary proceeding

2 consistent with these findings of fact and conclusions of law, and at the same time, file a

3 declaration of a competent witness under penalty of perjury who can attest to the accuracy of

4 the computation of interest on the debt determined herein to be owed to Mover by Jaurigui,

5 within 30 days of the date of entry of these findings of fact and conclusions of law.

6       IT IS SO ORDERED.

7                       ###

Date: September 8, 2022

_____
Robert Kwan
United States Bankruptcy Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW (MOVER V. JAURIGUI)